a full-time role.

CentralNic operates a shared registry environment where multiple registry zones (such as CentralNic's domains, the .LA ccTLD, this TLD and other gTLDs) share a common infrastructure and resources. Since the TLD will be operated in an identical manner to these other registries, and on the same infrastructure, then the TLD will benefit from an economy of scale with regards to access to CentralNic's resources.

CentralNic's resourcing model assumes that the "dedicated" resourcing required for the TLD (ie, that required to deal with issues related specifically to the TLD and not to general issues with the system as a whole) will be equal to the proportion of the overall registry system that the TLD will use. After three years of operation, the optimistic projection for the TLD states that there will be [10,000] domains in the zone. CentralNic has calculated that, if all its TLD clients are successful in their applications, and all meet their optimistic projections after three years, its registry system will be required to support up to 4.5 million domain names. Therefore the TLD will require [0.22]% of the total resources available for this area of the registry system.

In the event that registration volumes exceed this figure, CentralNic will proactively increase the size of the Technical Operations, Technical Development and support teams to ensure that the needs of the TLD are fully met. Revenues from the additional registration volumes will fund the salaries of these new hires. Nevertheless, CentralNic is confident that the staffing outlined above is sufficient to meet the needs of the TLD for at least the first 18 months of operation.

28.6. Periodic review of anti-abuse policies

Applicant acknowledges that new types of abusive behaviour emerge in cyber space and is prepared to take steps to counter any new types of abuse. Applicant will periodically (once every 12 months, or more frequently depending on the circumstances) require CentralNic to provide reports regarding the received abuse-related complaints. Such reports should contain categorisation of the abusive behaviour reported, actions taken and response time. Applicant will analyse the reports and will review its anti-abuse policies to continually improve the handling of abuse complaints.

---

29. Rights Protection Mechanisms: Applicants must describe how their registry will comply with policies and practices that minimize abusive registrations and other activities that affect the legal rights of others, such as the Uniform Domain Name Dispute Resolution Policy (UDRP), Uniform Rapid Suspension (URS) system, and Trademark Claims and Sunrise services at startup.
A complete answer should include:

- A description of how the registry operator will implement safeguards against allowing unqualified registrations (e.g., registrations made in violation of the registry's eligibility restrictions or policies), and reduce opportunities for behaviors such as phishing or pharming. At a minimum, the registry operator must offer a Sunrise period and a Trademark Claims service during the required time periods, and implement decisions rendered under the URS on an ongoing basis; and
- A description of resourcing plans for the initial implementation of, and ongoing maintenance for, this aspect of the criteria (number and description of personnel roles allocated to this area).

>To be eligible for a score of 2, answers must also include additional measures specific to rights protection, such as abusive use policies, takedown procedures, registrant pre-verification, or authentication procedures, or other covenants.
A complete answer is expected to be no more than 10 pages.

29.1 Mechanisms Designed to Prevent Abusive Registrations

Rights protection is a core objective of Symantec Corporation. Symantec Corporation will implement and adhere to any rights protection mechanisms (RPMs) that may be mandated from time to time by ICANN,

including each mandatory RPM set forth in the Trademark Clearinghouse model contained in the Registry Agreement, specifically Specification 7. Symantec Corporation acknowledges that, at a minimum, ICANN requires a Sunrise period, a Trademark Claims period, and interaction with the Trademark Clearinghouse with respect to the registration of domain names for the .PROTECTION gTLD. It should be noted that because ICANN, as of the time of this application submission, has not issued final guidance with respect to the Trademark Clearinghouse, Symantec Corporation cannot fully detail the specific implementation of the Trademark Clearinghouse within this application. Symantec Corporation will adhere to all processes and procedures to comply with ICANN guidance once this guidance is finalized.

As described in this response, Symantec Corporation will implement a Sunrise period and Trademark Claims service with respect to the registration of domain names within the .PROTECTION gTLD. Certain aspects of the Sunrise period and/or Trademark Claims service may be administered on behalf of Symantec Corporation by Symantec Corporation-approved registrars or by subcontractors of Symantec Corporation, such as its selected back-end registry services provider, CentralNic.

At the time of filing, ICANN has not yet released final details on the Trademark Clearinghouse service. However, the protection of intellectual property is of paramount importance to Symantec Corporation. Given this and the fact that the initial proposed use of the registry is for the exclusive use of Symantec Corporation, all initial domain name registrations in the .PROTECTION namespace will be made by Symantec Corporation. Therefore, while Symantec Corporation will implement a Sunrise period and Trademark Claims process, depending upon the cost to access the Trademark Clearinghouse, Symantec Corporation may elect to forego the minimum one-month Sunrise period and register names in the gTLD following this mandatory period.

Sunrise Period: As provided by the Trademark Clearinghouse model set forth in the ICANN Applicant Guidebook, the Sunrise service pre-registration procedure for domain names continues for at least 30 days prior to the launch of the general registration of domain names in the gTLD (unless Symantec Corporation decides to offer a longer Sunrise period).

During the Sunrise period, holders of marks that have been previously validated by the Trademark Clearinghouse receive notice of domain names that are an identical match (as defined in the ICANN Applicant Guidebook) to their mark(s). Such notice is in accordance with ICANN's requirements and is provided by Symantec Corporation either directly or through Symantec Corporation-approved registrars.

Symantec Corporation requires all registrants, either directly or through Symantec Corporation-approved registrars, to i) affirm that said registrants meet the Sunrise Eligibility Requirements (SER), and ii) submit to the Sunrise Dispute Resolution Policy (SDRP) consistent with Section 6 of the Trademark Clearinghouse model. At a minimum Symantec Corporation recognizes and honors all word marks for which a proof of use was submitted and validated by the Trademark Clearinghouse as well as any additional eligibility requirements as specified in Question 18.

During the Sunrise period, Symantec Corporation and/or Symantec Corporation-approved registrars, as applicable, are responsible for determining whether each domain name is eligible to be registered (including in accordance with the SERs).

Trademark Claims Service: As provided by the Trademark Clearinghouse model set forth in the ICANN Applicant Guidebook, all new gTLDs will have to provide a Trademark Claims service for a minimum of 60 days after the launch of the general registration of domain names in the gTLD (Trademark Claims period).

During the Trademark Claims period, in accordance with ICANN's requirements, Symantec Corporation or the Symantec Corporation-approved registrar will send a Trademark Claims Notice to any prospective registrant of a domain name that is an identical match (as defined in the ICANN Applicant Guidebook) to any mark that is validated in the Trademark Clearinghouse. The Trademark Claims Notice will include links to the Trademark Claims as listed in the Trademark Clearinghouse and will be provided at no cost.

Prior to registration of said domain name, Symantec Corporation or the Symantec Corporation-approved registrar will require each prospective registrant to provide the warranties dictated in the Trademark

Clearinghouse model set forth in the ICANN Applicant Guidebook. Those warranties will include receipt and understanding of the Trademark Claims Notice and confirmation that registration and use of said domain name will not infringe on the trademark rights of the mark holders listed. Without receipt of said warranties, the Symantec Corporation or the Symantec Corporation-approved registrar will not process the domain name registration.

Following the registration of a domain name, the Symantec Corporation-approved registrar will provide a notice of domain name registration to the holders of marks that have been previously validated by the Trademark Clearinghouse and are an identical match. This notice will be as dictated by ICANN. At a minimum Symantec Corporation will recognize and honor all word marks validated by the Trademark Clearinghouse.


29.2 Mechanisms Designed to Identify and address the abusive use of registered names on an ongoing basis

In addition to the Sunrise and Trademark Claims services described in Section 1 of this response, Symantec Corporation implements and adheres to RPMs post-launch as mandated by ICANN, and confirms that registrars accredited for the .PROTECTION gTLD are in compliance with these mechanisms. Certain aspects of these post-launch RPMs may be administered on behalf of Symantec Corporation by Symantec Corporation-approved registrars or by subcontractors of Symantec Corporation, such as its selected back-end registry services provider, CentralNic.

These post-launch RPMs include the established Uniform Domain-Name Dispute-Resolution Policy (UDRP), as well as the newer Uniform Rapid Suspension System (URS) and Trademark Post-Delegation Dispute Resolution Procedure (PDDRP). Where applicable, Symantec Corporation will implement all determinations and decisions issued under the corresponding RPM.

After a domain name is registered, trademark holders can object to the registration through the UDRP or URS. Objections to the operation of the gTLD can be made through the PDDRP.

The following descriptions provide implementation details of each post-launch RPM for the .PROTECTION gTLD:

- UDRP: The UDRP provides a mechanism for complainants to object to domain name registrations. The complainant files its objection with a UDRP provider and the domain name registrant has an opportunity to respond. The UDRP provider makes a decision based on the papers filed. If the complainant is successful, ownership of the domain name registration is transferred to the complainant. If the complainant is not successful, ownership of the domain name registration remains with the domain name registrant. Symantec Corporation and entities operating on its behalf adhere to all decisions rendered by UDRP providers.
- URS: As provided in the Applicant Guidebook, all registries are required to implement the URS. Similar to the UDRP, a complainant files its objection with a URS provider. The URS provider conducts an administrative review for compliance with filing requirements. If the complaint passes review, the URS provider notifies the registry operator and locks the domain. A lock means that the registry restricts all changes to the registration data, but the name will continue to resolve. After the domain is locked, the complaint is served to the domain name registrant, who has an opportunity to respond. If the complainant is successful, the registry operator is informed and the domain name is suspended for the balance of the registration period; the domain name will not resolve to the original website, but to an informational web page provided by the URS provider. If the complainant is not successful, the URS is terminated and full control of the domain name registration is returned to the domain name registrant. Similar to the existing UDRP, Symantec Corporation and entities operating on its behalf adhere to decisions rendered by the URS providers.
- PDDRP: As provided in the Applicant Guidebook, all registries are required to implement the PDDRP. The PDDRP provides a mechanism for a complainant to object to the registry operator's manner of operation or use of the gTLD. The complainant files its objection with a PDDRP provider, who performs a threshold review. The registry operator has the opportunity to respond and the provider issues its determination based on the papers filed, although there may be opportunity for further discovery and a hearing. Symantec Corporation participates in the PDDRP process as specified in the Applicant Guidebook.

Additional Measures Specific to Rights Protection: Symantec Corporation provides additional measures against potentially abusive registrations. These measures help mitigate phishing, pharming, and other Internet security threats. The measures exceed the minimum requirements for RPMs defined by Specification 7 of the Registry Agreement and are available at the time of registration. These measures include:

- Rapid Takedown or Suspension Based on Court Orders: Symantec Corporation complies promptly with any order from a court of competent jurisdiction that directs it to take any action on a domain name that is within its technical capabilities as a gTLD registry. These orders may be issued when abusive content, such as child pornography, counterfeit goods, or illegal pharmaceuticals, is associated with the domain name.
- Anti-Abuse Process: Symantec Corporation implements an anti-abuse process that is executed based on the type of domain name takedown requested. The anti-abuse process is for malicious exploitation of the DNS infrastructure, such as phishing, botnets, and malware.
- Authentication Procedures: CentralNic, Symantec Corporation's selected back-end registry services provider, uses two-factor authentication to augment security protocols for telephone, email, and chat communications.
-Eligibility Requirements: As discussed above, the initial proposed use of the registry is for the exclusive use of Symantec Corporation. Thus, all initial domain name registrations in the .PROTECTION namespace will be made by Symantec Corporation. This is expected to significantly reduce and/or eliminate the chance of any abusive registrations.


29.3 Resourcing Plans

29.3.1 Resource Planning

Symantec Corporation has included in its business plan staffing sufficient to implement and oversee the aforementioned Rights Protection Mechanism procedures. As previously noted in the application, this staffing resource will most likely be sourced from within Symantec Corporation's legal department. Should additional subject matter expertise be required, Symantec Corporation may engage the services of outside specialists on an as-needed basis.

29.3.2 Resource Planning Specific to Back-End Registry Activities


Since its founding, CentralNic has been focused on delivering secure, stable, and reliable registry services. Several essential management and staff who designed and launched the CentralNic registry and expanded the number of TLDs supported, all while maintaining strict service levels over the past decade, are still in place today. This experiential continuity will endure for the implementation and on-going maintenance of the .PROTECTION gTLD. CentralNic operates in a matrix structure, which allows its staff to be allocated to various critical functions in both a dedicated and a shared manner. With a team of specialists and generalists, the CentralNic project management methodology allows efficient and effective use of our staff in a focused way.

Supporting RPMs requires several departments within DERRent as well as within CentralNic. The implementation of Sunrise and the Trademark Claims service and ongoing RPM activities will pull from the 102 CentralNic staff members of the engineering, product management, development, security, and policy teams at CentralNic and the support staff of Symantec, which is on duty 24/7. No additional hardware or software resources are required to support this as CentralNic has fully operational capabilities to manage abuse today.


30A. Security Policy: provide a summary of the security policy for the proposed registry, including but not limited to:

• indication of any independent assessment reports demonstrating security capabilities, and provisions for periodic independent assessment reports to test security capabilities;

- description of any augmented security levels or capabilities commensurate with the nature of the applied for gTLD string, including the identification of any existing international or industry relevant security standards the applicant commits to following (reference site must be provided);
- list of commitments made to registrants concerning security levels.

To be eligible for a score of 2, answers must also include:

- Evidence of an independent assessment report demonstrating effective security controls (e.g., ISO 27001).

A summary of the above should be no more than 20 pages. Note that the complete security policy for the registry is required to be submitted in accordance with 30(b).

Except where specified this answer refers to the operations of the Applicant's outsource Registry Service Provider, CentralNic.

30(a).1. Introduction
CentralNic's Information Security Management System (ISMS) complies with ISO 27001. CentralNic is working towards achieving full ISO 27001 certification and has secured the services of Lloyd's Register Quality Assurance (LRQA), a UKAS accredited certifier for its ISO 27001 certification. A letter from LRQA confirming this engagement is included in Appendix 30(a).1. Stage One of this process is scheduled during May 2012, with Stage Two occurring in July 2012. The ISMS is part of a larger Management System which includes policies and procedures compliant to ISO 9001.

30(a).2. Independent Assessment
As part of ISO 27001 compliance, CentralNic's security policies will be subjected to annual external audit. Further details can be found in §30(b).

30(a).3. Augmented Security Levels
Applicant believes that the TLD requires no additional security levels above those expected of any gTLD registry operator. Nevertheless, Applicant and CentralNic will operate the TLD to a high level of security and stability in keeping with its status as a component of critical Internet infrastructure.
Registry systems are hardened against attack from external and internal threats. Access controls are in place and all systems are monitored and audited to mitigate the risk of unauthorised access, distribution or modification of sensitive data assets. The Authoritative DNS System has been designed to meet the threat of Distributed Denial-of-Service (DDoS) attacks by means of over-provisioning of network bandwidth, and deployment of Shared Unicast ("Anycast") addresses on nameservers. Whois services have been designed with built-in rate limiting and include mechanisms for protection of personal information. The stability of the registry is supported by use of high-availability technologies including a "hot" Disaster Recovery site in the Isle of Man, as well as a backup provider relationship with GMO Registry in Japan.

30(a).4. Commitments to Registrars
Applicant and CentralNic will make the following commitments to the TLD registrars:
• The SRS will be operated in a secure manner. Controls will be in place to prevent unauthorised access and modification of registry data.
• The Whois service will prevent unauthorised bulk access to domain name registration data, and provide tools to protect personal information.
• The DNS system will be designed to provide effective defence against DDoS attacks. The registry will proactively monitor the DNS system to provide early warning against threats to the stability of the TLD.
• The DNSSEC system will be operated in accordance with best practices and recommendations as described in the relevant RFC documents (described in §43).
• Security incidents reported by registrars, registrants and other stakeholders will be acted upon in accordance with the Security Incident Response Policy (see below).
• Security vulnerabilities reported to the registry will be acknowledged and remediated as quickly as possible.
• Registrars will be promptly notified of all incidents that affect the security and stability of the registry system and their customers, and will be kept informed as incidents develop.

30(a).5. Access Controls
CentralNic operates an access control policy for the registry system. For example, the web-based Staff Console which is used to administer the SRS and manage registrar accounts supports a total of ten different access levels, ranging from "Trainee", who have read-only access to a subset of features, to "System Administrator" who have full access to all systems.
Underlying server and network infrastructure is also subjected to access control. A centralised configuration manager is used to centrally control access to servers. Individual user accounts are created, managed and deleted via the configuration server. Access to servers is authenticated by means of SSH keys: only authorised keys may be used to access servers. Operations personnel can escalate privileges to perform administration tasks (such as updating software or restarting daemons) using the "sudo" command which is logged and audited as described below.
Only operations personnel have access to production environments. Development personnel are restricted to development, staging and OT&E environments.

30(a).6. Security Enforcement
Security controls are continually monitored to ensure that they are enforced. Monitoring includes use of intrusion detection systems on firewalls and application servers. Attempted breaches of access controls (for example, port scans or web application vulnerability scans) trigger NOC alerts and may result in the execution of the Security Incident Response Policy (see below).
Since CentralNic operates a centralised logging and monitoring system (see &sect42;), access logs are analysed in order to generate access reports which are then reviewed by NOC personnel. This includes access to servers via SSH, to web-based administration systems, and to security and networking equipment. Unexpected access to systems is investigated with a view to correcting any breaches and/or revoking access where appropriate.

30(a).8. Security Incident Response Policy
CentralNic operates a Security Incident Response Policy which applies to all events and incidents as defined by the policy, and to all computer systems and networks operated by CentralNic.
The Policy provides a mechanism by which security events and incidents are defined (as observable change to the normal behaviour of a system attributable to a human root cause). It also defines the conditions under which an incident may be defined as escalated (when events affect critical production systems or requires that implementation of a resolution that must follow a change control process) and emergencies (when events impact the health or safety of human beings, breach primary controls of critical systems, or prevent activities which protect or may affect the health or safety of individuals).
The Policy established an Incident Response Team which regularly reviews status reports and authorises specific remedies. The IST conduct an investigation which seeks to determine the human perpetrator who is the root cause for the incident. Very few incidents will warrant or require an investigation. However, investigation resources like forensic tools, dirty networks, quarantine networks and consultation with law enforcement may be useful for the effective and rapid resolution of an emergency incident.
The Policy makes use of CentralNic's existing support ticketing and bug tracking systems to provide a unique ID for the event, and means by which the incident may be escalated, information may be reported, change control processes put into effect, and ultimately resolved. The Policy also describes the process by which an incident is escalated to invoke an Emergency Response, which involves Lock-Down and Repair processes, monitoring and capturing of data for forensic analysis, and liaison with emergency services and law enforcement as necessary.

30(a).9. Role of the Network Operations Centre (NOC)
In addition to its role in managing and operating CentralNic's infrastructure, the NOC plays a key role in managing security. The NOC responds to any and all security incidents, such as vulnerability reports received from registrars, clients and other stakeholders; monitoring operator and security mailing lists (such as the DNS-OARC lists) to obtain intelligence about new security threats; responding to security-related software updates; and acting upon security alerts raised by firewall and intrusion detection systems.

30(a).10. Information Security Team
CentralNic maintains an Information Security Team (IST) to proactively manage information security. The IST is a cross-functional team from relevant areas of CentralNic. These key members of staff are responsible for cascading rules, regulations and information to their respective departments. They are also the first port of call

for their departmental staff to report potential security incidences and breaches, the IST are all members of an internal email group used to co-ordinate and discuss security related issues.
The IST is comprised of the CEO, CTO, Operations Manager, Senior Operations Engineer and Security Engineer.
IST responsibilities include:
• Review and monitor information security threats and incidents.
• Approve initiatives and methodologies to enhance information security.
• Agree and review the security policy, objectives and responsibilities.
• Review client requirements concerning information security.
• Promote the visibility of business support for information security company-wide.
• Manage changes to 3rd party services that may impact on Information Security
• Perform internal audits with the assistance of Blackmores.

30(a).11 Auditing and Review
ISO 27001 includes processes for the auditing and review of security systems and policies. Audits are performed annually by an independent assessor. The IST periodically reviews the ISMS and conducts a gap analysis, identifying areas where performance does not comply with policy, and where the Risk Assessment has identified the need for further work.

30(a).12. Testing of Controls and Procedures
CentralNic will conduct bi-annual penetration tests of its registry systems to ensure that access controls are properly enforced and that no new vulnerabilities have been introduced to the system. Penetration tests will include both "black box" testing of public registry services such as Whois and the Registrar Console, "grey box" testing of authenticated services such as EPP, and tests of physical security at CentralNic's offices and facilities. CentralNic will retain the services of a reputable security testing company such as SecureData (who, as MIS-CDS, performed the 2009 assessment of CentralNic's security stance). The results of this test will be used in annual reviews and audits of the ISMS.

30(a).13. Applicant Security Policy
Applicant's existing security policies restrict access to confidential data relating to the TLD to shareholders and officers. These records will be stored on CentralNic's secure servers. Applicant will be using CentralNic's access credentials, which include IP-based access, secure passwords and an encrypted network connection using SSL.
Applicant will securely store access credentials in its private offices with access restricted to officers of the company. CentralNic will provide the necessary processing facilities related to the TLD, including servers and networks and provide the Applicant with secure remote access. Unauthorized access to these facilities will be prevented by a two factor authentication system with ad hoc and regular access audits. Physical documents are locked in secure, private offices.
Physical Security
Applicant's facilities have extensive physical security in place. Applicant's building remains locked at all times with a 24-hour alarm system and rotating cameras situated at multiple areas in the interior and exterior of the building, and at all points of entry as well as at digital and physical storage points. Key access is restricted to essential personnel. Internal and external cameras provide full coverage of all workstations and servers. Cameras are connected to a secure DVR system to record unauthorized access.
Computer and Network Security
Applicant abides by computer security best practices, requiring monitor screen locks and password protection. Applicant's computer equipment is password protected on a secure network with antivirus and software patching programs in place. Antivirus monitoring updates are conducted on a daily basis. All security software is kept up to date under Applicant's existing security policies.
Applicant has network security in place. Applicant's network infrastructure includes secured, underground cable conduits. Wireless network access is encrypted and requires authorization from approved personnel. Network access is restricted to MAC approved computers. Portable media is secured and must be checked out with an officer to leave premises. Every user has a unique user name and password. Existing password policies require password updating every 90 days.
LAN & Wireless Security

The Applicant's office LAN contains no servers. This drastically simplifies our network topology. We are not running any servers to the outside world. Thus, we have no need for open inbound ports or DMZs. We have restricted the firewall to allow no inbound initiated traffic. There are no ports open for outsiders to get on to our office network. Specifically, there are no SSH, DNS, RDP, HTTP, SSL, POP3, IMAP, SMTP, or VPN inbound ports allowed to our office LAN, thereby effectively eliminating a major source of attack vectors on our office LAN.

Only approved wired/wireless devices can get on our LAN. All unapproved device attempts to get on the network our logged for review. We regularly review the list of approved devices. Devices approved for use on the LAN, must have all OS patches and updates, and anti-virus software that updates daily. No personal devices are ever allowed on the LAN, only devices which have been procured through our approved corporate vendors.

We have changed all passwords and SSIDs of our network infrastructure from their defaults. The wireless access points permit only WPA2 devices.

All proposed changes to the network infrastructure's configuration are vetted by Applicant's security team, and only changes they approve are allowed. The security team is responsible for maintaining the schematic diagram of our network and updating it with approved changes.

Employees are given unique passwords. Upon each employee's departure from the company, that access is removed. Ongoing training for employees is conducted with the objective of increasing their awareness of compliance requirements and the ramification of breaches. We monitor and terminate any attempts by employees to breach these requirements.

Applicant will continue to work with CentralNic and other security experts to continually enhance site and network security measures in addition to policy development, employee training, and enhanced physical security measures.

© *Internet Corporation For Assigned Names and Numbers.*

EXHIBIT 3



# ICANN

## New gTLD Application Submitted to ICANN by: Symantec Corporation

**String: PROTECTION**

**Originally Posted: 13 June 2012**

**Application ID: 1-1027-42662**

## Applicant Information

### 1. Full legal name

Symantec Corporation

### 2. Address of the principal place of business

350 Ellis Street
Mountain View California 94043
US

### 3. Phone number

+1 650 527 8000

### 4. Fax number

+1 916 632 1425


**5. If applicable, website or URL**


# Primary Contact


## 6(a). Name

Philip Lodico


## 6(b). Title

Managing Partner


## 6(c). Address


## 6(d). Phone Number

+1 202 223 9252


## 6(e). Fax Number


## 6(f). Email Address

lodico.sm@fairwindspartners.com


# Secondary Contact

## 7(a). Name

Rick Graves

## 7(b). Title

Director - Corporate Marketing

## 7(c). Address

## 7(d). Phone Number

+1 916 632 1425

## 7(e). Fax Number

## 7(f). Email Address

rick_graves@symantec.com

# Proof of Legal Establishment

## 8(a). Legal form of the Applicant

Corporation

## 8(b). State the specific national or other jursidiction that defines the type of entity identified in 8(a).

United States - Incorporated in the State of Delaware, Headquartered in California

## 8(c). Attach evidence of the applicant's establishment.

```
Attachments are not displayed on this form.
```

## 9(a). If applying company is publicly traded, provide the exchange and symbol.

```
NASDAQ;SYMC
```

## 9(b). If the applying entity is a subsidiary, provide the parent company.

## 9(c). If the applying entity is a joint venture, list all joint venture partners.

# Applicant Background

## 11(a). Name(s) and position(s) of all directors

| | |
|---|---|
| Dan Schulman | Group President, Enterprise Growth, American Express Company |
| David Mahoney | Former Co-CEO of McKesson HBOC, Inc. and CEO of iMcKesson LLC |
| Enrique Salem | President and Chief Executive Officer |
| Frank Dangeard | Managing Partner, Harcourt |
| Geraldine Laybourne | Founder and Former Chairman and Chief Executive Officer, Oxygen Media |
| Michael Brown | Former Chairman of the Board and Chief Executive Officer, Quantum Corporation |
| Paul Unruh | Former Chief Financial Officer and Vice Chairman, Bechtel Group, Inc. |
| Robert Miller | Chairman American International Group |
| Stephen Bennett | Chairman of the Board |
| Stephen Gillett | Chief Information Officer, Executive Vice President, Digital Ventures, Starbucks |

## 11(b). Name(s) and position(s) of all officers and partners

| | |
|---|---|
| Enrique Salem | President and Chief Executive Officer |
| Francis deSouza | Group President, Enterprise Products and Services |

| J. David Thompson | Group President and Chief Information Officer |
| James Beer | Executive Vice President, Chief Financial Officer |
| Janice Chaffin | Group President, Consumer Business Unit |
| Rebecca Ranninger | Executive Vice President, Chief Human Resources Officer |
| Rowan Trollope | Group President, SMB and Symantec.cloud |
| Scott Taylor | Executive Vice President, General Counsel and Secretary |
| William Robbins | Executive Vice President, Worldwide Sales and Services |

**11(c). Name(s) and position(s) of all shareholders holding at least 15% of shares**

**11(d). For an applying entity that does not have directors, officers, partners, or shareholders: Name(s) and position(s) of all individuals having legal or executive responsibility**

# Applied-for gTLD string

**13. Provide the applied-for gTLD string. If an IDN, provide the U-label.**

PROTECTION

**14(a). If an IDN, provide the A-label (beginning with "xn--").**

**14(b). If an IDN, provide the meaning or restatement of the string in English, that is, a description of the literal meaning of the string in the opinion of the applicant.**

**14(c). If an IDN, provide the language of the label (in English).**

**14(c). If an IDN, provide the language of the label (as referenced by ISO-639-1).**


**14(d). If an IDN, provide the script of the label (in English).**


**14(d). If an IDN, provide the script of the label (as referenced by ISO 15924).**


**14(e). If an IDN, list all code points contained in the U-label according to Unicode form.**


**15(a). If an IDN, Attach IDN Tables for the proposed registry.**

Attachments are not displayed on this form.


**15(b). Describe the process used for development of the IDN tables submitted, including consultations and sources used.**


**15(c). List any variant strings to the applied-for gTLD string according to the relevant IDN tables.**


**16. Describe the applicant's efforts to ensure that there are no known operational or rendering problems concerning the applied-for gTLD string. If such issues are known, describe steps that will be taken to mitigate these issues in software and other applications.**

Symantec Corporation ("Symantec") foresees no known rendering issues in connection with the proposed .PROTECTION gTLD for which it is applying. This answer is based upon consultation with Symantec's selected back-end provider, VeriSign, Inc., which has successfully launched a number of new gTLDs over the last decade. In reaching this determination, the following data points were analyzed:

-ICANN's Security Stability Advisory Committee (SSAC) entitled Alternative TLD Name Systems and Roots: Conflict, Control and Consequences (SAC009);

-IAB – RFC3696 "Application Techniques for Checking and Transformation of Names"
-Known software issues which Verisign has encountered during the last decade
launching new gTLDs;
-Character type and length;
-ICANN supplemental notes to Question 16; and
-ICANN's presentation during its Costa Rica regional meeting on TLD Universal
Acceptance.

## 17. (OPTIONAL) Provide a representation of the label according to the International Phonetic Alphabet (http://www.langsci.ucl.ac.uk/ipa/).

# Mission/Purpose

## 18(a). Describe the mission/purpose of your proposed gTLD.

18.1 Mission and Purpose of .PROTECTION

Symantec Corporation ("Symantec") is a leading global provider of information
security and protection, serving the needs of consumers around the world, with
more than 18,500 employees and operations in numerous countries. Symantec's
products are available for purchase online to consumers and Symantec's online
content is accessible in the .COM gTLD and in multiple ccTLDs, including .CA, .DE,
.EU, and .RU. Symantec is applying for four generic-term gTLDs: .PROTECTION
and .SECURITY, which correspond with Symantec's core competencies, and .CLOUD
and .ANTIVIRUS, which correspond to Symantec's products.

The intended future mission and purpose of the .PROTECTION gTLD is to serve as a
trusted, hierarchical, secure, and intuitive namespace provided by Symantec for
its consumers. Symantec is committed to moving forward with a .PROTECTION gTLD
application; however at the time of filing this application, there has not been
enough time, and currently there is not enough market information available, to
fully analyze and evaluate all potential use case options.

Symantec will be analyzing and evaluating other gTLD applications as well as
general market adoption to determine short- and long-term potential best-in-class
use case options to most effectively serve and enhance Symantec's online strategy
as a leading provider of information security and protection. As a company,
Symantec's unique focus is to eliminate risks to information, technology, and
processes independent of the device, platform, interaction, or location. Symantec
helps individuals, small and medium-sized businesses, and global organizations
ensure that their information, technology infrastructures, and related processes
are protected and easily managed. Symantec delivers solutions that allow customers
to access information when they need it and make it available to all of those who
should have access to it. The .PROTECTION gTLD will be in line with the company's
current focus by providing a trusted, hierarchical, secure, and intuitive
namespace.

Protection and security are at the core of Symantec's offerings, and will continue
to remain at that core into the future. Symantec will always be in the business of
providing protection and security to its consumers. Symantec aims to protect

completely; with Symantec, customers can protect more of their information and technology infrastructure, in greater depth, wherever that information is stored or used. Therefore, the .PROTECTION gTLD will become one of Symantec's core assets. The .PROTECTION gTLD is intended to enhance Symantec's online presence and identity; expand its marketing and promotion efforts; provide a secure channel for online products and services; and offer a platform through which to consolidate many of the intellectual property activities of Symantec.

Symantec intends to initially limit registration and use of domain names within the .PROTECTION gTLD to Symantec and its qualified subsidiaries and affiliates. This initial limited use will allow Symantec to establish its operations and achieve full sustainability. This limited distribution coupled with the other requirements set forth in Specification 9 of the template Registry Agreement is intended to exempt Symantec from its annual Code of Conduct Compliance requirements.

After Stage 2 (see below), Symantec will evaluate whether opportunities exist to carry out the business strategy for the gTLD through expansion that continues the sustainable operations of the registry through fee-based registrations to parties other than Symantec and its qualified subsidiaries and affiliates.

Symantec currently plans a three-stage rollout for the .PROTECTION gTLD:

1. Stage 1
The initial stage of implementation of the gTLD will involve Symantec registering a limited number of .PROTECTION second-level domain names.

This initial use will provide Symantec's IT and security personnel the time to run a number of tests to ensure seamless and secure access using the .PROTECTION gTLD domain names, interoperability with various software and Web-based applications, and unbroken and secure use of all names. This initial allocation will also allow the appropriate Symantec staff to coordinate with the internal and external staff responsible for the delegation and setup phases of the .PROTECTION gTLD to ensure a proper transition from delegation to full operation.

2. Stage 2
Once all testing has been successfully completed, Symantec will begin allocating domain names in .PROTECTION for more widespread internal corporate use. It is in Stage 2 that Symantec will evaluate expanding the operations of the gTLD to permit registration by other registrants such as licensees and/or strategic partners. Should an assessment of its expansion strategy lead to a decision to extend registration rights to other parties, this expansion is currently planned to take place during Stage 3. However, any expansion would be conditioned upon a review of Specification 9 (Registry Code of Conduct) set forth in the template Registry Agreement to ensure compliance with Symantec's business model.

3. Stage 3
Based on its evaluations, Symantec will assess and determine whether its business plan and expansion strategy should be augmented by extending registration rights to a broader class of licensees, strategic partners, customers of Symantec, and/or other third parties. It is anticipated by Symantec that changes to the domain name industry, and particularly the impact of generic term gTLDs, will take at least five years to be realized and assessed. Any decision to expand the gTLDs beyond corporate, subsidiary, and affiliate use will take into account this experience as well as the technical analysis of potential expansion.

Notwithstanding this potential future expanded use of the .PROTECTION namespace beginning in the sixth year of operation, Symantec currently anticipates implementing a throttle mechanism to ensure that any proposed expansion is controlled and responsible.

Specifically, under the throttle mechanism Symantec would cease registration of domain names to this potential expanded universe of registrants if and when Symantec reaches 90 percent of the annual 50,000-domain name transaction currently provided for in the template Registry Agreement. Symantec believes that is prudent to incorporate this "time-out" into the business plan in order to reevaluate potential future growth and the necessary resources to ensure that this growth does not negatively impact the secure and stable operation of the .PROTECTION namespace when approaching the 50,000-domain name transaction threshold. This proposed "time-out" mechanism is described in greater detail in the responses to the financial questions (Question 45-50).

The potential use of the .PROTECTION gTLD will also be driven by Symantec's future business strategies as identified in its annual report and investor filings, see: http://investor.symantec.com/phoenix.zhtml?c=89422&p=irol-reports.

Utilizing current projections based upon Symantec's existing businesses, future business plans, current domain name portfolio, and other strategic factors, Symantec estimates second-level domain name registrations to be in line with the projections set forth in the financial template provided in response to Question 46 of this application.

## 18(b). How do you expect that your proposed gTLD will benefit registrants, Internet users, and others?

18.2 How do you expect that your proposed gTLD will benefit registrants, Internet users, and others?

Symantec believes that a proposed .PROTECTION gTLD has the potential to offer the following benefits to Internet users and consumers:

Establish a trusted source of information and an online marketplace for the millions of consumers who purchase goods and services through Symantec's online stores, for investors and third parties seeking information, and for the general Internet user population;

Provide Symantec and its qualified subsidiaries and affiliates with short and memorable Internet addresses; provide increased navigation to products, services, advertising campaigns, public interest content, public awareness initiatives, etc.;

Minimize the cost and need for defensive registrations because domain names within the .PROTECTION gTLD will only be allocated internally to Symantec and its qualified subsidiaries and affiliates, at least for the first three years of operation; and

Develop a potential platform for the secure access to, purchase of, and distribution of Symantec products and information to consumers, in order to minimize the potential for counterfeit or infringing goods and services.

18.2.1 What is the goal of your proposed gTLD in terms of areas of specialty, service levels, or reputation?

The primary mission and purpose of the .PROTECTION gTLD is to provide a trusted, hierarchical, secure, and intuitive online marketplace to deliver Symantec content, services, and information about our business and focus, as well as other

goods and services. As Symantec continues to expand, it is the company's desire to pursue and develop opportunities to market and distribute its online content and products to consumers in the U.S. and internationally on various platforms, including the Internet and mobile devices, among others.

Businesses are increasingly adopting cloud, virtualization, and mobile technologies to reduce the cost of their IT infrastructures and enhance access to their information. By providing products and solutions that support the adoption of these key technology trends, Symantec seeks to maintain a position of leadership in helping businesses protect, secure, and manage their information and identities. Given the increasing demand to access Symantec and its products through a variety of channels, which include domain names, Symantec believes that a .PROTECTION gTLD has the potential to provide an innovative, virtual avenue to Symantec goods and services that will deepen and broaden its relationship with consumers.

Most importantly, Symantec will be able to provide access to its products and online content in a namespace devoid of piracy, cybersquatting, and other malicious activities. Providing consumers with a trusted experience is paramount to Symantec, and a .PROTECTION gTLD will be used to further that goal.

While security companies such as Symantec fight a never-ending battle to protect information, consumers, businesses, and governments from piracy on the Internet, a .PROTECTION gTLD potentially offers consumers a safe and intuitive means of accessing authorized content from Symantec and its qualified subsidiaries and affiliates.

18.2.2 What do you anticipate your proposed gTLD will add to the current space, in terms of competition, differentiation, or innovation?

The primary driving factors of the .PROTECTION gTLD are differentiation and innovation. The number of domain names registered will not measure the success of the gTLD, but rather success will be judged by the level of consumer recognition and trust that is placed in the .PROTECTION gTLD. Using this benchmark, Symantec strives to build consumer recognition and trust through the usage of the .PROTECTION gTLD that rises to the level of that found in the .EDU and .GOV gTLDs.

18.2.3 What goals does your proposed gTLD have in terms of user experience?

Symantec believes that the .PROTECTION gTLD will provide a trusted ecosystem experience for the millions of consumers worldwide who purchase the company's products, as well as those who seek information that Symantec provides, such as investors and members of the press. In addition to providing consumers with short, memorable, and intuitive domain names, the .PROTECTION gTLD will indicate to consumers that all domains and content therein are owned and controlled by Symantec, thus protecting users from potential infringing, pirated, or harmful content.

The initial use of the .PROTECTION gTLD will involve Symantec registering a limited number of second-level domain names. This initial use will provide Symantec's IT and security personnel the ability to run a number of tests to ensure seamless and secure access to the Symantec websites, and interoperability with various software and Web-/mobile-based applications. Once appropriate security and stability issues have been satisfactorily addressed, Symantec will likely begin allocating domain names for internal corporate use and may redirect new .PROTECTION domain names to preexisting content. This phased rollout will likely take place over a multi-year period, but is subject to change depending upon a range of external factors.

During this same period of time, Symantec will evaluate potential strategies to use the .PROTECTION gTLD in other ways that will advance Symantec's corporate mission and goals.

18.2.4 Provide a complete description of the applicant's intended registration policies in support of the goals listed above.

Symantec currently intends for the .PROTECTION gTLD to be exclusively used by Symantec and its qualified subsidiaries and affiliates, at least for the first three years of operation. Because of this condition, Symantec intends to address registration and use requirements in its qualified subsidiary and affiliate agreements, rather than in a domain name registration agreement.

Notwithstanding this, Symantec will incorporate all required ICANN consensus policies and other legal/policy requirements imposed on new gTLD applicants into the terms and conditions of the domain name registration agreements.

18.2.5 Will your proposed gTLD impose any measures for protecting the privacy or confidential information of registrants or users? If so, please describe any such measures.

As a global information and security company, Symantec recognizes that this is an evolving area of law in which there is no international standard. However, due to the fact that every domain name will be registered to Symantec and its qualified subsidiaries and affiliates, at least for the first three years of operation, Symantec has a vested interest in making sure that accurate and current domain name information is readily available in connection with each .PROTECTION domain name. For the .PROTECTION gTLD, all private and confidential information will be protected.

Symantec will ensure that the operation of the .PROTECTION gTLD will be consistent with its Statement of Privacy Principles, available on its website, see http://www.symantec.com/about/profile/policies/privacy.jsp.

In addition, Symantec intends to incorporate contractual language in its Registry-Registrar Agreement (RRA) modeled after language that has been included in the template Registry Agreement and that has been successfully utilized by existing ICANN gTLD Registry Operators.

The template Registry Agreement states, "Registry Operator shall (i) notify each ICANN-accredited registrar that is a party to the registry-registrar agreement for the TLD of the purposes for which data about any identified or identifiable natural person ("Personal Data") submitted to Registry Operator by such registrar is collected and used under this Agreement or otherwise and the intended recipients (or categories of recipients) of such Personal Data, and (ii) require such registrar to obtain the consent of each registrant in the TLD for such collection and use of Personal Data. Registry Operator shall take reasonable steps to protect Personal Data collected from such registrar from loss, misuse, unauthorized disclosure, alteration or destruction. Registry Operator shall not use or authorize the use of Personal Data in a way that is incompatible with the notice provided to registrars."

18.2.6 Describe whether and in what ways outreach and communications will help to achieve your projected benefits.

Symantec sees the potential for this gTLD to play a large role in Symantec's future online strategic initiative. However, there are a number of unanswered questions concerning consumer recognition, the adoption of new gTLDs, and the response from search engines in the marketplace that will influence the usage of the gTLD and communication about that usage.

Notwithstanding this, Symantec plans to start using .PROTECTION domains initially as redirects to existing .COM domains. Symantec also plans to carefully review the release of new gTLDs by others, the response from search engines to gTLDs, and the perception of consumers. As the marketplace evolves, Symantec will invest in outreach and communication as needed to ensure that its consumers, partners, and affiliates continue to interact with Symantec content in a simplified and efficient manner.

## 18(c). What operating rules will you adopt to eliminate or minimize social costs?

18.3 What operating rules will you adopt to eliminate or minimize social costs (e.g., time or financial resource costs, as well as various types of consumer vulnerabilities)?

Symantec's proposed operating rules to limit registration to Symantec and its qualified subsidiaries and affiliates, at least for the first three years of operation, will provide a trusted online environment for consumers to access Symantec's online content, and by default will minimize social costs. This verified ecosystem provides consumers with a trusted source for Symantec goods and services with a substantially lower risk of the fraud, misdirection, infringement, or scams that consumers are plagued with in .COM and other open gTLDs. Symantec does not anticipate consumer vulnerabilities. Therefore, one way in which social costs will be eliminated is that there will be no need for other trademark and brand owners to defensively register second-level domains in the .PROTECTION gTLD. In fact, Symantec's expectation is that the usage of a .PROTECTION gTLD will eliminate many of the vulnerabilities that Symantec consumers face in the wider Internet today.

18.3.1 What other steps will you take to minimize negative consequences/costs imposed upon consumers?

Symantec believes that the proposed operation of the .PROTECTION gTLD as set forth in this application has no known negative consequences or cost implications to consumers. On the contrary, the proposed operation of this registry will likely lead to direct and quantifiable benefits to consumers.

18.3.2 How will multiple applications for a particular domain name be resolved, for example, by auction or on a first-come/first-serve basis?

Symantec does not envision multiple applicants for the same domain name, as domain names will only be allocated to Symantec and its qualified subsidiaries and affiliates, at least for the first three years of operation, in accordance with Symantec's business plan for the .PROTECTION gTLD.

18.3.3 Explain any cost benefits for registrants you intend to implement (e.g., advantageous pricing, introductory discounts, bulk registration discounts).

Symantec does not envision any advantageous pricing, introductory discounts, or bulk registration discounts because these marketing/commercial initiatives are inconsistent with the mission and purpose of the .PROTECTION gTLD as a trusted online source identifier. Moreover, it is the current intention of Symantec to provide domain name registrations to itself and its qualified subsidiaries and affiliates at no cost, though the company reserves the right to reevaluate this decision and may alter it in the future.

18.3.4 Note that the Registry Agreement requires that registrars be offered the option to obtain initial domain name registrations for periods of one to ten years at the discretion of the registrar, but no greater than ten years. Additionally, the Registry Agreement requires advance written notice of price increases. Do you intend to make contractual commitments to registrants regarding the magnitude of price escalation? If so, please describe your plans.

Symantec is committed to providing the domain name registration periods set forth in the Registry Agreement. However, as noted above, the registration and use of the domain name is conditioned upon a separate qualified subsidiary or affiliate relationship with Symantec. Therefore, providing contractual commitments in a domain name registrant agreement regarding the magnitude of price escalations does not seem relevant or appropriate. Additionally, as noted above, the current business model envisions Symantec providing domain name registrations to itself and its qualified subsidiaries and affiliates at no cost, at least for the first three years of operation.

Symantec acknowledges that the current template Registry Agreement requires that the Registry Operator "shall offer registrars the option to obtain registration periods for one to ten years at the discretion of the registrar." However, Symantec and its qualified subsidiaries and affiliates, as the sole registrants within the .PROTECTION gTLD, will only be registering domain names on an annual basis. This is done to better account for costs on an annual basis as well as to provide for more concise financial statements in Question 46 of this application; therefore, there will be no multi-year registrations or deferred revenue.

# Community-based Designation

## 19. Is the application for a community-based TLD?

No

## 20(a). Provide the name and full description of the community that the applicant is committing to serve.

## 20(b). Explain the applicant's relationship to the community identified in 20(a).

## 20(c). Provide a description of the community-based purpose of the applied-for gTLD.

**20(d). Explain the relationship between the applied-for gTLD string and the community identified in 20(a).**

**20(e). Provide a description of the applicant's intended registration policies in support of the community-based purpose of the applied-for gTLD.**

**20(f). Attach any written endorsements from institutions/groups representative of the community identified in 20(a).**

Attachments are not displayed on this form.

# Geographic Names

**21(a). Is the application for a geographic name?**

No

# Protection of Geographic Names

**22. Describe proposed measures for protection of geographic names at the second and other levels in the applied-for gTLD.**

22.1 Symantec Corporation has Properly Researched this Topic

Symantec Corporation ("Symantec") is keenly aware of the sensitivity of national governments in connection with protecting country and territory identifiers in the Domain Name System ("DNS"). In preparation for answering this question, Symantec reviewed the following relevant background material regarding the protection of geographic names in the DNS:

-ICANN Board Resolution 01-92 regarding the methodology developed for the reservation and release of country names in the .INFO top-level domain, see http:⁄⁄www.icann.org⁄en⁄minutes⁄minutes-10sep01.htm;
-ICANN's Proposed Action Plan on .INFO Country Names, see

http://www.icann.org/en/meetings/montevideo/action-plan-country-names-09oct01.htm;
-"Report of the Second WIPO Internet Domain Name Process: The Recognition and
Rights and the Use of Names in the Internet Domain Name System," Section 6,
Geographical Identifiers, see
http://www.wipo.int/amc/en/processes/process2/report/html/report.html;
-ICANN's Governmental Advisory Committee (GAC) Principles Regarding New gTLDs, see
https://gacweb.icann.org/download/attachments/1540128/gTLD_principles_0.pdf?
version=1&modificationDate=1312358178000; and
-ICANN's Generic Names Supporting Organization Reserved Names Working Group –
Final Report, see http://gnso.icann.org/issues/new-gtlds/final-report-rn-wg-
23may07.htm.

22.2 Initial Reservation of Country and Territory Names

Symantec is committed to initially reserving the country and territory names
contained in the internationally recognized lists described in Article 5 of
Specification 5 attached to the Applicant Guidebook at the second-level and at all
other levels within the .PROTECTION gTLD at which Symantec will provide
registrations. Specifically, Symantec will reserve:

1. The short form (in English) of all country and territory names contained on the
ISO 3166-1 list, as updated from time to time, including the European Union, which
is exceptionally reserved on the ISO 3166-1 list, and its scope extended in August
1999 to any application needing to represent the name European Union, see
http://www.iso.org/iso/support/country_codes/iso_3166_code_lists/iso-
3166-1_decoding_table.htm#EU;

2. The United Nations Group of Experts on Geographical Names, Technical Reference
Manual for the Standardization of Geographical Names, Part III Names of Countries
of the World; and

3. The list of United Nations member states in six official United Nations
languages prepared by the Working Group on Country Names of the United Nations
Conference on the Standardization of Geographical Names.

22.3 Fair & Non-Misleading Use of Geographical Identifiers

Symantec is a leading provider of information security and protection serving the
wide-ranging needs of consumers around the globe, with more than 18,500 employees
and operations in numerous countries throughout North America, South America,
Asia, Africa, and Europe. Symantec Corporation's online sales are available to
consumers in multiple countries, and online content can be accessed under the .COM
gTLD and numerous ccTLDs, including .CA, .DE, .EU, and .RU.

Symantec intends to explore the option of providing a hierarchical and intuitive
framework for the .PROTECTION namespace by using geographic identifiers as second-
level domain names. Symantec believes that the use of geographic identifiers to
the left of the TLD and as part of the domain name itself has a direct and
material impact on search engine algorithms and their corresponding query results.
In addition, such naming conventions are intuitive and practiced by direct
navigation Internet users (those who type their intended destination into address
bars as opposed to search engines). Symantec would like to evaluate whether this
type of hierarchical and intuitive use of second-level domain names within a gTLD
provides increased consumer functionality and innovation, as premised by ICANN.

Symantec believes that the .PROTECTION gTLD can provide an online source
identifying function for Internet users around the world navigating to
the .PROTECTION namespace.

22.4 The Legal Protection of Geographical Identifiers

One of the more authoritative resources on the current state of the law in connection with the protection of geographical identifiers was authored by the World Intellectual Property Organization (WIPO) in its 2001 "Report of the Second WIPO Internet Domain Name Process: The Recognition of Rights and the Use of Names in the Internet Domain Name System." Section six of this report was devoted exclusively to the protection of geographical identifiers.

In analyzing the well-established framework against the misuse of geographical identifiers at the international, regional, and national levels, WIPO identified the following two elements for the protection of geographical identifiers: (i) a prohibition of false descriptions of the geographical source of goods; and (ii) a more extensive set of rules prohibiting the misuse of one class of geographical source indicators, known as geographical indications (see "Report of the Second WIPO Internet Domain Name Process," Paragraphs 206 and 210). Neither false descriptions of the geographical source of goods, nor misuse of geographical indications, is present in Symantec's current or proposed use of geographical identifiers.

Notwithstanding WIPO's recommendation that the protection of geographical identifiers is "a difficult area on which views are not only divided, but also ardently held" (Paragraph 237) national governments within the ICANN Governmental Advisory Committee (GAC) and other international forums have continued to advocate for increased safeguards to protect against the misuse of geographical identifiers within the domain name system.

Symantec, acting as a responsible international business, seeks to minimize any potential business practices that might mislead consumers. However, at the same time, it believes that it is important to be able to use geographical identifiers in a fair use and non-misleading manner, if such use can benefit Internet users as proposed in Symantec's business model.

22.5 Samples of Fair & Non-Misleading Use of Geographical Identifiers

In undertaking a thorough research of this subject matter prior to filing this application, Symantec's subject matter experts were able to uncover the following representative sampling of fair and non-misleading use of geographical identifiers used in the existing gTLD domain name space:

Fair Use of National Geographical Identifiers

AUSTRALIA.COOP - Is operated by Co-operatives Australia, the national body for State Co-operative Federations, and provides a valuable resource about cooperatives within Australia.

USA.JOBS - Is operated by DirectEmployers Association ("DE"). While Employ Media, the registry operator of the .JOBS gTLD, is currently in a dispute with ICANN regarding the allocation of this and other domain names, DE has a series of partnerships and programs with the United States Department of Labor, the National Association of State Workforce Agencies, and Facebook to help unemployed workers find jobs.

MALDIVIAN.AERO - Is the dominant domestic air carrier in Maldives, and provides a range of commercial and leisure air transport services.

Fair Use of Regional/Local Geographical Indicators

TEXAS.JOBS - Is operated by a joint effort between DE, the Texas Workforce Commission, and the National Labor Exchange to connect job seekers with approximately 96,000 job openings. An additional domain name operated by this

joint effort was WORKINTEXAS-VETERANS.JOBS, a resource devoted to helping Texas veterans translate their military skills to jobs in the civil marketplace.

BROOKLYN.COOP - Is operated by Brooklyn Cooperative Federal Credit Union, which began as a modest storefront business in 2001, but is now New York City's fastest growing credit union and a model for community development credit unions nationwide.

SACRAMENTO.AERO - Is a portal website operated by Sacramento County to provide links to each of the airports serving the Sacramento area: Sacramento International Airport (SMF), Mather Airport (MHR), Executive Airport (SAC), and Franklin Field (F72).

22.6 Protection of Regional and Local Geographic Names for Non-Misleading Use

Symantec has stated its intention to consider using non-reserved geographic identifiers as part of a hierarchical and intuitive framework in a fair and non-misleading use to help consumers navigate the .PROTECTION namespace. Symantec is committed to operating the .PROTECTION namespace in a manner that minimizes potential consumer confusion, and will actively work with others in the ICANN community regarding any future policy development in this area.

22.7 Potential Future Release of Initially Reserved Names

Given that Symantec is an international organization currently operating in numerous other countries, Symantec looks forward to collaborating with other new gTLD registry operators in potentially working with ICANN's GAC to explore potential processes that could permit the release of initially reserved country names (including ISO-3166 two-characters). Specifically, Symantec is interested in exploring other Registry Service Evaluation Processes (RSEP) that have been filed by existing gTLD registry operators in releasing previously reserved domain names.

22.8 Dispute Resolution

Symantec does not envision any potential disputes from governments or public authorities in connection with the registration and use of geographic names within the .PROTECTION gTLD based upon its proposed use, set forth in the response to Question 18 of this application.

However, Symantec is committed to working with governments, public authorities, or IGOs that may have a concern regarding the registration of names with national or geographic significance at the second-level within .PROTECTION. Therefore, should there arise any potential disputes, Symantec will undertake an immediate policy development process as identified below.

22.9 Creation and Updating the Policies

If there should arise some future need for the creation or updating of the policies regarding this class of domain names, Symantec will act in an open and transparent manner consistent with its prior practices to develop such a policy and/or recommendation.

Symantec is also committed to continually reviewing and updating these lists to prevent the misleading use of geographical identifiers. Consistent with this commitment, Symantec intends to remain an active participant in any ongoing ICANN policy discussion regarding the protection of geographic names within the DNS.

# Registry Services

## 23. Provide name and full description of all the Registry Services to be provided.

VeriSign, Inc. Response to Q23 Registry Services

23.1 Customary Registry Services

As Symantec Corporation's selected provider of backend registry services, Verisign provides a comprehensive system and physical security solution that is designed to ensure a TLD is protected from unauthorized disclosure, alteration, insertion, or destruction of registry data. Verisign's system addresses all areas of security, including information and policies, security procedures, the systems development lifecycle, physical security, system hacks, break-ins, data tampering, and other disruptions to operations. Verisign's operational environments not only meet the security criteria specified in its customer contractual agreements, thereby preventing unauthorized access to or disclosure of information or resources on the Internet by systems operating in accordance with applicable standards, but also are subject to multiple independent assessments as detailed in the response to Question 30, Security Policy. Verisign's physical and system security methodology follows a mature, ongoing lifecycle that was developed and implemented many years before the development of the industry standards with which Verisign currently complies. Please see the response to Question 30, Security Policy, for details of the security features of Verisign's registry services.

Verisign's registry services fully comply with relevant standards and best current practice RFCs published by the Internet Engineering Task Force (IETF), including all successor standards, modifications, or additions relating to the DNS and name server operations including without limitation RFCs 1034, 1035, 1982, 2181, 2182, 2671, 3226, 3596, 3597, 3901, 4343, and 4472. Moreover, Verisign's Shared Registration System (SRS) supports the following IETF Extensible Provisioning Protocol (EPP) specifications, where the Extensible Markup Language (XML) templates and XML schemas are defined in RFC 3915, 5730, 5731, 5732, 5733, and 5734. By strictly adhering to these RFCs, Verisign helps to ensure its registry services do not create a condition that adversely affects the throughput, response time, consistency, or coherence of responses to Internet servers or end systems. Besides its leadership in authoring RFCs for EPP, Domain Name System Security Extensions (DNSSEC), and other DNS services, Verisign has created and contributed to several now well-established IETF standards and is a regular and long-standing participant in key Internet standards forums.

Figure 23 1 summarizes the technical and business components of those registry services, customarily offered by a registry operator (i.e., Verisign), that support this application. These services are currently operational and support both large and small Verisign-managed registries. Customary registry services are provided in the same manner as Verisign provides these services for its existing gTLDs.

Through these established registry services, Verisign has proven its ability to operate a reliable and low-risk registry that supports millions of transactions per day. Verisign is unaware of any potential security or stability concern related to any of these services.

Registry services defined by this application are not intended to be offered in a

manner unique to the new generic top-level domain (gTLD) nor are any proposed services unique to this application's registry.

See Figure 0 1: Registry Services. Each proposed service has been previously approved by ICANN to ensure registry security and stability.

In addition the registry services found in Table 23-1, Symantec Corporation is evaluating offering the following registry services:

1. Imposition of an annual cost recovery based fee to validate registrars that will be providing domain name registration services in the .PROTECTION gTLD.

2. The use of RFPs (Request for Proposals) and Auctions to determine string allocation in appropriate circumstances.

As further evidence of Verisign's compliance with ICANN mandated security and stability requirements, Verisign allocates the applicable RFCs to each of the five customary registry services (items A – E above). For each registry service, Verisign also provides evidence in Figure 23 2 of Verisign's RFC compliance and includes relevant ICANN prior-service approval actions.

See: Figure 23 2: ICANN RFC Compliance. Verisign currently operates TLDs in full compliance with each registry service's applicable RFC(s). Each listed Verisign service has been previously approved by ICANN and is now operational on registries under Verisign management.

23.1.1 Critical Operations of the Registry

i. Receipt of Data from Registrars Concerning Registration of Domain Names and Name Servers
See Item A in Figure 23 1 and Figure 23 2.

ii. Provision to Registrars Status Information Relating to the Zone Servers
Verisign is Symantec Corporation's selected provider of backend registry services. Verisign registry services provisions to registrars status information relating to zone servers for the TLD. The services also allow a domain name to be updated with clientHold, serverHold status, which removes the domain name server details from zone files. This ensures that DNS queries of the domain name are not resolved temporarily. When these hold statuses are removed, the name server details are written back to zone files and DNS queries are again resolved. Figure 23 3 describes the domain name status information and zone insertion indicator provided to registrars. The zone insertion indicator determines whether the name server details of the domain name exist in the zone file for a given domain name status. Verisign also has the capability to withdraw domain names from the zone file in near-real time by changing the domain name statuses upon request by customers, courts, or legal authorities as required.
See: Figure 23 3: Zone Server Status Information. Verisign provisions to registrars status information related to the TLD.

iii. Dissemination of TLD Zone Files
See Item B in Figure 23 1 and Figure 23 2.

iv. Operation of the Registry Zone Servers
Verisign is Symantec Corporation's selected provider of backend registry services. Verisign, as a company, operates zone servers and serves DNS resolution from 76 geographically distributed resolution sites located in North America, South America, Africa, Europe, Asia, and Australia. Currently, 17 DNS locations are designated primary sites, offering greater capacity than smaller sites comprising the remainder of the Verisign constellation. Verisign also uses Anycast techniques and regional Internet resolution sites to expand coverage, accommodate emergency

or surge capacity, and support system availability during maintenance procedures. Verisign operates Symantec Corporation's gTLD from a minimum of eight of its primary sites (two on the East Coast of the United States, two on the West Coast of the United States, two in Europe, and two in Asia) and expands resolution sites based on traffic volume and patterns. Further details of the geographic diversity of Verisign's zone servers are provided in the response to Question 34, Geographic Diversity. Moreover, additional details of Verisign's zone servers are provided in the response to Question 32, Architecture and the response to Question 35, DNS Service.
v. Dissemination of Contact and Other Information Concerning Domain Name Server Registrations
See Item C in Figure 23 1 and Figure 23 2.

23.2 Other Products or Services the Registry Operator Is Required to Provide Because of the Establishment of a Consensus Policy

Verisign, Symantec Corporation's selected provider of backend registry services, is a proven supporter of ICANN's consensus-driven, bottom-up policy development process whereby community members identify a problem, initiate policy discussions, and generate a solution that produces effective and sustained results. Verisign currently provides all of the products or services (collectively referred to as services) that the registry operator is required to provide because of the establishment of a Consensus Policy. For the .PROTECTION gTLD, Verisign implements these services using the same proven processes and procedures currently in-place for all registries under Verisign's management. Furthermore, Verisign executes these services on computing platforms comparable to those of other registries under Verisign's management. Verisign's extensive experience with consensus policy required services and its proven processes to implement these services greatly minimize any potential risk to Internet security or stability. Details of these services are provided in the following subsections. It shall be noted that consensus policy services required of registrars (e.g., WHOIS Reminder, Expired Domain) are not included in this response. This exclusion is in accordance with the direction provided in the question's Notes column to address registry operator services.

23.2.1 Inter-Registrar Transfer Policy (IRTP)
Technical Component: In compliance with the IRTP consensus policy, Verisign, Symantec Corporation's selected provider of backend registry services, has designed its registration systems to systematically restrict the transfer of domain names within 60 days of the initial create date. In addition, Verisign has implemented EPP and "AuthInfo" code functionality, which is used to further authenticate transfer requests. The registration system has been designed to enable compliance with the five-day Transfer grace period and includes the following functionality:
- Allows the losing registrar to proactively 'ACK' or acknowledge a transfer prior to the expiration of the five-day Transfer grace period
- Allows the losing registrar to proactively 'NACK' or not acknowledge a transfer prior to the expiration of the five-day Transfer grace period
- Allows the system to automatically ACK the transfer request once the five-day Transfer grace period has passed if the losing registrar has not proactively ACK'd or NACK'd the transfer request.

Business Component: All requests to transfer a domain name to a new registrar are handled according to the procedures detailed in the IRTP. Dispute proceedings arising from a registrar's alleged failure to abide by this policy may be initiated by any ICANN-accredited registrar under the Transfer Dispute Resolution Policy. Symantec Corporation's compliance office serves as the first-level dispute resolution provider pursuant to the associated Transfer Dispute Resolution Policy. As needed, Verisign is available to offer policy guidance as issues arise.
Security and Stability Concerns: Verisign is unaware of any impact, caused by the

service, on throughput, response time, consistency, or coherence of the responses
to Internet servers or end-user systems. By implementing the IRTP in accordance
with ICANN policy, security is enhanced as all transfer commands are authenticated
using the AuthInfo code prior to processing.

ICANN Prior Approval: Verisign has been in compliance with the IRTP since November
2004 and is available to support Symantec Corporation in a consulting capacity as
needed.
Unique to the TLD: This service is not provided in a manner unique to
the .PROTECTION gTLD.

23.2.2 Add Grace Period (AGP) Limits Policy
Technical Component: Verisign's registry system monitors registrars' Add grace
period deletion activity and provides reporting that permits Symantec Corporation
to assess registration fees upon registrars that have exceeded the AGP thresholds
stipulated in the AGP Limits Policy. Further, Symantec Corporation accepts and
evaluates all exemption requests received from registrars and determines whether
the exemption request meets the exemption criteria. Symantec Corporation maintains
all AGP Limits Policy exemption request activity so that this material may be
included within Symantec Corporation's Monthly Registry Operator Report to ICANN.

Registrars that exceed the limits established by the policy may submit exemption
requests to Symantec Corporation for consideration. Symantec Corporation's
compliance office reviews these exemption requests in accordance with the AGP
Limits Policy and renders a decision. Upon request, Symantec Corporation submits
associated reporting on exemption request activity to support reporting in
accordance with established ICANN requirements.

Business Component: The Add grace period (AGP) is restricted for any gTLD operator
that has implemented an AGP. Specifically, for each operator:
- During any given month, an operator may not offer any refund to an ICANN-
accredited registrar for any domain names deleted during the AGP that exceed (i)
10 percent of that registrar's net new registrations (calculated as the total
number of net adds of one-year through ten-year registrations as defined in the
monthly reporting requirement of Operator Agreements) in that month, or (ii) fifty
(50) domain names, whichever is greater, unless an exemption has been granted by
an operator.
- Upon the documented demonstration of extraordinary circumstances, a registrar
may seek from an operator an exemption from such restrictions in a specific month.
The registrar must confirm in writing to the operator how, at the time the names
were deleted, these extraordinary circumstances were not known, reasonably could
not have been known, and were outside the registrar's control. Acceptance of any
exemption will be at the sole and reasonable discretion of the operator; however
"extraordinary circumstances" that reoccur regularly for the same registrar will
not be deemed extraordinary.

In addition to all other reporting requirements to ICANN, Symantec Corporation
identifies each registrar that has sought an exemption, along with a brief
description of the type of extraordinary circumstance and the action, approval, or
denial that the operator took.

Security and Stability Concerns: Verisign is unaware of any impact, caused by the
policy, on throughput, response time, consistency, or coherence of the responses
to Internet servers or end-user systems.
ICANN Prior Approval: Verisign, Symantec Corporation's backend registry services
provider, has had experience with this policy since its implementation in April
2009 and is available to support Symantec Corporation in a consulting capacity as
needed.
Unique to the TLD: This service is not provided in a manner unique to
the .PROTECTION gTLD.

23.2.3 Registry Services Evaluation Policy (RSEP)
Technical Component: Verisign, Symantec Corporation's selected provider of backend
registry services, adheres to all RSEP submission requirements. Verisign has
followed the process many times and is fully aware of the submission procedures,
the type of documentation required, and the evaluation process that ICANN adheres
to.
Business Component: In accordance with ICANN procedures detailed on the ICANN RSEP
website (http:⁄⁄www.icann.org⁄en⁄registries⁄rsep⁄), all gTLD registry operators
are required to follow this policy when submitting a request for new registry
services.
Security and Stability Concerns: As part of the RSEP submission process, Verisign,
Symantec Corporation's backend registry services provider, identifies any
potential security and stability concerns in accordance with RSEP stability and
security requirements.  Verisign never launches services without satisfactory
completion of the RSEP process and resulting approval.
ICANN Prior Approval: Not applicable.
Unique to the TLD: gTLD RSEP procedures are not implemented in a manner unique to
the .PROTECTION qTLD.


23.3 Products or Services Only a Registry Operator Is Capable of Providing by
Reason of Its Designation As the Registry Operator

Verisign, Symantec Corporation's selected backend registry services provider, has
developed a Registry-Registrar Two-Factor Authentication Service that complements
traditional registration and resolution registry services. In accordance with
direction provided in Question 23, Verisign details below the technical and
business components of the service, identifies any potential threat to registry
security or stability, and lists previous interactions with ICANN to approve the
operation of the service. The Two-Factor Authentication Service is currently
operational, supporting multiple registries under ICANN's purview.

Symantec Corporation is unaware of any competition issue that may require the
registry service(s) listed in this response to be referred to the appropriate
governmental competition authority or authorities with applicable jurisdiction.
ICANN previously approved the service(s), at which time it was determined that
either the service(s) raised no competitive concerns or any applicable concerns
related to competition were satisfactorily addressed.

23.3.1 Two-Factor Authentication Service
Technical Component: The Registry-Registrar Two-Factor Authentication Service is
designed to improve domain name security and assist registrars in protecting the
accounts they manage. As part of the service, dynamic one-time passwords augment
the user names and passwords currently used to process update, transfer, and⁄or
deletion requests. These one-time passwords enable transaction processing to be
based on requests that are validated both by "what users know" (i.e., their user
name and password) and "what users have" (i.e., a two-factor authentication
credential with a one-time-password).

Registrars can use the one-time-password when communicating directly with
Verisign's Customer Service department as well as when using the registrar portal
to make manual updates, transfers, and⁄or deletion transactions. The Two-Factor
Authentication Service is an optional service offered to registrars that execute
the Registry-Registrar Two-Factor Authentication Service Agreement.

Business Component: There is no charge for the Registry-Registrar Two-Factor
Authentication Service. It is enabled only for registrars that wish to take
advantage of the added security provided by the service.
Security and Stability Concerns: Verisign is unaware of any impact, caused by the
service, on throughput, response time, consistency, or coherence of the responses

to Internet servers or end-user systems. The service is intended to enhance domain
name security, resulting in increased confidence and trust by registrants.
ICANN Prior Approval: ICANN approved the same Two-Factor Authentication Service
for Verisign's use on .COM and .NET on 10 July 2009 (RSEP Proposal 2009004) and
for .NAME on 16 February 2011 (RSEP Proposal 2011001).

Unique to the TLD: This service is not provided in a manner unique to
the .PROTECTION gTLD.

# Demonstration of Technical & Operational Capability

## 24. Shared Registration System (SRS) Performance

VeriSign, Inc. Response to Question 24 Shared Registration System (SRS)
Performance

24.1 Robust Plan for Operating a Reliable SRS
24.1.1 High-Level Shared Registration System (SRS) System Description
VeriSign, Inc. ("Verisign"), Symantec Corporation's selected provider of back-end
registry services, provides and operates a robust and reliable SRS that enables
multiple registrars to provide domain name registration services in the top-level
domain (TLD). Verisign's proven reliable SRS serves approximately 915 registrars,
and Verisign, as a company, has averaged more than 140 million registration
transactions per day. The SRS provides a scalable, fault-tolerant platform for the
delivery of gTLDs through the use of a central customer database, a Web interface,
a standard provisioning protocol (i.e., Extensible Provisioning Protocol, "EPP"),
and a transport protocol (i.e., Secure Sockets Layer, "SSL").
The SRS components include:
-Web Interface: Allows customers to access the authoritative database for
accounts, contacts, users, authorization groups, product catalog, product
subscriptions, and customer notification messages.
-EPP Interface: Provides an interface to the SRS that enables registrars to use
EPP to register and manage domains, hosts, and contacts.
-Authentication Provider: A Verisign-developed application, specific to the SRS,
that authenticates a user based on a login name, password, and the SSL certificate
common name and client IP address.
The SRS is designed to be scalable and fault tolerant by incorporating clustering
in multiple tiers of the platform. New nodes can be added to a cluster within a
single tier to scale a specific tier, and if one node fails within a single tier,
the services will still be available. The SRS allows registrars to manage
the .PROTECTION gTLD domain names in a single architecture.
To flexibly accommodate the scale of its transaction volumes, as well as new
technologies, Verisign employs the following design practices:
-Scale for Growth: Scale to handle current volumes and projected growth.
-Scale for Peaks: Scale to twice base capacity to withstand "registration add
attacks" from a compromised registrar system.

-Limit Database CPU Utilization: Limit utilization to no more than 50 percent
during peak loads.

-Limit Database Memory Utilization: Each user's login process that connects to the
database allocates a small segment of memory to perform connection overhead,
sorting, and data caching. Verisign's standards mandate that no more than 40

percent of the total available physical memory on the database server will be
allocated for these functions.

Verisign's SRS is built upon a three-tier architecture as illustrated in Figure
24-1 and detailed here.

(See Figure 24-1, SRS Architecture: Verisign's SRS is hierarchically designed to
meet the forecasted registration volume of the .PROTECTION gTLD, and it can be
scaled to meet future registration volume increases.)

-Gateway Layer: The first tier, the gateway servers, uses EPP to communicate with
registrars. These gateway servers then interact with application servers, which
comprise the second tier.
-Application Layer: The application servers contain business logic for managing
and maintaining the registry business. The business logic is particular to each
TLD's business rules and requirements. The flexible internal design of the
application servers allows Verisign to easily leverage existing business rules to
apply to the .PROTECTION gTLD. The application servers store Symantec
Corporation's data in the registry database, which comprises the third and final
tier. This simple, industry-standard design has been highly effective with other
customers for whom Verisign provides backend registry services.
-Database Layer: The database is the heart of this architecture. It stores all the
essential information provisioned from registrars through the gateway servers.
Separate servers query the database, extract updated zone and WHOIS information,
validate that information, and distribute it around the clock to Verisign's
worldwide domain name resolution sites.
-Scalability and Performance: Verisign, Symantec Corporation's selected back-end
registry services provider, implements its scalable SRS on a supportable
infrastructure that achieves the availability requirements in Specification 10.
Verisign employs the design patterns of simplicity and parallelism in both its
software and systems, based on its experience that these factors contribute most
significantly to scalability and reliable performance. Going counter to feature-
rich development patterns, Verisign intentionally minimizes the number of lines of
code between the end-user and the data delivered. The result is a network of
restorable components that provide rapid, accurate updates. Figure 24-2 depicts
EPP traffic flows and local redundancy in Verisign's SRS provisioning
architecture. As detailed in the figure, local redundancy is maintained for each
layer as well as each piece of equipment. This built-in redundancy enhances
operational performance while enabling the future system scaling necessary to meet
additional demand created by this or future registry applications.

(See Figure 24-2, Built-in SRS Redundancy: Verisign's SRS system is built upon
multiple layers of redundancy to ensure the system remains highly available.)

Besides improving scalability and reliability, local SRS redundancy enables
Verisign to take down individual system components for maintenance and upgrades,
with little to no performance impact. With Verisign's redundant design, Verisign
can perform routine maintenance while the remainder of the system remains online
and unaffected. For the .PROTECTION gTLD registry, this flexibility minimizes
unplanned downtime and provides a more consistent end-user experience.

24.1.2 Representative Network Diagrams
Figure 24-3 provides a summary network diagram of Symantec Corporation's selected
back-end registry services provider's (Verisign's) SRS. This configuration at both
the primary and alternate-primary Verisign data centers provides a highly reliable
backup capability. Data is continuously replicated between both sites to ensure
failover to the alternate-primary site can be implemented expeditiously to support
both planned and unplanned outages.
(See Figure 24-3, SRS Network Diagram: Verisign's fully redundant SRS design and
geographically separated data centers help ensure service level availability

requirements are met.)
24.1.3 Number of Servers

As Symantec Corporation's selected provider of back-end registry services,
Verisign continually reviews its server deployments for all aspects of its
registry service. Verisign evaluates usage based on peak performance objectives as
well as current transaction volumes, which drive the quantity of servers in its
implementations. Verisign's scaling is based on the following factors:
Server configuration is based on CPU, memory, disk IO, total disk, and network
throughput projections.

Server quantity is determined through statistical modeling to fulfill overall
performance objectives as defined by both the service availability and the server
configuration.

To ensure continuity of operations for the .PROTECTION gTLD, Verisign uses a
minimum of 100 dedicated servers per SRS site. These servers are virtualized to
meet demand.

24.1.4 Description of Interconnectivity with Other Registry Systems

Figure 24-4 provides a technical overview of the Symantec Corporation's selected
back-end registry services provider's (Verisign's) SRS, showing how the SRS
component fits into this larger system and interconnects with other system
components.

(See Figure 24-4, Technical Overview: Verisign's SRS provides the registrar-facing
component of the system establishing the zone file needed to enable DNS and WHOIS
services.)

24.1.5 Frequency of Synchronization Between Servers

As Symantec Corporation's selected provider of back-end registry services,
Verisign uses synchronous replication to keep the Verisign SRS continuously in
sync between the two data centers. This synchronization is performed in near-real
time, thereby supporting rapid failover should a failure occur or a planned
maintenance outage be required.

24.1.6 Synchronization Scheme

Verisign uses synchronous replication to keep the Verisign SRS continuously in
sync between the two data centers. Because the alternate-primary site is
continuously up, and built using an identical design to the primary data center,
it is classified as a "hot standby."

24.2 Scalability and Performance Are Consistent with the overall business approach
and planned size of the registry

Verisign is an experienced back-end registry provider that has developed and uses
proprietary system scaling models to guide the growth of its TLD supporting
infrastructure. These models direct Verisign's infrastructure scaling to include,
but not be limited to, server capacity, data storage volume, and network
throughput that are aligned to projected demand and usage patterns. Verisign
periodically updates these models to account for the adoption of more capable and
cost-effective technologies.

Verisign's scaling models are proven predictors of needed capacity and related
cost. As such, they provide the means to link the projected infrastructure needs
of the .PROTECTION gTLD with necessary implementation and sustainment cost. Using
the projected usage volume for the "Most Likely" scenario (defined in Question 46,

Template 1 - Financial Projections: Most Likely) as an input to its scaling models, Verisign derived the necessary infrastructure required to implement and sustain this gTLD. Verisign's pricing for the back-end registry services it provides to Symantec Corporation fully accounts for cost related to this infrastructure, which is provided as "Total Critical Registry Function Cash Outflows" (Template 1, Line IIb.G) within the Question 46 financial projections response of this application.

24.3 Technical plan that is adequately resourced in the planned costs detailed in the financial section

Verisign, the Symantec Corporation's selected provider of back-end registry services, is an experienced back-end registry provider that has developed a set of proprietary resourcing models to project the number and type of personnel resources necessary to operate a TLD. Verisign routinely adjusts these staffing models to account for new tools and process innovations. These models enable Verisign to continually right-size its staff to accommodate projected demand and meet service level agreements as well as Internet security and stability requirements. Using the projected usage volume for the "Most Likely" scenario (defined in Question 46, Template 1 - Financial Projections: Most Likely) as an input to its staffing models, Verisign derived the necessary personnel levels required for this gTLD's initial implementation and ongoing maintenance. Verisign's pricing for the back-end registry services provided to Symantec Corporation fully accounts for this personnel-related cost, which is provided as "Total Critical Registry Function Cash Outflows" (Template 1, Line IIb.G) within the Question 46 financial projections response of this application.

Verisign employs more than 1,040 individuals of which more than 775 comprise its technical work force. (Current statistics are publicly available in Verisign's quarterly filings.) Drawing from this pool of on-hand and fully committed technical resources, Verisign has maintained DNS operational accuracy and stability 100 percent of the time for more than 13 years for .COM, proving Verisign's ability to align personnel resource growth to the scale increases of Verisign's TLD service offerings.

Verisign projects it will use the following personnel roles, which are described in Section 5 of the response to Question 31 of this application, Technical Overview of Proposed Registry, to support SRS performance:

-Application Engineers: 19
-Database Administrators: 8
-Database Engineers: 3
-Network Administrators: 11
-Network Architects: 4
-Project Managers: 25
-Quality Assurance Engineers: 11
-SRS System Administrators: 13
-Storage Administrators: 4
-Systems Architects: 9

To implement and manage the .PROTECTION gTLD as described in this application, Verisign, Symantec Corporation's selected back-end registry services provider, scales, as needed, the size of each technical area now supporting its portfolio of TLDs. Consistent with its resource modeling, Verisign periodically reviews the level of work to be performed and adjusts staff levels for each technical area.

When usage projections indicate a need for additional staff, Verisign's internal staffing group uses an in-place staffing process to identify qualified candidates. These candidates are then interviewed by the lead of the relevant technical area. By scaling one common team across all its TLDs instead of creating a new entity to

manage only this proposed gTLD, Verisign realizes significant economies of scale and ensures its TLD best practices are followed consistently. This consistent application of best practices helps ensure the security and stability of both the Internet and this proposed gTLD, as Verisign holds all contributing staff members accountable to the same procedures that guide its execution of the Internet's largest TLDs (i.e., .COM and .NET). Moreover, by augmenting existing teams, Verisign affords new employees the opportunity to be mentored by existing senior staff. This mentoring minimizes startup learning curves and helps ensure that new staff members properly execute their duties.

24.4 Evidence of Compliance with Specification 6 and 10 to the Registry Agreement

24.4.1 Section 1.2 (EPP) of Specification 6, Registry Interoperability and Continuity Specifications

Verisign, Symantec Corporation's selected back-end registry services provider, provides these services using its SRS, which complies fully with Specification 6, Section 1.2 of the Registry Agreement. In using its SRS to provide back-end registry services, Verisign implements and complies with relevant existing RFCs (i.e., 5730, 5731, 5732, 5733, 5734, and 5910) and intends to comply with RFCs that may be published in the future by the Internet Engineering Task Force (IETF), including successor standards, modifications, or additions thereto relating to the provisioning and management of domain names that use EPP. In addition, Verisign's SRS includes a Registry Grace Period (RGP) and thus complies with RFC 3915 and its successors. Details of the Verisign SRS' compliance with RFC SRS/EPP are provided in the response to Question 25, Extensible Provisioning Protocol, of this application. Verisign does not use functionality outside the base EPP RFCs, although proprietary EPP extensions are documented in Internet-Draft format following the guidelines described in RFC 3735 within the response to Question 25 of this application. Moreover, prior to deployment, Symantec Corporation will provide to ICANN updated documentation of all the EPP objects and extensions supported in accordance with Specification 6, Section 1.2.

24.4.2 Specification 10, EPP Registry Performance Specifications

Verisign's SRS meets all EPP Registry Performance Specifications detailed in Specification 10, Section 2. Evidence of this performance can be verified by a review of the .COM and .NET Registry Operator's Monthly Reports, which Verisign files with ICANN. These reports detail Verisign's operational status of the .COM and .NET registries, which use an SRS design and approach comparable to the one proposed for the .PROTECTION gTLD. These reports provide evidence of Verisign's ability to meet registry operation service level agreements (SLAs) comparable to those detailed in Specification 10. The reports are accessible at the following URL: http://www.icann.org/en/tlds/monthly-reports/.

In accordance with EPP Registry Performance Specifications detailed in Specification 10, Verisign's SRS meets the following performance attributes:

-EPP service availability: ≤ 864 minutes of downtime (≈98%)
-EPP session-command round trip time (RTT): ≤4000 milliseconds (ms), for at least 90 percent of the commands
-EPP query-command RTT: ≤2000 ms, for at least 90 percent of the commands
-EPP transform-command RTT: ≤4000 ms, for at least 90 percent of the commands

# 25. Extensible Provisioning Protocol (EPP)

VeriSign, Inc. Response to Question 25 Extensible Provisioning Protocol (EPP)

25.1 Complete knowledge and understanding of this aspect of registry technical requirements

VeriSign, Inc. ("Verisign'), Symantec Corporation's selected back-end registry services provider, has used Extensible Provisioning Protocol (EPP) since its inception and possesses complete knowledge and understanding of EPP registry systems. Its first EPP implementation – for a thick registry for the .NAME generic top-level domain (gTLD) – was in 2002. Since then Verisign has continued its RFC-compliant use of EPP in multiple TLDs. as detailed in Figure 25-1.

(See: Figure 25 1: EPP Implementations. Verisign has repeatedly proven its ability to successfully implement EPP for both small and large registries.)

Verisign's understanding of EPP and its ability to implement code that complies with the applicable RFCs is unparalleled. Mr. Scott Hollenbeck, Verisign's director of software development, authored the Extensible Provisioning Protocol and continues to be fully engaged in its refinement and enhancement (U.S. Patent Number 7299299 – Shared registration system for registering domain names). Verisign has also developed numerous new object mappings and object extensions following the guidelines in RFC 3735 (Guidelines for Extending the Extensible Provisioning Protocol). Mr. James Gould, a principal engineer at Verisign, led and co-authored the most recent EPP Domain Name System Security Extensions (DNSSEC) RFC effort (RFC 5910).

All registry systems for which Verisign is the registry operator or provides back-end registry services use EPP. Upon approval of this application, Verisign will use EPP to provide the back-end registry services for this gTLD. The .COM, .NET, and .NAME registries for which Verisign is the registry operator use an SRS design and approach comparable to the one proposed for this gTLD. Approximately 915 registrars use the Verisign EPP service, and the registry system performs more than 140 million EPP transactions daily without performance issues or restrictive maintenance windows. The processing time service level agreement (SLA) requirements for the Verisign-operated .NET gTLD are the strictest of the current Verisign managed gTLDs. All processing times for Verisign-operated gTLDs can be found in ICANN's Registry Operator's Monthly Reports at http://www.icann.org/en/tlds/monthly-reports/.

Verisign has also been active on the Internet Engineering Task Force (IETF) Provisioning Registry Protocol (provreg) working group and mailing list since work started on the EPP protocol in 2000. This working group provided a forum for members of the Internet community to comment on Mr. Scott Hollenbeck's initial EPP drafts, which Mr. Hollenbeck refined based on input and discussions with representatives from registries, registrars, and other interested parties. The working group has since concluded, but the mailing list is still active to enable discussion of different aspects of EPP.

25.1.1 EPP Interface with Registrars

Verisign, Symantec Corporation's selected back-end registry services provider, fully supports the features defined in the EPP specifications and provides a set of software development kits (SDK) and tools to help registrars build secure and stable interfaces. Verisign's SDKs give registrars the option of either fully writing their own EPP client software to integrate with the Shared Registration System (SRS), or using the Verisign-provided SDKs to aid them in the integration effort. Registrars can download the Verisign EPP SDKs and tools from the registrar website (http://www.Verisign.com/domain-name-services/current-registrars/epp-sdk/index.html).

The EPP SDKs provide a host of features including connection pooling, Secure Sockets Layer (SSL), and a test server (stub server) to run EPP tests against. One

tool—the EPP tool—provides a web interface for creating EPP Extensible Markup Language (XML) commands and sending them to a configurable set of target servers. This helps registrars in creating the template XML and testing a variety of test cases against the EPP servers. An Operational Test and Evaluation (OT&E) environment, which runs the same software as the production system so approved registrars can integrate and test their software before moving into a live production environment, is also available.

25.2 Technical plan scope/scale consistent with the overall business approach and planned size of the registry

Verisign, Symantec Corporation's selected back-end registry services provider, is an experienced back-end registry provider that has developed and uses proprietary system scaling models to guide the growth of its TLD supporting infrastructure. These models direct Verisign's infrastructure scaling to include, but not be limited to, server capacity, data storage volume, and network throughput that are aligned to projected demand and usage patterns. Verisign periodically updates these models to account for the adoption of more capable and cost-effective technologies.

Verisign's scaling models are proven predictors of needed capacity and related cost. As such, they provide the means to link the projected infrastructure needs of the .PROTECTION gTLD with necessary implementation and sustainment cost. Using the projected usage volume for the most likely scenario (defined in Question 46, Template 1 - Financial Projections: Most Likely) as an input to its scaling models, Verisign derived the necessary infrastructure required to implement and sustain this gTLD. Verisign's pricing for the back-end registry services it provides to Symantec Corporation fully accounts for cost related to this infrastructure, which is provided as "Total Critical Registry Function Cash Outflows" (Template 1, Line IIb.G) within the Question 46 financial projections response.

25.3 Technical plan that is adequately resourced in the planned costs detailed in the financial section

Verisign, Symantec Corporation's selected back-end registry services provider, is an experienced back-end registry provider that has developed a set of proprietary resourcing models to project the number and type of personnel resources necessary to operate a TLD. Verisign routinely adjusts these staffing models to account for new tools and process innovations. These models enable Verisign to continually right-size its staff to accommodate projected demand and meet service level agreements as well as Internet security and stability requirements. Using the projected usage volume for the most likely scenario (defined in Question 46, Template 1 - Financial Projections: Most Likely) as an input to its staffing models, Verisign derived the necessary personnel levels required for this gTLD's initial implementation and ongoing maintenance.

Verisign's pricing for the back-end registry services it provides to Symantec Corporation fully accounts for cost related to this infrastructure, which is provided as "Total Critical Registry Function Cash Outflows" (Template 1, Line IIb.G) within the Question 46 financial projections response.
Verisign employs more than 1,040 individuals of which more than 775 comprise its technical work force. (Current statistics are publicly available in Verisign's quarterly filings.) Drawing from this pool of on-hand and fully committed technical resources, Verisign has maintained DNS operational accuracy and stability 100 percent of the time for more than 13 years for .com, proving Verisign's ability to align personnel resource growth to the scale increases of Verisign's TLD service offerings.

Verisign projects it will use the following personnel roles, which are described

in Section 5 of the response to Question 31, Technical Overview of Proposed
Registry, to support the provisioning of EPP services:
- Application Engineers: 19
- Database Engineers: 3
- Quality Assurance Engineers: 11


To implement and manage the .PROTECTION gTLD as described in this application,
Verisign, Symantec Corporation's selected back-end registry services provider,
scales, as needed, the size of each technical area now supporting its portfolio of
TLDs. Consistent with its resource modeling, Verisign periodically reviews the
level of work to be performed and adjusts staff levels for each technical area.


When usage projections indicate a need for additional staff, Verisign's internal
staffing group uses an in-place staffing process to identify qualified candidates.
These candidates are then interviewed by the lead of the relevant technical area.
By scaling one common team across all its TLDs instead of creating a new entity to
manage only this proposed gTLD, Verisign realizes significant economies of scale
and ensures its TLD best practices are followed consistently. This consistent
application of best practices helps ensure the security and stability of both the
Internet and this proposed gTLD, as Verisign holds all contributing staff members
accountable to the same procedures that guide its execution of the Internet's
largest TLDs (i.e., .COM and .NET). Moreover, by augmenting existing teams,
Verisign affords new employees the opportunity to be mentored by existing senior
staff. This mentoring minimizes start-up learning curves and helps ensure that new
staff members properly execute their duties.


25.4 Ability to comply with Relevant RFCs

Verisign, Symantec Corporation's selected back-end registry services provider,
incorporates design reviews, code reviews, and peer reviews into its software
development lifecycle (SDLC) to ensure compliance with the relevant RFCs.
Verisign's dedicated QA team creates extensive test plans and issues internal
certifications when it has confirmed the accuracy of the code in relation to the
RFC requirements. Verisign's QA organization is independent from the development
team within engineering. This separation helps Verisign ensure adopted processes
and procedures are followed, further ensuring that all software releases fully
consider the security and stability of the TLD.


For the .PROTECTION gTLD, the Shared Registration System (SRS) complies with the
following IETF EPP specifications, where the XML templates and XML schemas are
defined in the following specifications:
- EPP RGP 3915 (http://www.apps.ietf.org/rfc/rfc3915.html): EPP Redemption Grace
Period (RGP) Mapping specification for support of RGP statuses and support of
Restore Request and Restore Report (authored by Verisign's Scott Hollenbeck)
- EPP 5730 (http://tools.ietf.org/html/rfc5730): Base EPP specification (authored
by Verisign's Scott Hollenbeck)
- EPP Domain 5731 (http://tools.ietf.org/html/rfc5731): EPP Domain Name Mapping
specification (authored by Verisign's Scott Hollenbeck)
- EPP Host 5732 (http://tools.ietf.org/html/rfc5732): EPP Host Mapping
specification (authored by Verisign's Scott Hollenbeck)
- EPP Contact 5733 (http://tools.ietf.org/html/rfc5733): EPP Contact Mapping
specification (authored by Verisign's Scott Hollenbeck)
- EPP TCP 5734 (http://tools.ietf.org/html/rfc5734): EPP Transport over
Transmission Control Protocol (TCP) specification (authored by Verisign's Scott
Hollenbeck)
- EPP DNSSEC 5910 (http://tools.ietf.org/html/rfc5910): EPP Domain Name System
Security Extensions (DNSSEC) Mapping specification (authored by Verisign's James
Gould and Scott Hollenbeck)


25.5 Proprietary EPP Extensions

Verisign, Symantec Corporation's selected back-end registry services provider,
uses its SRS to provide registry services. The SRS supports the following EPP
specifications, which Verisign developed following the guidelines in RFC 3735,
where the XML templates and XML schemas are defined in the specifications:
- IDN Language Tag (http://www.verisigninc.com/assets/idn-language-tag.pdf): EPP
internationalized domain names (IDN) language tag extension used for IDN domain
name registrations
- RGP Poll Mapping (http://www.verisigninc.com/assets/whois-info-extension.pdf):
EPP mapping for an EPP poll message in support of Restore Request and Restore
Report
- WHOIS Info Extension (http://www.verisigninc.com/assets/whois-info-
extension.pdf): EPP extension for returning additional information needed for
transfers
- EPP ConsoliDate Mapping (http://www.verisigninc.com/assets/consolidate-
mapping.txt): EPP mapping to support a Domain Sync operation for synchronizing
domain name expiration dates
- NameStore Extension (http://www.verisigninc.com/assets/namestore-extension.pdf):
EPP extension for routing with an EPP intelligent gateway to a pluggable set of
back-end products and services
- Low Balance Mapping (http://www.verisigninc.com/assets/low-balance-mapping.pdf):
EPP mapping to support low balance poll messages that proactively notify
registrars of a low balance (available credit) condition

As part of the 2006 implementation report to bring the EPP RFC documents from
Proposed Standard status to Draft Standard status, an implementation test matrix
was completed. Two independently developed EPP client implementations based on the
RFCs were tested against the Verisign EPP server for the domain, host, and contact
transactions. No compliance-related issues were identified during this test,
providing evidence that these extensions comply with RFC 3735 guidelines and
further demonstrating Verisign's ability to design, test, and deploy an RFC-
compliant EPP implementation.

25.5.1 EPP Templates and Schemas

The EPP XML schemas are formal descriptions of the EPP XML templates. They are
used to express the set of rules to which the EPP templates must conform in order
to be considered valid by the schema. The EPP schemas define the building blocks
of the EPP templates, describing the format of the data and the different EPP
commands' request and response formats. The current EPP implementations managed by
Verisign, Symantec Corporation's selected back-end registry services provider, use
these EPP templates and schemas, as will the proposed TLD. For each proprietary
XML template/schema Verisign provides a reference to the applicable template and
includes the schema.

25.5.1.1 XML templates/schema for idnLang-1.0
Template: The templates for idnLang-1.0 can be found in Chapter 3, EPP Command
Mapping of the relevant EPP documentation, http://www.verisigninc.com/assets/idn-
language-tag.pdf.
Schema: This schema describes the extension mapping for the IDN language tag. The
mapping extends the EPP domain name mapping to provide additional features
required for the provisioning of IDN domain name registrations.

  <?xml version="1.0" encoding="UTF-8"?>

  <schema targetNamespace="http://www.Verisign.com/epp/idnLang-1.0"
   xmlns:idnLang="http://www.Verisign.com/epp/idnLang-1.0"
   xmlns="http://www.w3.org/2001/XMLSchema"
   elementFormDefault="qualified")

```
(annotation)
  (documentation)
   Extensible Provisioning Protocol v1.0 domain name
   extension schema for IDN Lang Tag.
  (/documentation)
(/annotation)

(!--
Child elements found in EPP commands.
--)
  (element name="tag" type="language"/)

  (!--
 End of schema.
 --)
(/schema)
```

25.5.1.2 XML templates/schema for rgp-poll-1.0
Template: The templates for rgp-poll-1.0 can be found in Chapter 3, EPP Command
Mapping of the relevant EPP documentation, http://www.verisigninc.com/assets/rgp-
poll-mapping.pdf.
Schema: This schema describes the extension mapping for poll notifications. The
mapping extends the EPP base mapping to provide additional features for registry
grace period (RGP) poll notifications.

```
(?xml version="1.0" encoding="UTF-8"?)

(schema targetNamespace="http://www.Verisign.com/epp/rgp-poll-1.0"
  xmlns:rgp-poll="http://www.Verisign.com/epp/rgp-poll-1.0"
  xmlns:eppcom="urn:ietf:params:xml:ns:eppcom-1.0"
  xmlns:rgp="urn:ietf:params:xml:ns:rgp-1.0"
  xmlns="http://www.w3.org/2001/XMLSchema"
  elementFormDefault="qualified")

(!--
Import common element types.
--)
(import namespace="urn:ietf:params:xml:ns:eppcom-1.0"
  schemaLocation="eppcom-1.0.xsd"/)
(import namespace="urn:ietf:params:xml:ns:rgp-1.0"
  schemaLocation="rgp-1.0.xsd"/)

(annotation)
  (documentation)
   Extensible Provisioning Protocol v1.0
   Verisign poll notification specification for registry grace period
   poll notifications.
  (/documentation)
(/annotation)

(!--
Child elements found in EPP commands.
--)
(element name="pollData" type="rgp-poll:pollDataType"/)

(!--
Child elements of the (notifyData) element for the
redemption grace period.
--)
(complexType name="pollDataType")
```

```
    〈sequence〉
      〈element name="name" type="eppcom:labelType"/〉
      〈element name="rgpStatus" type="rgp:statusType"/〉
      〈element name="reqDate" type="dateTime"/〉
      〈element name="reportDueDate" type="dateTime"/〉
    〈/sequence〉
  〈/complexType〉
  〈
!--
End of schema.
--〉
 〈/schema〉
```

25.5.1.3 XML templates/schema for whoisInf-1.0
Template: The templates for whoisInf-1.0 can be found in Chapter 3, EPP Command
Mapping of the relevant EPP documentation,
http://www.verisigninc.com/assets/whois-info-extension.pdf.
Schema: This schema describes the extension mapping for the Whois Info extension.
The mapping extends the EPP domain name mapping to provide additional features for
returning additional information needed for transfers.

```
 〈?xml version="1.0" encoding="UTF-8"?〉

 〈schema targetNamespace="http://www.Verisign.com/epp/whoisInf-1.0"
  xmlns:whoisInf="http://www.Verisign.com/epp/whoisInf-1.0"
  xmlns:eppcom="urn:ietf:params:xml:ns:eppcom-1.0"
  xmlns="http://www.w3.org/2001/XMLSchema"
  elementFormDefault="qualified"〉

 〈import namespace="urn:ietf:params:xml:ns:eppcom-1.0"
  schemaLocation="eppcom-1.0.xsd"/〉

 〈annotation〉
    〈documentation〉
     Extensible Provisioning Protocol v1.0
     extension schema for Whois Info
    〈/documentation〉
 〈/annotation〉

 〈!--
Possible Whois Info extension root elements.
--〉
 〈element name="whoisInf" type="whoisInf:whoisInfType"/〉
 〈element name="whoisInfData" type="whoisInf:whoisInfDataType"/〉

 〈!--
Child elements for the 〈whoisInf〉 extension which
is used as an extension to an info command.
--〉
 〈complexType name="whoisInfType"〉
    〈sequence〉
      〈element name="flag" type="boolean"/〉
    〈/sequence〉
 〈/complexType〉

 〈!--
Child elements for the 〈whoisInfData〉 extension which
is used as an extension to the info response.
--〉
 〈complexType name="whoisInfDataType"〉
```

```
(sequence)
(element name="registrar" type="string"/)
(element name="whoisServer" type="eppcom:labelType"
  minOccurs="0"/)
(element name="url" type="token" minOccurs="0"/)
(element name="irisServer" type="eppcom:labelType"
  minOccurs="0"/)
(/sequence)
(/complexType)

(/schema)
```

25.5.1.4 XML templates/schema for sync-1.0 (consoliDate)
Template: The templates for sync-1.0 can be found in Chapter 3, EPP Command
Mapping of the relevant EPP documentation,
http://www.verisigninc.com/assets/consolidate-mapping.txt.
Schema: This schema describes the extension mapping for the synchronization of
domain name registration period expiration dates. This service is known as
"ConsoliDate." The mapping extends the EPP domain name mapping to provide features
that allow a protocol client to end a domain name registration period on a
specific month and day.

```
(?xml version="1.0" encoding="UTF-8"?)

(schema targetNamespace="http://www.Verisign.com/epp/sync-1.0"
       xmlns:sync="http://www.Verisign.com/epp/sync-1.0"
       xmlns="http://www.w3.org/2001/XMLSchema"
       elementFormDefault="qualified")

  (annotation)
    (documentation)
      Extensible Provisioning Protocol v1.0 domain name
      extension schema for expiration date synchronization.
    (/documentation)
  (/annotation)

  (!--
Child elements found in EPP commands.
--)
    (element name="update" type="sync:updateType"/)

  (!--
Child elements of the (update) command.
--)
    (complexType name="updateType")
      (sequence)
        (element name="expMonthDay" type="gMonthDay"/)
      (/sequence)
    (/complexType)

  (!--
End of schema.
--)
    (/schema)
```

25.5.1.5 XML templates/schema for namestoreExt-1.1
Template: The templates for namestoreExt-1.1 can be found in Chapter 3, EPP
Command Mapping of the relevant EPP documentation,
http://www.verisigninc.com/assets/namestore-extension.pdf.
Schema: This schema describes the extension mapping for the routing with an EPP

intelligent gateway to a pluggable set of back-end products and services. The mapping extends the EPP domain name and host mapping to provide a sub-product identifier to identify the target sub-product that the EPP operation is intended for.

```
<?xml version="1.0" encoding="UTF-8"?>

<schema targetNamespace="http://www.Verisign-grs.com/epp/namestoreExt-1.1"
 xmlns="http://www.w3.org/2001/XMLSchema"
 xmlns:namestoreExt="http://www.Verisign-grs.com/epp/namestoreExt-1.1"
 elementFormDefault="qualified">

<annotation>
  <documentation>
   Extensible Provisioning Protocol v1.0 Namestore extension schema
   for destination registry routing.
  </documentation>
</annotation>

<!-- General Data types. -->
<simpleType name="subProductType">
  <restriction base="token">
    <minLength value="1"/>
    <maxLength value="64"/>
  </restriction>
</simpleType>

<complexType name="extAnyType">
  <sequence>
    <any namespace="##other" maxOccurs="unbounded"/>
  </sequence>
</complexType>

<!-- Child elements found in EPP commands and responses. -->
<element name="namestoreExt" type="namestoreExt:namestoreExtType"/>

<!-- Child elements of the <product> command. -->
<complexType name="namestoreExtType">
  <sequence>
    <element name="subProduct"
      type="namestoreExt:subProductType"/>
  </sequence>
</complexType>

<!-- Child response elements. -->
<element name="nsExtErrData" type="namestoreExt:nsExtErrDataType"/>

<!-- <prdErrData> error response elements. -->
<complexType name="nsExtErrDataType">
  <sequence>
    <element name="msg" type="namestoreExt:msgType"/>
  </sequence>
</complexType>

<!-- <prdErrData> <msg> element. -->
<complexType name="msgType">
  <simpleContent>
    <extension base="normalizedString">
      <attribute name="code"
        type="namestoreExt:prdErrCodeType" use="required"/>
```

```
      (attribute name="lang" type="language" default="en"/)
    (/extension)
  (/simpleContent)
(/complexType)

(!-- (prdErrData)  error response codes. --)
(simpleType name="prdErrCodeType")
  (restriction base="unsignedShort")
    (enumeration value="1"/)
  (/restriction)
(/simpleType)

(!-- End of schema. --)
(/schema)
```

25.5.1.6 XML templates/schema for lowbalance-poll-1.0
Template: The templates for lowbalance-poll-1.0 can be found in Chapter 3, EPP
Command Mapping of the relevant EPP documentation,
http://www.verisigninc.com/assets/low-balance-mapping.pdf.
Schema: This schema describes the extension mapping for the account low balance
notification. The mapping extends the EPP base mapping so an account holder can be
notified via EPP poll messages whenever the available credit for an account
reaches or goes below the credit threshold.

```
(?xml version="1.0" encoding="UTF-8"?)

(schema targetNamespace="http://www.Verisign.com/epp/lowbalance-poll-1.0"
  xmlns:lowbalance-poll="http://www.Verisign.com/epp/lowbalance-poll-1.0"
  xmlns:eppcom="urn:ietf:params:xml:ns:eppcom-1.0"
  xmlns="http://www.w3.org/2001/XMLSchema"
  elementFormDefault="qualified")

(!-- Import common element types.--)
(import namespace="urn:ietf:params:xml:ns:eppcom-1.0"
  schemaLocation="eppcom-1.0.xsd"/)

(annotation)
  (documentation)
   Extensible Provisioning Protocol v1.0
   Verisign poll notification specification for low balance notifications.
  (/documentation)
(/annotation)

(!--Child elements found in EPP commands.--)
(element name="pollData" type="lowbalance-poll:pollDataType"/)

(!--Child elements of the (notifyData) element for the low balance.--)
(complexType name="pollDataType")
  (sequence)
    (element name="registrarName" type="eppcom:labelType"/)
    (element name="creditLimit" type="normalizedString"/)
    (element name="creditThreshold"
     type="lowbalance-poll:thresholdType"/)
    (element name="availableCredit" type="normalizedString"/)
  (/sequence)
(/complexType)

(complexType name="thresholdType")
  (simpleContent)
    (extension base="normalizedString")
```

```
     (attribute name="type"
      type="lowbalance-poll:thresholdValueType"
      use="required"/)
   (/extension)
  (/simpleContent)
(/complexType)

(simpleType name="thresholdValueType")
  (restriction base="token")
    (enumeration value="FIXED"/)
    (enumeration value="PERCENT"/)
  (/restriction)
(/simpleType)

(!-- End of schema.--)
(/schema)
```

25.6 Proprietary EPP Extension Consistency with Registration Lifecycle

Symantec Corporation's selected back-end registry services provider's (Verisign's)
proprietary EPP extensions, defined in Section 5 above, are consistent with the
registration lifecycle documented in the response to Question 27, Registration
Lifecycle. Details of the registration lifecycle are presented in that response.
As new registry features are required, Verisign develops proprietary EPP
extensions to address new operational requirements. Consistent with ICANN
procedures Verisign adheres to all applicable Registry Services Evaluation Process
(RSEP) procedures.


# 26. Whois

VeriSign, Inc. Response to Question 26, WHOIS

26.1 Complete knowledge and understanding of this aspect of registry technical
requirements
VeriSign, Inc. ("Verisign") Symantec Corporation's selected back-end registry
services provider, has operated the WHOIS lookup service for the gTLDs and ccTLDs
it manages since 1991, and will provide these proven services for the .PROTECTION
gTLD registry. In addition, it continues to work with the Internet community to
improve the utility of WHOIS data, while thwarting its application for abusive
uses.
26.1.1 High-Level WHOIS System Description
Like all other components of Symantec Corporation's selected back-end registry
services provider's (Verisign's) registry service, Verisign's WHOIS system is
designed and built for both reliability and performance in full compliance with
applicable RFCs. Verisign's current WHOIS implementation has answered more than
five billion WHOIS queries per month for the TLDs it manages, and has experienced
more than 250,000 queries per minute in peak conditions. The proposed gTLD uses a
WHOIS system design and approach that is comparable to the current implementation.
Independent quality control testing ensures Verisign's WHOIS service is RFC-
compliant through all phases of its lifecycle.
Verisign's redundant WHOIS databases further contribute to overall system
availability and reliability. The hardware and software for its WHOIS service is
architected to scale both horizontally (by adding more servers) and vertically (by
adding more CPUs and memory to existing servers) to meet future need.
Verisign can fine-tune access to its WHOIS database on an individual Internet
Protocol (IP) address basis, and it works with registrars to help ensure their

services are not limited by any restriction placed on WHOIS. Verisign provides
near real-time updates for WHOIS services for the TLDs under its management. As
information is updated in the registration database, it is propagated to the WHOIS
servers for quick publication. These updates align with the near real-time
publication of Domain Name System (DNS) information as it is updated in the
registration database. This capability is important for the .PROTECTION gTLD
registry as it is Verisign's experience that when DNS data is updated in near real
time, so should WHOIS data be updated to reflect the registration specifics of
those domain names.
Verisign's WHOIS response time has been less than 500 milliseconds for 95 percent
of all WHOIS queries in .COM, .NET, .TV, and .CC. The response time in these TLDs,
combined with Verisign's capacity, enables the WHOIS system to respond to up to
30,000 searches (or queries) per second for a total capacity of 2.6 billion
queries per day.
The WHOIS software written by Verisign complies with RFC 3912. Verisign uses an
advanced in-memory database technology to provide exceptional overall system
performance and security. In accordance with RFC 3912, Verisign provides a website
at whois.nic.PROTECTION that provides free public query-based access to the
registration data.
Verisign currently operates both thin and thick WHOIS systems.
Verisign commits to implementing a RESTful WHOIS service upon finalization of
agreements with the IETF (Internet Engineering Task Force).
26.1.1a Provided Functionalities for User Interface
To use the WHOIS service via port 43, the user enters the applicable parameter on
the command line as illustrated here:
-For domain name: whois EXAMPLE.TLD
-For registrar: whois "registrar Example Registrar, Inc."
-For name server: whois "NS1.EXAMPLE.TLD" or whois "name server (IP address)"
To use the WHOIS service via the Web-based directory service search interface:
-Go to http:⁄⁄whois.nic.PROTECTION
-Click on the appropriate button (Domain, Registrar, or Name Server)
-Enter the applicable parameter:
--Domain name, including the TLD (e.g., EXAMPLE.TLD)
--Full name of the registrar, including punctuation (e.g., Example Registrar,
Inc.)
--Full host name or the IP address (e.g., NS1.EXAMPLE.TLD or 198.41.3.39)
-Click on the Submit button.
26.1.1b Provisions to Ensure That Access Is Limited to Legitimate Authorized Users
and Is in Compliance with Applicable Privacy Laws or Policies
To further promote reliable and secure WHOIS operations, Verisign, Symantec
Corporation's selected back-end registry services provider, has implemented rate-
limiting characteristics within the WHOIS service software. For example, to
prevent data mining or other abusive behavior, the service can throttle a specific
requestor if the query rate exceeds a configurable threshold. In addition, QoS
technology enables rate limiting of queries before they reach the servers, which
helps protect against denial of service (DoS) and distributed denial of service
(DDoS) attacks.
Verisign's software also permits restrictions on search capabilities. For example,
wild card searches can be disabled. If needed, it is possible to temporarily
restrict and⁄or block requests coming from specific IP addresses for a
configurable amount of time. Additional features that are configurable in the
WHOIS software include help files, headers and footers for WHOIS query responses,
statistics, and methods to memory map the database. Furthermore, Verisign is
European Union (EU) Safe Harbor certified and has worked with European data
protection authorities to address applicable privacy laws by developing a tiered
WHOIS access structure that requires users who require access to more extensive
data to (i) identify themselves, (ii) confirm that their use is for a specified
purpose and (iii) enter into an agreement governing their use of the more
extensive WHOIS data.
26.1.2 Relevant Network Diagrams

Figure 26-1 provides a summary network diagram of the WHOIS service provided by Verisign, Symantec Corporation's selected back-end registry services provider. The figure details the configuration with one resolution/WHOIS site. For the .PROTECTION gTLD, Verisign provides WHOIS service from six of its 17 primary sites based on the proposed gTLD's traffic volume and patterns. A functionally equivalent resolution architecture configuration exists at each WHOIS site.

26.1.3 IT and Infrastructure Resources

Figure 26-2 summarizes the IT and infrastructure resources that Verisign, Symantec Corporation's selected back-end registry services provider, uses to provision WHOIS services from Verisign primary resolution sites. As needed, virtual machines are created based on actual and projected demand.

See Figure 26-2

26.1.4 Description of Interconnectivity with Other Registry Systems

Figure 26-3 provides a technical overview of the registry system provided by Verisign, Symantec Corporation's selected back-end registry services provider, and shows how the WHOIS service component fits into this larger system and interconnects with other system components.

26.1.5 Frequency of Synchronization Between Servers

Synchronization between the SRS and the geographically distributed WHOIS resolution sites occurs approximately every three minutes. Verisign, Symantec Corporation's selected back-end registry services provider, uses a two-part WHOIS update process to ensure WHOIS data is accurate and available. Every 12 hours an initial file is distributed to each resolution site. This file is a complete copy of all WHOIS data fields associated with each domain name under management. As interactions with the SRS cause the WHOIS data to be changed, these incremental changes are distributed to the resolution sites as an incremental file update. This incremental update occurs approximately every three minutes. When the new 12-hour full update is distributed, this file includes all past incremental updates. Verisign's approach to frequency of synchronization between servers meets the Performance Specifications defined in Specification 10 of the Registry Agreement for new gTLDs.

26.2 Technical plan scope/scale consistent with the overall business approach and planned size of the registry

Verisign, Symantec Corporation's selected back-end registry services provider, is an experienced back-end registry provider that has developed and uses proprietary system scaling models to guide the growth of its TLD supporting infrastructure. These models direct Verisign's infrastructure scaling to include, but not be limited to, server capacity, data storage volume, and network throughput that are aligned to projected demand and usage patterns. Verisign periodically updates these models to account for the adoption of more capable and cost-effective technologies.

Verisign's scaling models are proven predictors of needed capacity and related cost. As such, they provide the means to link the projected infrastructure needs of the .PROTECTION gTLD with necessary implementation and sustainment cost. Using the projected usage volume for the "Most Likely" scenario (defined in Question 46, Template 1 – Financial Projections: Most Likely) as an input to its scaling models, Verisign derived the necessary infrastructure required to implement and sustain this gTLD. Verisign's pricing for the back-end registry services it provides to Symantec Corporation fully accounts for cost related to this infrastructure, which is provided as "Total Critical Registry Function Cash Outflows" (Template 1, Line IIb.G) within the Question 46 financial projections response of this application.

26.3 Technical plan that is adequately resourced in the planned costs detailed in the financial section

Verisign, Symantec Corporation's selected back-end registry services provider, is an experienced back-end registry provider that has developed a set of proprietary resourcing models to project the number and type of personnel resources necessary to operate a TLD. Verisign routinely adjusts these staffing models to account for new tools and process innovations. These models enable Verisign to continually right-size its staff to accommodate projected demand and meet service level

agreements as well as Internet security and stability requirements. Using the projected usage volume for the "Most Likely" scenario (defined in Question 46, Template 1 - Financial Projections: Most Likely) as an input to its staffing models, Verisign derived the necessary personnel levels required for this gTLD's initial implementation and ongoing maintenance. Verisign's pricing for the back-end registry services it provides to Symantec Corporation fully accounts for cost related to this infrastructure, which is provided as "Total Critical Registry Function Cash Outflows" (Template 1, Line IIb.G) within the Question 46 financial projections response of this application.

Verisign employs more than 1,040 individuals of which more than 775 comprise its technical work force. (Current statistics are publicly available in Verisign's quarterly filings.) Drawing from this pool of on-hand and fully committed technical resources, Verisign has maintained DNS operational accuracy and stability 100 percent of the time for more than 13 years for .COM, proving Verisign's ability to align personnel resource growth to the scale increases of Verisign's TLD service offerings.

Verisign projects it will use the following personnel roles, which are described in Section 5 of the response to Question 31, Technical Overview of Proposed Registry, of this application to support WHOIS services:

-Application Engineers: 19
-Database Engineers: 3
-Quality Assurance Engineers: 11

To implement and manage the .PROTECTION gTLD as described in this application, Verisign, Symantec Corporation's selected back-end registry services provider, scales, as needed, the size of each technical area now supporting its portfolio of TLDs. Consistent with its resource modeling, Verisign periodically reviews the level of work to be performed and adjusts staff levels for each technical area. When usage projections indicate a need for additional staff, Verisign's internal staffing group uses an in-place staffing process to identify qualified candidates. These candidates are then interviewed by the lead of the relevant technical area. By scaling one common team across all its TLDs instead of creating a new entity to manage only this proposed gTLD, Verisign realizes significant economies of scale and ensures its TLD best practices are followed consistently. This consistent application of best practices helps ensure the security and stability of both the Internet and this proposed gTLD, as Verisign holds all contributing staff members accountable to the same procedures that guide its execution of the Internet's largest TLDs (i.e., .COM and .NET). Moreover, by augmenting existing teams, Verisign affords new employees the opportunity to be mentored by existing senior staff. This mentoring minimizes startup learning curves and helps ensure that new staff members properly execute their duties.

26.4 Compliance with Relevant RFC

Symantec Corporation's selected back-end registry services provider's (Verisign's) WHOIS service complies with the data formats defined in Specification 4 of the Registry Agreement. Verisign will provision WHOIS services for registered domain names and associated data in the top-level domain (TLD). Verisign's WHOIS services are accessible over Internet Protocol version 4 (IPv4) and Internet Protocol version 6 (IPv6), via both Transmission Control Protocol (TCP) port 43 and a Web-based directory service at whois.nic.PROTECT, which, in accordance with RFC 3912, provides free public query-based access to domain name, registrar, and name server lookups. Verisign's proposed WHOIS system meets all requirements as defined by ICANN for each registry under Verisign management. Evidence of this successful implementation, and thus compliance with the applicable RFCs, can be verified by a review of the .COM and .NET Registry Operator's Monthly Reports that Verisign files with ICANN. These reports provide evidence of Verisign's ability to meet registry operation service level agreements (SLAs) comparable to those detailed in Specification 10. The reports are accessible at the following URL: http://www.icann.org/en/tlds/monthly-reports/.

26.5 Compliance with Specifications 4 and 10 of Registry Agreement

In accordance with Specification 4, Verisign, Symantec Corporation's selected back-end registry services provider, provides a WHOIS service that is available

via both port 43 in accordance with RFC 3912, and a Web-based directory service at whois.nic.PROTECT also in accordance with RFC 3912, thereby providing free public query-based access. Verisign acknowledges that ICANN reserves the right to specify alternative formats and protocols, and upon such specification, Verisign will implement such alternative specification as soon as reasonably practicable.
The format of the following data fields conforms to the mappings specified in Extensible Provisioning Protocol (EPP) RFCs 5730 - 5734 so the display of this information (or values returned in WHOIS responses) can be uniformly processed and understood: domain name status, individual and organizational names, address, street, city, state⁄province, postal code, country, telephone and fax numbers, email addresses, date, and times.
Specifications for data objects, bulk access, and lookups comply with Specification 4 and are detailed in the following subsections, provided in both bulk access and lookup modes.
Bulk Access Mode: This data is provided on a daily schedule to a party designated from time to time in writing by ICANN. The specification of the content and format of this data, and the procedures for providing access, shall be as stated below, until revised in the ICANN Registry Agreement.
The data is provided in three files:
-Domain Name File: For each domain name, the file provides the domain name, server name for each name server, registrar ID, and updated date.
-Name Server File: For each registered name server, the file provides the server name, each IP address, registrar ID, and updated date.
-Registrar File: For each registrar, the following data elements are provided: registrar ID, registrar address, registrar telephone number, registrar email address, WHOIS server, referral URL, updated date, and the name, telephone number, and email address of all the registrar's administrative, billing, and technical contacts.
Lookup Mode: Figures 26-4 through 26-6 provide the query and response format for domain name, registrar, and name server data objects.
See Figure 26-4
See Figure 26-5
See Figure 26-6
26.5.1 Specification 10, RDDS Registry Performance Specifications
The WHOIS service meets all registration data directory services (RDDS) registry performance specifications detailed in Specification 10, Section 2. Evidence of this performance can be verified by a review of the .COM and .NET Registry Operator's Monthly Reports that Verisign files monthly with ICANN. These reports are accessible from the ICANN website at the following URL:
http:⁄⁄www.icann.org⁄en⁄tlds⁄monthly-reports⁄.
In accordance with RDDS registry performance specifications detailed in Specification 10, Verisign's WHOIS service meets the following proven performance attributes:
-RDDS availability: GBP 864 min of downtime (greater than 98%)
-RDDS query RTT: GBP 2000 ms, for at least 95% of the queries
-RDDS update time: GBP 60 min, for at least 95% of the probes
26.6 Searchable WHOIS
Verisign, Symantec Corporation's selected back-end registry services provider, provides a searchable WHOIS service for the .PROTECTION gTLD. Verisign has experience in providing tiered access to WHOIS for the .NAME registry, and uses these methods and control structures to help reduce potential malicious use of the function. The searchable WHOIS system currently uses Apache's Lucene full text search engine to index relevant WHOIS content with near-real time incremental updates from the provisioning system.
Features of the Verisign searchable WHOIS function include:
-Provision of a Web-based searchable directory service
-Ability to perform partial match, at least, for the following data fields: domain name, contacts and registrant's name, and contact and registrant's postal address, including all the sub-fields described in EPP (e.g., street, city, state, or province)

-Ability to perform exact match, at least, on the following fields: registrar ID, name server name, and name server's IP address (only applies to IP addresses stored by the registry, i.e., glue records)
-Ability to perform Boolean search supporting, at least, the following logical operators to join a set of search criteria: AND, OR, NOT
-Search results that include domain names that match the selected search criteria
Verisign's implementation of searchable WHOIS is EU Safe Harbor certified and includes appropriate access control measures that help ensure that only legitimate authorized users can use the service. Furthermore, Verisign's compliance office monitors current ICANN policy and applicable privacy laws or policies to help ensure the solution is maintained within compliance of applicable regulations. Features of these access control measures include:
-All unauthenticated searches are returned as thin results
-Registry system authentication is used to grant access to appropriate users for thick WHOIS data search results.
-Account access is granted by the Symantec Corporation's defined .PROTECTION gTLD admin user.
Potential Forms of Abuse and Related Risk Mitigation: Leveraging its experience providing tiered access to WHOIS for the .NAME registry and interacting with ICANN, data protection authorities, and applicable industry groups, Verisign, Symantec Corporation's selected back-end registry services provider, is knowledgeable of the likely data mining forms of abuse associated with a searchable WHOIS service. Figure 26-7 summarizes these potential forms of abuse and Verisign's approach to mitigate the identified risk.
See Figure 26-7


# 27. Registration Life Cycle

VeriSign, Inc. Response to Q27 Registration Lifecycle

27.1 Complete Knowledge and Understanding of Registration Lifecycles and States

Starting with domain name registration and continuing through domain name delete operations, Symantec Corporation's selected backend registry services provider's (Verisign's) registry implements the full registration lifecycle for domain names supporting the operations in the Extensible Provisioning Protocol (EPP) specification. The registration lifecycle of the domain name starts with registration and traverses various states as specified in the following sections. The registry system provides options to update domain names with different server and client status codes that block operations based on the EPP specification. The system also provides different grace periods for different billable operations, where the price of the billable operation is credited back to the registrar if the billable operation is removed within the grace period. Together Figure 27 1 and Figure 27 2 define the registration states comprising the registration lifecycle and explain the trigger points that cause state-to-state transitions. States are represented as green rectangles within Figure 27 1.

See: Figure 27 1: Registration Lifecycle State Diagram

See: Figure 27 2: Registration States
27.1.1 Registration Lifecycle of Create/Update/Delete

The following section details the create/update/delete processes and the related renewal process that Verisign, Symantec Corporation's selected backend registry services provider, follows. For each process, this response defines the process function and its characterization, and as appropriate provides a process flow chart.

Case 1:15-cv-01028-LPS-IDB   Document 1-4   Filed 08/13/15   Page 52 of 105 PageID# 398

Create Process: The domain name lifecycle begins with a registration or what is referred to as a Domain Name Create operation in EPP. The system fully supports the EPP Domain Name Mapping as defined by RFC 5731, where the associated objects (e.g., hosts and contacts) are created independent of the domain name.

Process Characterization: The Domain Name Create command is received, validated, run through a set of business rules, persisted to the database, and committed in the database if all business rules pass. The domain name is included with the data flow to the DNS and WHOIS resolution services. If no name servers are supplied, the domain name is not included with the data flow to the DNS. A successfully created domain name has the created date and expiration date set in the database. Creates are subject to grace periods as described in Section 1.3 of this response, Add Grace Period, Redemption Grace Period, and Notice Periods for Renewals or Transfers.

The Domain Name Create operation is detailed in Figure 27 3 and requires the following attributes:
- A domain name that meets the string restrictions.
- A domain name that does not already exist.
- The registrar is authorized to create a domain name in .PROTECTION.
- The registrar has available credit.
- A valid Authorization Information (Auth-Info) value.
- Required contacts (e.g., registrant, administrative contact, technical contact, and billing contact) are specified and exist.
- The specified name servers (hosts) exist, and there is a maximum of 13 name servers.
- A period in units of years with a maximum value of 10 (default period is one year).

See: Figure 27 3: Create Process Flow Chart

Renewal Process: The domain name can be renewed unless it has any form of Pending Delete, Pending Transfer, or Renew Prohibited.

A request for renewal that sets the expiry date to more than ten years in the future is denied. The registrar must pass the current expiration date (without the timestamp) to support the idempotent features of EPP, where sending the same command a second time does not cause unexpected side effects.

Automatic renewal occurs when a domain name expires. On the expiration date, the registry extends the registration period one year and debits the registrar account balance. In the case of an auto-renewal of the domain name, a separate Auto-Renew grace period applies. Renewals are subject to grace periods as described in Section 1.3 of this response, Add Grace Period, Redemption Grace Period, and Notice Periods for Renewals or Transfers.

Process Characterization: The Domain Name Renew command is received, validated, authorized, and run through a set of business rules. The data is updated and committed in the database if it passes all business rules. The updated domain name's expiration date is included in the flow to the WHOIS resolution service.

The Domain Name Renew operation is detailed in Figure 27 4 and requires the following attributes:
- A domain name that exists and is sponsored by the requesting registrar.
- The registrar is authorized to renew a domain name in .PROTECTION.
- The registrar has available credit.
- The passed current expiration date matches the domain name's expiration date.
- A period in units of years with a maximum value of 10 (default period is one year). A domain name expiry past ten years is not allowed.

See: Figure 27 4: Renewal Process Flow Chart

Registrar Transfer Procedures. A registrant may transfer his/her domain name from his/her current registrar to another registrar. The database system allows a transfer as long as the transfer is not within the initial 60 days, per industry standard, of the original registration date.
The registrar transfer process goes through many process states, which are described in detail below, unless it has any form of Pending Delete, Pending Transfer, or Transfer Prohibited.

A transfer can only be initiated when the appropriate Auth-Info is supplied. The Auth-Info for transfer is only available to the current registrar. Any other registrar requesting to initiate a transfer on behalf of a registrant must obtain the Auth-Info from the registrant.

The Auth-Info is made available to the registrant upon request. The registrant is the only party other than the current registrar that has access to the Auth-Info. Registrar transfer entails a specified extension of the expiry date for the object. The registrar transfer is a billable operation and is charged identically to a renewal for the same extension of the period. This period can be from one to ten years, in one-year increments.

Because registrar transfer involves an extension of the registration period, the rules and policies applying to how the resulting expiry date is set after transfer are based on the renewal policies on extension.

Per industry standard, a domain name cannot be transferred to another registrar within the first 60 days after registration. This restriction continues to apply if the domain name is renewed during the first 60 days. Transfer of the domain name changes the sponsoring registrar of the domain name, and also changes the child hosts (ns1.sample.xyz) of the domain name (sample .xyz).

The domain name transfer consists of five separate operations:
- Transfer Request (Figure 27 5): Executed by a non-sponsoring registrar with the valid Auth-Info provided by the registrant. The Transfer Request holds funds of the requesting registrar but does not bill the registrar until the transfer is completed. The sponsoring registrar receives a Transfer Request poll message.
- Transfer Cancel (Figure 27 6): Executed by the requesting registrar to cancel the pending transfer. The held funds of the requesting registrar are reversed. The sponsoring registrar receives a Transfer Cancel poll message.
- Transfer Approve (Figure 27 7): Executed by the sponsoring registrar to approve the Transfer Request. The requesting registrar is billed for the Transfer Request and the sponsoring registrar is credited for an applicable Auto-Renew grace period. The requesting registrar receives a Transfer Approve poll message.
- Transfer Reject (Figure 27 8): Executed by the sponsoring registrar to reject the pending transfer. The held funds of the requesting registrar are reversed. The requesting registrar receives a Transfer Reject poll message.
- Transfer Query (Figure 27 9): Executed by either the requesting registrar or the sponsoring registrar of the last transfer.

The registry auto-approves a transfer if the sponsoring registrar takes no action. The requesting registrar is billed for the Transfer Request and the sponsoring registrar is credited for an applicable Auto-Renew grace period. The requesting registrar and the sponsoring registrar receive a Transfer Auto-Approve poll message.

See: Figure 27 5: Transfer Request Process
See: Figure 27 6: Transfer Cancel Process
See: Figure 27 7: Transfer Approve Process

See: Figure 27 8: Transfer Reject Process
See: Figure 27 9: Transfer Query Process

Delete Process: A registrar may choose to delete the domain name at any time.

Process Characterization: The domain name can be deleted, unless it has any form of Pending Delete, Pending Transfer, or Delete Prohibited.

A domain name is also prohibited from deletion if it has any in-zone child hosts that are name servers for domain names. For example, the domain name "sample.xyz" cannot be deleted if an in-zone host "ns.sample.xyz" exists and is a name server for "sample2.xyz."
If the Domain Name Delete occurs within the Add grace period, the domain name is immediately deleted and the sponsoring registrar is credited for the Domain Name Create. If the Domain Name Delete occurs outside the Add grace period, it follows the Redemption grace period (RGP) lifecycle.

Update Process: The sponsoring registrar can update the following attributes of a domain name:
- Auth-Info
- Name servers
- Contacts (i.e., registrant, administrative contact, technical contact, and billing contact)
- Statuses (e.g., Client Delete Prohibited, Client Hold, Client Renew Prohibited, Client Transfer Prohibited, Client Update Prohibited)

Process Characterization: Updates are allowed provided that the update includes the removal of any Update Prohibited status. The Domain Name Update operation is detailed in Figure 27 10.
A domain name can be updated unless it has any form of Pending Delete, Pending Transfer, or Update Prohibited.

See: Figure 27 10: Update Process Flow Chart

27.1.2 Pending, Locked, Expired, and Transferred
Verisign, Symantec Corporation's selected backend registry services provider, handles pending, locked, expired, and transferred domain names as described here. When the domain name is deleted after the five-day Add grace period, it enters into the Pending Delete state. The registrant can return its domain name to active any time within the five-day Pending Delete grace period. After the five-day Pending Delete grace period expires, the domain name enters the Redemption Pending state and then is deleted by the system. The registrant can restore the domain name at any time during the Redemption Pending state.

When a non-sponsoring registrar initiates the domain name transfer request, the domain name enters Pending Transfer state and a notification is mailed to the sponsoring registrar for approvals. If the sponsoring registrar doesn't respond within five days, the Pending Transfer expires and the transfer request is automatically approved.

EPP specifies both client (registrar) and server (registry) status codes that can be used to prevent registry changes that are not intended by the registrant. Currently, many registrars use the client status codes to protect against inadvertent modifications that would affect their customers' high-profile or valuable domain names.

Verisign's registry service supports the following client (registrar) and server (registry) status codes:
- clientHold
- clientRenewProhibited

```
- clientTransferProhibited
- clientUpdateProhibited
- clientDeleteProhibited
- serverHold
- serverRenewProhibited
- serverTransferProhibited
- serverUpdateProhibited
- serverDeleteProhibited
```

27.1.3 Add Grace Period, Redemption Grace Period, and Notice Periods for Renewals
or Transfers
Verisign, Symantec Corporation's selected backend registry services provider,
handles Add grace periods, Redemption grace periods, and notice periods for
renewals or transfers as described here.
- Add Grace Period: The Add grace period is a specified number of days following
the initial registration of the domain name. The current value of the Add grace
period for all registrars is five days.
- Redemption Grace Period: If the domain name is deleted after the five-day grace
period expires, it enters the Redemption grace period and then is deleted by the
system. The registrant has an option to use the Restore Request command to restore
the domain name within the Redemption grace period. In this scenario, the domain
name goes to Pending Restore state if there is a Restore Request command within 30
days of the Redemption grace period. From the Pending Restore state, it goes
either to the OK state, if there is a Restore Report Submission command within
seven days of the Restore Request grace period, or a Redemption Period state if
there is no Restore Report Submission command within seven days of the Restore
Request grace period.
- Renew Grace Period: The Renew⁄Extend grace period is a specified number of days
following the renewal⁄extension of the domain name's registration period. The
current value of the Renew⁄Extend grace period is five days.
- Auto-Renew Grace Period: All auto-renewed domain names have a grace period of 45
days.
- Transfer Grace Period: Domain names have a five-day Transfer grace period.

27.1.4 Aspects of the Registration Lifecycle Not Covered by Standard EPP RFCs
Symantec Corporation's selected backend registry services provider's (Verisign's)
registration lifecycle processes and code implementations adhere to the standard
EPP RFCs related to the registration lifecycle. By adhering to the RFCs,
Verisign's registration lifecycle is complete and addresses each registration-
related task comprising the lifecycle. No aspect of Verisign's registration
lifecycle is not covered by one of the standard EPP RFCs and thus no additional
definitions are provided in this response.

27.2 Consistency with any specific commitments made to registrants as adapted to
the overall business approach for the proposed gTLD

The registration lifecycle described above applies to the .PROTECTION gTLD as well
as other TLDs managed by Verisign, Symantec Corporation's selected backend
registry services provider; thus Verisign remains consistent with commitments made
to its registrants. No unique or specific registration lifecycle modifications or
adaptations are required to support the overall business approach for
the .PROTECTION gTLD.
To accommodate a range of registries, Verisign's registry implementation is
capable of offering both a thin and thick WHOIS implementation, which is also
built upon Verisign's award-winning ATLAS infrastructure.
27.3 Compliance with relevant RFCS

Symantec Corporation's selected backend registry services provider's (Verisign's)
registration lifecycle complies with applicable RFCs, specifically RFCs 5730 –
5734 and 3915. The system fully supports the EPP Domain Name Mapping as defined by

RFC 5731, where the associated objects (e.g., hosts and contacts) are created independent of the domain name.

In addition, in accordance with RFCs 5732 and 5733, the Verisign registration system enforces the following domain name registration constraints:
- Uniqueness⁄Multiplicity: A second-level domain name is unique in the .PROTECTION database. Two identical second-level domain names cannot simultaneously exist in .PROTECTION. Further, a second-level domain name cannot be created if it conflicts with a reserved domain name.
- Point of Contact Associations: The domain name is associated with the following points of contact. Contacts are created and managed independently according to RFC 5733.
-- Registrant
-- Administrative contact
-- Technical contact
-- Billing contact
- Domain Name Associations: Each domain name is associated with:
-- A maximum of 13 hosts, which are created and managed independently according to RFC 5732
-- An Auth-Info, which is used to authorize certain operations on the object
-- Status(es), which are used to describe the domain name's status in the registry
-- A created date, updated date, and expiry date

27.4 Demonstrates that technical resources required to carry through the plans for this element are already on hand or readily available

Verisign, Symantec Corporation's selected backend registry services provider, is an experienced backend registry provider that has developed a set of proprietary resourcing models to project the number and type of personnel resources necessary to operate a TLD. Verisign routinely adjusts these staffing models to account for new tools and process innovations. These models enable Verisign to continually right-size its staff to accommodate projected demand and meet service level agreements as well as Internet security and stability requirements. Using the projected usage volume for the most likely scenario (defined in Question 46, Template 1 - Financial Projections: Most Likely) as an input to its staffing models, Verisign derived the necessary personnel levels required for this gTLD's initial implementation and ongoing maintenance. Verisign's pricing for the backend registry services it provides to Symantec Corporation fully accounts for cost related to this infrastructure, which is provided as "Total Critical Registry Function Cash Outflows" (Template 1, Line IIb.G) within the Question 46 financial projections response.
Verisign employs more than 1,040 individuals of which more than 775 comprise its technical work force. (Current statistics are publicly available in Verisign's quarterly filings.) Drawing from this pool of on-hand and fully committed technical resources, Verisign has maintained DNS operational accuracy and stability 100 percent of the time for more than 13 years for .COM, proving Verisign's ability to align personnel resource growth to the scale increases of Verisign's TLD service offerings.

Verisign projects it will use the following personnel roles, which are described in Section 5 of the response to Question 31, Technical Overview of Proposed Registry, to support the registration lifecycle:
- Application Engineers: 19
- Customer Support Personnel: 36
- Database Administrators: 8
- Database Engineers: 3
- Quality Assurance Engineers: 11
- SRS System Administrators: 13

To implement and manage the .PROTECTION gTLD as described in this application,

Verisign, Symantec Corporation's selected backend registry services provider, scales, as needed, the size of each technical area now supporting its portfolio of TLDs. Consistent with its resource modeling, Verisign periodically reviews the level of work to be performed and adjusts staff levels for each technical area. When usage projections indicate a need for additional staff, Verisign's internal staffing group uses an in-place staffing process to identify qualified candidates. These candidates are then interviewed by the lead of the relevant technical area. By scaling one common team across all its TLDs instead of creating a new entity to manage only this proposed gTLD, Verisign realizes significant economies of scale and ensures its TLD best practices are followed consistently. This consistent application of best practices helps ensure the security and stability of both the Internet and this proposed gTLD, as Verisign holds all contributing staff members accountable to the same procedures that guide its execution of the Internet's largest TLDs (i.e., .COM and .NET). Moreover, by augmenting existing teams, Verisign affords new employees the opportunity to be mentored by existing senior staff. This mentoring minimizes start-up learning curves and helps ensure that new staff members properly e

# 28. Abuse Prevention and Mitigation

VeriSign, Inc. Response to Question 28 Abuse Prevention and Mitigation

28.1 Abuse Prevention and Mitigation Implementation Plan

Symantec Corporation's primary safeguard against mitigating abusive and/or non-compliant registrations within the .PROTECTION name space is the limited universe of registrants that will be permitted to register with the .PROTECTION gTLD. As a dot Brand registry, registration will initially be limited to Symantec Corporation and its qualified subsidiaries and affiliates.  This built-in validation mechanism promotes uniform compliance and increase accuracy of WHOIS data. Symantec Corporation is committed to providing best in class safeguards and will be closely monitoring other .BRAND applicants for suitable safeguards.

28.1.2 Policies for Handling Complaints Regarding Abuse

As required by the ICANN template Registry Agreement, Symantec Corporation will establish, publish, and maintain on its website a single point of contact for handling abuse complaints. This contact will be a role account, e.g., abuse@registry.PROTECTION. All email inquiries submitted to this email account will be responded to in a reasonably timely manner. Symantec Corporation will employ an escalated complaint procedure. This procedure will place priority on complaints received from a trusted/verified source (e.g. law enforcement). If the complaint falls within the scope of Symantec Corporation's Abuse Policy Listed below, Symantec Corporation reserves the right to suspend or cancel the non-compliant domain.

The role email account identified above will have multiple Symantec Corporation staff recipients to allow for monitoring on a 24X7 basis. In addition the phone number provided for on the Registry website will be answered by Symantec Corporation staff during normal working hours.

28.1.3 Proposed Measures for Removal of Orphan Glue Records

Although orphan glue records often support correct and ordinary operation of the Domain Name System (DNS), registry operators will be required to remove orphan glue records (as defined at http://www.icann.org/en/committees/security/sac048.pdf) when provided with

evidence in written form that such records are present in connection with malicious conduct. Symantec Corporation's selected back-end registry services provider's (Verisign's) registration system is specifically designed to not allow orphan glue records. Registrars are required to delete/move all dependent DNS records before they are allowed to delete the parent domain.

To prevent orphan glue records, Verisign performs the following checks before removing a domain or name server:

Checks during domain delete:
- Parent domain delete is not allowed if any other domain in the zone refers to the child name server.
- If the parent domain is the only domain using the child name server, then both the domain and the glue record are removed from the zone.

Check during explicit name server delete:
Verisign confirms that the current name server is not referenced by any domain name (in-zone) before deleting the name server.

Zone-file impact:
If the parent domain references the child name server AND if other domains in the zone also reference it AND if the parent domain name is assigned a serverHold status, then the parent domain goes out of the zone but the name server glue record does not.
If no domains reference a name server, then the zone file removes the glue record.

28.1.4 Resourcing Plans

Details related to resourcing plans for the initial implementation and ongoing maintenance of Symantec Corporation's abuse plan are provided in Section 2 of this response.

28.1.5 Measures to Promote WHOIS Accuracy

Ensuring the accuracy of WHOIS information is of paramount importance to Symantec Corporation in the operation of the .PROTECTION gTLD. Symantec Corporation will employ the following mechanism to promote WHOIS accuracy.

-Only Symantec Corporation and qualified subsidiaries, affiliates and potentially licensees, and partners of Symantec Corporation will be permitted to register in the .PROTECTION namespace.
-There will be a strict prohibition against the use of proxy registration services;
-Symantec Corporation will maintain a web-based form for third parties to submit claims regarding false and or inaccurate WHOIS data.

28.1.5.1 Authentication of Registrant Information

Because all registrants in the .PROTECTION gTLD namespace will have a pre-existing contractual relationship with Symantec Corporation, this will be pre-authenticated thus promoting accurate and complete WHOIS data.

28.1.5.2 Regular Monitoring of Registration Data for Accuracy and Completeness

Verisign, Symantec Corporation's selected back-end registry services provider, has established policies and procedures to encourage registrar compliance with ICANN's WHOIS accuracy requirements. Verisign provides the following service to Symantec Corporation for incorporation into its full-service registry operations.

WHOIS data reminder process. Verisign regularly reminds registrars of their
obligation to comply with ICANN's WHOIS Data Reminder Policy, which was adopted by
ICANN as a consensus policy on 27 March 2003
(http://www.icann.org/en/registrars/wdrp.htm). Verisign sends a notice to all
registrars once a year reminding them of their obligation to be diligent in
validating the WHOIS information provided during the registration process, to
investigate claims of fraudulent WHOIS information, and to cancel domain name
registrations for which WHOIS information is determined to be invalid.

28.1.5.3 Use of Registrars

Symantec Corporation has not yet made any determinations regarding which registrar
will be selected to provide domain name registration services in the gTLD.
Symantec Corporation currently uses one corporate domain name registrar. The
likely registrar plan will be to use one corporate registrar, thus enabling
Symantec Corporation to maintain its entire domain name portfolio with one
registrar. However, any final determination will depend upon Symantec Corporation
and the registrar of choice reaching an agreed-upon price for the specified
services.

28.1.6 Malicious or Abusive Behavior Definitions, Metrics, and Service Level
Requirements for Resolution

Symantec Corporation will have an Authorized Usage Policy that will govern how a
registrant may use its registered domain name(s). A draft framework of this policy
is as follows:

By registering a name in this gTLD, the registrant agrees to be bound by the terms
of this Acceptable Use Policy (AUP). Registrant may not:
1. Use domain names for any purposes that are prohibited by the laws of the
jurisdiction(s) in which registrant does business, or any other applicable law.
 2. Use domain names for any purposes or in any manner that violates a statute,
rule, or law governing use of the Internet and/or electronic commerce
(specifically including "phishing," "pharming," distributing Internet viruses and
other destructive activities).
 3. Use domain names for the following types of activity:
 i. Violation of the privacy or publicity rights of any third party,
ii. Promotion of or engagement in hate speech; hate crime; terrorism; violence
against people, animals, or property; or intolerance of or against any protected
class;
iii. Promotion of or engagement in defamatory, harassing, abusive or otherwise
objectionable behavior;
iv. Promotion of or engagement in child pornography or the exploitation of
children;
v. Promotion of or engagement in any spam or other unsolicited bulk email, or
computer or network hacking or cracking;
vi. Infringement on the intellectual property rights of another member of
the .PROTECTION gTLD community, or any other person or entity;
vii. Engagement in activities designed to impersonate any third party or create a
likelihood of confusion in sponsorship;
viii. Interference with the operation of the .PROTECTION gTLD or services offered
by Symantec Corporation;
ix. Installation of any viruses, worms, bugs, Trojan horses, or other code, files,
or programs designed to, or capable of, disrupting, damaging, or limiting the
functionality of any software or hardware; or distributing false or deceptive
language, or unsubstantiated or comparative claims, regarding Symantec
Corporation;
x. Registration of .PROTECTION domain names for the purpose of reselling or
transferring those domain names.

28.1.7 Controls to Ensure Proper Access to Domain Functions

Symantec Corporation will primarily be relying upon the safeguards incorporated at the registrar level to ensure proper access to domain names.  Because Symantec Corporation envisions working with a single corporate registrar, this will provide an important gate keeping functions.

28.1.7.2 Requiring Multiple, Unique Points of Contact and Means of Notification

Symantec Corporation will likely assigned multiple unique point of contact.  In connection with compliance, abuse, or malicious activity, an individual within Symantec Corporation's legal department will be identified.  In connection with technical, security, and/or stability issues, an individual in Symantec Corporation's IT department will be identified.  These unique POCs will have a corresponding unique email address that will auto-forward emails to these addresses to multiple individuals in each of the appropriate departments to ensure that there is no single point of failure in the communication chain.

28.2 Technical plan that is adequately resourced in the planned costs detailed in the financial section

28.2.1 Resource Planning

Symantec Corporation is committed to operating the .PROTECTION gTLD in a manner that protects the core brand of Symantec Corporation. Symantec Corporation has projected that a staff level 0.25 FTE for legal compliance and oversight for the gTLD. In addition, Symantec Corporation can rely upon existing in-house legal and other support staff should the need arise.  Symantec Corporation has strategically chosen Verisign as its registry services provider because of their excellent track record in operating some of the world's most complex and critical top level domains.  Verisign's support for the .PROTECTION gTLD will help ensure its success.

28.2.2 Resource Planning Specific to Back-end Registry Activities

Verisign, Symantec Corporation's selected back-end registry services provider, is an experienced back-end registry provider that has developed a set of proprietary resourcing models to project the number and type of personnel resources necessary to operate a gTLD. Verisign routinely adjusts these staffing models to account for new tools and process innovations. These models enable Verisign to continually right-size its staff to accommodate projected demand and meet service level agreements as well as Internet security and stability requirements. Using the projected usage volume for the most likely scenario (defined in Question 46, Template 1 – Financial Projections: Most Likely) as an input to its staffing models, Verisign derived the necessary personnel levels required for this gTLD's initial implementation and ongoing maintenance. Verisign's pricing for the back-end registry services it provides to Symantec Corporation fully accounts for cost related to this infrastructure, which is provided as "Total Critical Registry Function Cash Outflows" (Template 1, Line IIb.G) within the Question 46 financial projections response.

Verisign employs more than 1,040 individuals of which more than 775 comprise its technical work force. (Current statistics are publicly available in Verisign's quarterly filings.) Drawing from this pool of on-hand and fully committed technical resources, Verisign has maintained DNS operational accuracy and stability 100 percent of the time for more than 13 years for .COM, proving Verisign's ability to align personnel resource growth to the scale increases of Verisign's TLD service offerings.

Verisign projects it will use the following personnel roles, which are described

in Section 5 of the response to Question 31, Technical Overview of Proposed
Registry, to support abuse prevention and mitigation:
Application Engineers: 19
Business Continuity Personnel: 3
Customer Affairs Organization: 9
Customer Support Personnel: 36
Information Security Engineers: 11
Network Administrators: 11
Network Architects: 4
Network Operations Center (NOC) Engineers: 33
Project Managers: 25
Quality Assurance Engineers: 11
Systems Architects: 9

To implement and manage the .PROTECTION gTLD as described in this application,
Verisign, Symantec Corporation's selected back-end registry services provider,
scales, as needed, the size of each technical area now supporting its portfolio of
TLDs. Consistent with its resource modeling, Verisign periodically reviews the
level of work to be performed and adjusts staff levels for each technical area.

When usage projections indicate a need for additional staff, Verisign's internal
staffing group uses an in-place staffing process to identify qualified candidates.
These candidates are then interviewed by the lead of the relevant technical area.
By scaling one common team across all its TLDs instead of creating a new entity to
manage only this proposed gTLD, Verisign realizes significant economies of scale
and ensures its TLD best practices are followed consistently. This consistent
application of best practices helps ensure the security and stability of both the
Internet and this proposed gTLD, as Verisign holds all contributing staff members
accountable to the same procedures that guide its execution of the Internet's
largest TLDs (i.e., .COM and .NET). Moreover, by augmenting existing teams,
Verisign affords new employees the opportunity to be mentored by existing senior
staff. This mentoring minimizes start-up learning curves and helps ensure that new
staff members properly execute their duties.

28.3.2 Ongoing Anti-Abuse Policies and Procedures

28.3.2.1 Policies and Procedures that Identify Malicious or Abusive Behavior

Verisign, Symantec Corporation's selected back-end registry services provider,
provides the following service to Symantec Corporation for incorporation into its
full-service registry operations.

Malware scanning service. Registrants are often unknowing victims of malware
exploits. Verisign has developed proprietary code to help identify malware in the
zones it manages, which in turn helps registrars by identifying malicious code
hidden in their domain names.
Verisign's malware scanning service helps prevent websites from infecting other
websites by scanning web pages for embedded malicious content that will infect
visitors' websites. Verisign's malware scanning technology uses a combination of
in-depth malware behavioral analysis, anti-virus results, detailed malware
patterns, and network analysis to discover known exploits for the particular
scanned zone. If malware is detected, the service sends the registrar a report
that contains the number of malicious domains found and details about malicious
content within its TLD zones. Reports with remediation instructions are provided
to help registrars and registrants eliminate the identified malware from the
registrant's website.

28.3.2.2 Policies and Procedures that Address the Abusive Use of Registered Names

Suspension processes: Any registrant which ceases to have a qualified ongoing

legal relationship with Symantec Corporation will immediately have their domain name suspended and/or cancelled. In addition, any registrant that fails to timely respond to a WHOIS accuracy complaint is subject to having their domain name suspended and/or cancelled. Prior to taking any affirmation action in connection with an WHOIS accuracy compliant, Symantec Corporation will attempt to contact registrant through various electronic means (email, telephone and fax).

Suspension processes conducted by back-end registry services provider: In the case of domain name abuse, Symantec Corporation will determine whether to take down the subject domain name. Verisign, Symantec Corporation's selected back-end registry services provider, will follow the following auditable processes to comply with the suspension request.

Verisign Suspension Notification: Symantec Corporation submits the suspension request to Verisign for processing, documented by:
Threat domain name
Registry incident number
Incident narrative, threat analytics, screen shots to depict abuse, and/or other evidence
Threat classification
Threat urgency description
Recommended timeframe for suspension/takedown
Technical details (e.g., WHOIS records, IP addresses, hash values, anti-virus detection results/nomenclature, name servers, domain name statuses that are relevant to the suspension)
Incident response, including surge capacity

Verisign Notification Verification: When Verisign receives a suspension request from Symantec Corporation, it performs the following verification procedures:
Validate that all the required data appears in the notification.
Validate that the request for suspension is for a registered domain name.
Return a case number for tracking purposes.

Suspension Rejection: If required data is missing from the suspension request, or the domain name is not registered, the request will be rejected and returned to Symantec Corporation with the following information:
Threat domain name
Registry incident number
Verisign case number
Error reason

Upon Symantec Corporation request, Verisign can provide a process for registrants to protest the suspension.

Domain Suspension: Verisign places the domain to be suspended on the following statuses:
serverUpdateProhibited
serverDeleteProhibited
serverTransferProhibited
serverHold

Suspension Acknowledgement: Verisign notifies Symantec Corporation that the suspension has been completed. Acknowledgement of the suspension includes the following information:
Threat domain name
Registry incident number
Verisign case number
Case number
Domain name
Symantec Corporation abuse contact name and number, or registrar abuse contact

name and number
Suspension status

28.4 When executed in accordance with the Registry Agreement, plans will result in
compliance with contractual requirements

As noted in the Question 18 business plan, the purpose of this gTLD registry is to
provide Symantec Corporation with a secure and trusted namespace that is the
representation of its brand online. Given the fact that Symantec Corporation
authored the contractual requirements, which have been incorporated into the
Registrant Agreement, Symantec Corporation intends to fully comply with these
contractual requirements. Moreover, Symantec Corporation has a vested interest to
ensure that all qualified subsidiaries, affiliates, and potentially partners,
licensees and other related third parties adhere to these legal requirements.

As noted, in the above referenced compliance section, failure for registrants to
timely remedy any non-compliant activity will result in the suspension and⁄or
deletion of the domain in question.

28.5 Technical plan scope⁄scale that is consistent with the overall business
approach and planned size of the registry

28.5.1 Scope⁄Scale Consistency

As a .BRAND gTLD Registry, the allocated registry staff will ensure that all
registrations are in compliance with the requirements set forth in the Registrant
Agreement. As this staff member(s) is proposed to be sourced from Symantec
Corporation's legal department, this will facilitate compliance of affiliates,
partners, licensees or other third parties with whom Symantec Corporation has a
pre-existing legal relationship. Unlike other registries that must oversee
numerous registrars and untold number of registrants, the .PROTECTION gTLD will be
a limited-universe of known entities with a pre-existing legal relationship with
Symantec that will likely be registered through one registrar.

28.5.2 Scope⁄Scale Consistency Specific to Back-End Registry Activities

Verisign, Symantec Corporation's selected back-end registry services provider, is
an experienced back-end registry provider that has developed and uses proprietary
system scaling models to guide the growth of its TLD supporting infrastructure.
These models direct Verisign's infrastructure scaling to include, but not be
limited to, server capacity, data storage volume, and network throughput that are
aligned to projected demand and usage patterns. Verisign periodically updates
these models to account for the adoption of more capable and cost-effective
technologies.

Verisign's scaling models are proven predictors of needed capacity and related
cost. As such, they provide the means to link the projected infrastructure needs
of the .PROTECTION gTLD with necessary implementation and sustainment cost. Using
the projected usage volume for the most likely scenario (defined in Question 46,
Template 1 – Financial Projections: Most Likely) as an input to its scaling
models, Verisign derived the necessary infrastructure required to implement and
sustain this gTLD. Verisign's pricing for the back-end registry services it
provides to Symantec Corporation fully accounts for cost related to this
infrastructure, which is provided as "Other Operating Cost" (Template 1, Line I.L)
within the Question 46 financial projections response.

# 29. Rights Protection Mechanisms

VeriSign, Inc. Response to Question 29 Rights Protection Mechanisms

29.1 Mechanisms Designed to Prevent Abusive Registrations

Rights protection is a core objective of Symantec Corporation. Symantec Corporation will implement and adhere to any rights protection mechanisms (RPMs) that may be mandated from time to time by ICANN, including each mandatory RPM set forth in the Trademark Clearinghouse model contained in the Registry Agreement, specifically Specification 7. Symantec Corporation acknowledges that, at a minimum, ICANN requires a Sunrise period, a Trademark Claims period, and interaction with the Trademark Clearinghouse with respect to the registration of domain names for the .PROTECTION gTLD. It should be noted that because ICANN, as of the time of this application submission, has not issued final guidance with respect to the Trademark Clearinghouse, Symantec Corporation cannot fully detail the specific implementation of the Trademark Clearinghouse within this application. Symantec Corporation will adhere to all processes and procedures to comply with ICANN guidance once this guidance is finalized.

As described in this response, Symantec Corporation will implement a Sunrise period and Trademark Claims service with respect to the registration of domain names within the .PROTECTION gTLD. Certain aspects of the Sunrise period and/or Trademark Claims service may be administered on behalf of Symantec Corporation by Symantec Corporation-approved registrars or by subcontractors of Symantec Corporation, such as its selected back-end registry services provider, Verisign.

At the time of filing, ICANN has not yet released final details on the Trademark Clearinghouse service. However, the protection of intellectual property is of paramount importance to Symantec Corporation. Given this and the fact that the initial proposed use of the registry is for the exclusive use of Symantec Corporation, all initial domain name registrations in the .PROTECTION namespace will be made by Symantec Corporation. Therefore, while Symantec Corporation will implement a Sunrise period and Trademark Claims process, depending upon the cost to access the Trademark Clearinghouse, Symantec Corporation may elect to forego the minimum one-month Sunrise period and register names in the gTLD following this mandatory period.

Sunrise Period: As provided by the Trademark Clearinghouse model set forth in the ICANN Applicant Guidebook, the Sunrise service pre-registration procedure for domain names continues for at least 30 days prior to the launch of the general registration of domain names in the gTLD (unless Symantec Corporation decides to offer a longer Sunrise period).

During the Sunrise period, holders of marks that have been previously validated by the Trademark Clearinghouse receive notice of domain names that are an identical match (as defined in the ICANN Applicant Guidebook) to their mark(s). Such notice is in accordance with ICANN's requirements and is provided by Symantec Corporation either directly or through Symantec Corporation-approved registrars.

Symantec Corporation requires all registrants, either directly or through Symantec Corporation-approved registrars, to i) affirm that said registrants meet the Sunrise Eligibility Requirements (SER), and ii) submit to the Sunrise Dispute Resolution Policy (SDRP) consistent with Section 6 of the Trademark Clearinghouse model. At a minimum Symantec Corporation recognizes and honors all word marks for which a proof of use was submitted and validated by the Trademark Clearinghouse as well as any additional eligibility requirements as specified in Question 18.

During the Sunrise period, Symantec Corporation and/or Symantec Corporation-

approved registrars, as applicable, are responsible for determining whether each domain name is eligible to be registered (including in accordance with the SERs).

Trademark Claims Service: As provided by the Trademark Clearinghouse model set forth in the ICANN Applicant Guidebook, all new gTLDs will have to provide a Trademark Claims service for a minimum of 60 days after the launch of the general registration of domain names in the gTLD (Trademark Claims period).

During the Trademark Claims period, in accordance with ICANN's requirements, Symantec Corporation or the Symantec Corporation-approved registrar will send a Trademark Claims Notice to any prospective registrant of a domain name that is an identical match (as defined in the ICANN Applicant Guidebook) to any mark that is validated in the Trademark Clearinghouse. The Trademark Claims Notice will include links to the Trademark Claims as listed in the Trademark Clearinghouse and will be provided at no cost.

Prior to registration of said domain name, Symantec Corporation or the Symantec Corporation-approved registrar will require each prospective registrant to provide the warranties dictated in the Trademark Clearinghouse model set forth in the ICANN Applicant Guidebook. Those warranties will include receipt and understanding of the Trademark Claims Notice and confirmation that registration and use of said domain name will not infringe on the trademark rights of the mark holders listed. Without receipt of said warranties, the Symantec Corporation or the Symantec Corporation-approved registrar will not process the domain name registration.

Following the registration of a domain name, the Symantec Corporation-approved registrar will provide a notice of domain name registration to the holders of marks that have been previously validated by the Trademark Clearinghouse and are an identical match. This notice will be as dictated by ICANN. At a minimum Symantec Corporation will recognize and honor all word marks validated by the Trademark Clearinghouse.


29.2 Mechanisms Designed to Identify and address the abusive use of registered names on an ongoing basis

In addition to the Sunrise and Trademark Claims services described in Section 1 of this response, Symantec Corporation implements and adheres to RPMs post-launch as mandated by ICANN, and confirms that registrars accredited for the .PROTECTION gTLD are in compliance with these mechanisms. Certain aspects of these post-launch RPMs may be administered on behalf of Symantec Corporation by Symantec Corporation-approved registrars or by subcontractors of Symantec Corporation, such as its selected back-end registry services provider, Verisign.

These post-launch RPMs include the established Uniform Domain-Name Dispute-Resolution Policy (UDRP), as well as the newer Uniform Rapid Suspension System (URS) and Trademark Post-Delegation Dispute Resolution Procedure (PDDRP). Where applicable, Symantec Corporation will implement all determinations and decisions issued under the corresponding RPM.

After a domain name is registered, trademark holders can object to the registration through the UDRP or URS. Objections to the operation of the gTLD can be made through the PDDRP.

The following descriptions provide implementation details of each post-launch RPM for the .PROTECTION gTLD:

- UDRP: The UDRP provides a mechanism for complainants to object to domain name registrations. The complainant files its objection with a UDRP provider and the domain name registrant has an opportunity to respond. The UDRP provider makes a

decision based on the papers filed. If the complainant is successful, ownership of the domain name registration is transferred to the complainant. If the complainant is not successful, ownership of the domain name remains with the domain name registrant. Symantec Corporation and entities operating on its behalf adhere to all decisions rendered by UDRP providers.
- URS: As provided in the Applicant Guidebook, all registries are required to implement the URS. Similar to the UDRP, a complainant files its objection with a URS provider. The URS provider conducts an administrative review for compliance with filing requirements. If the complaint passes review, the URS provider notifies the registry operator and locks the domain. A lock means that the registry restricts all changes to the registration data, but the name will continue to resolve. After the domain is locked, the complaint is served to the domain name registrant, who has an opportunity to respond. If the complainant is successful, the registry operator is informed and the domain name is suspended for the balance of the registration period; the domain name will not resolve to the original website, but to an informational web page provided by the URS provider. If the complainant is not successful, the URS is terminated and full control of the domain name registration is returned to the domain name registrant. Similar to the existing UDRP, Symantec Corporation and entities operating on its behalf adhere to decisions rendered by the URS providers.
- PDDRP: As provided in the Applicant Guidebook, all registries are required to implement the PDDRP. The PDDRP provides a mechanism for a complainant to object to the registry operator's manner of operation or use of the gTLD. The complainant files its objection with a PDDRP provider, who performs a threshold review. The registry operator has the opportunity to respond and the provider issues its determination based on the papers filed, although there may be opportunity for further discovery and a hearing. Symantec Corporation participates in the PDDRP process as specified in the Applicant Guidebook.

Additional Measures Specific to Rights Protection: Symantec Corporation provides additional measures against potentially abusive registrations. These measures help mitigate phishing, pharming, and other Internet security threats. The measures exceed the minimum requirements for RPMs defined by Specification 7 of the Registry Agreement and are available at the time of registration. These measures include:

- Rapid Takedown or Suspension Based on Court Orders: Symantec Corporation complies promptly with any order from a court of competent jurisdiction that directs it to take any action on a domain name that is within its technical capabilities as a gTLD registry. These orders may be issued when abusive content, such as child pornography, counterfeit goods, or illegal pharmaceuticals, is associated with the domain name.
- Anti-Abuse Process: Symantec Corporation implements an anti-abuse process that is executed based on the type of domain name takedown requested. The anti-abuse process is for malicious exploitation of the DNS infrastructure, such as phishing, botnets, and malware.
- Authentication Procedures: Verisign, Symantec Corporation's selected back-end registry services provider, uses two-factor authentication to augment security protocols for telephone, email, and chat communications.
-Eligibility Requirements: As discussed above, the initial proposed use of the registry is for the exclusive use of Symantec Corporation. Thus, all initial domain name registrations in the .PROTECTION namespace will be made by Symantec Corporation. This is expected to significantly reduce and/or eliminate the chance of any abusive registrations.


29.3 Resourcing Plans

29.3.1 Resource Planning

ICANN New gTLD Application    Document 1-4    Filed 08/13/15    Page 67 of 105 PageID # 413
Case 1:15-cv-01028-LPS    Document 1-4    Filed 08/13/15    Page 67 of 105 PageID # 413
Page 58 of 63

Symantec Corporation has included in its business plan staffing sufficient to implement and oversee the aforementioned Rights Protection Mechanism procedures. As previously noted in the application, this staffing resource will most likely be sourced from within Symantec Corporation's legal department. Should additional subject matter expertise be required, Symantec Corporation may engage the services of outside specialists on an as-needed basis.

29.3.2 Resource Planning Specific to Back-End Registry Activities

Verisign, Symantec Corporation's selected back-end registry services provider, is an experienced back-end registry provider that has developed a set of proprietary resourcing models to project the number and type of personnel resources necessary to operate a gTLD. Verisign routinely adjusts these staffing models to account for new tools and process innovations. These models enable Verisign to continually right-size its staff to accommodate projected demand and meet service level agreements as well as Internet security and stability requirements. Using the projected usage volume for the most likely scenario (defined in Question 46, Template 1 - Financial Projections: Most Likely) as an input to its staffing models, Verisign derived the necessary personnel levels required for the .PROTECTION gTLD's initial implementation and ongoing maintenance. Verisign's pricing for the back-end registry services it provides to Symantec Corporation fully accounts for cost related to this infrastructure, which is provided as Line IIb.G, Total Critical Registry Function Cash Outflows, within the Question 46 financial projections response of this application.

Verisign employs more than 1,040 individuals of which more than 775 comprise its technical work force. (Current statistics are publicly available in Verisign's quarterly filings.) Drawing from this pool of on-hand and fully committed technical resources, Verisign has maintained DNS operational accuracy and stability 100 percent of the time for more than 13 years for .COM, proving Verisign's ability to align personnel resource growth to the scale increases of Verisign's TLD service offerings.

Verisign projects it will use the following personnel roles, which are described in Section 5 of the response to Question 31, Technical Overview of Proposed Registry, to support the implementation of RPMs:
- Customer Affairs Organization: 9
- Customer Support Personnel: 36
- Information Security Engineers: 11

To implement and manage the .PROTECTION gTLD as described in this application, Verisign, Symantec Corporation's selected back-end registry services provider, scales, as needed, the size of each technical area now supporting its portfolio of TLDs. Consistent with its resource modeling, Verisign periodically reviews the level of work to be performed and adjusts staff levels for each technical area.

When usage projections indicate a need for additional staff, Verisign's internal staffing group uses an in-place staffing process to identify qualified candidates. These candidates are then interviewed by the lead of the relevant technical area. By scaling one common team across all its TLDs instead of creating a new entity to manage only this proposed .PROTECTION gTLD, Verisign realizes significant economies of scale and ensures its TLD best practices are followed consistently. This consistent application of best practices helps ensure the security and stability of both the Internet and this proposed gTLD, as Verisign holds all contributing staff members accountable to the same procedures that guide its execution of the Internet's largest TLDs (i.e., .COM and .NET). Moreover, by augmenting existing teams, Verisign affords new employees the opportunity to be mentored by existing senior staff. This mentoring minimizes start-up learning curves and helps ensure that new staff members properly execute their duties.

## 30(a). Security Policy: Summary of the security policy for the proposed registry

VeriSign, Inc. Response to Question 30A Security Policy - Part A

30A.1 Detailed description of processes and solutions deployed to manage logical security across infrastructure and systems, monitoring and detecting threats and security vulnerabilities and taking appropriate steps to resolve them

Symantec Corporation's selected back-end registry services provider's (Verisign's) comprehensive security policy has evolved over the years as part of managing some of the world's most critical TLDs. Verisign's Information Security Policy is the primary guideline that sets the baseline for all other policies, procedures, and standards that Verisign follows. This security policy addresses all of the critical components for the management of back-end registry services, including architecture, engineering, and operations.

Verisign's general security policies and standards with respect to these areas are provided as follows:

Architecture
- Information Security Architecture Standard: This standard establishes the Verisign standard for application and network architecture. The document explains the methods for segmenting application tiers, using authentication mechanisms, and implementing application functions.
- Information Security Secure Linux Standard: This standard establishes the information security requirements for all systems that run Linux throughout the Verisign organization.
- Information Security Secure Oracle Standard: This standard establishes the information security requirements for all systems that run Oracle throughout the Verisign organization.
- Information Security Remote Access Standard: This standard establishes the information security requirements for remote access to terminal services throughout the Verisign organization.
- Information Security SSH Standard: This standard establishes the information security requirements for the application of Secure Shell (SSH) on all systems throughout the Verisign organization.

Engineering
- Secure SSL⁄TLS Configuration Standard: This standard establishes the information security requirements for the configuration of Secure Sockets Layer⁄Transport Layer Security (SSL⁄TLS) for all systems throughout the Verisign organization.
- Information Security C++ Standards: These standards explain how to use and implement the functions and application programming interfaces (APIs) within C++. The document also describes how to perform logging, authentication, and database connectivity.
- Information Security Java Standards: These standards explain how to use and implement the functions and APIs within Java. The document also describes how to perform logging, authentication, and database connectivity.

Operations
- Information Security DNS Standard: This standard establishes the information security requirements for all systems that run DNS systems throughout the Verisign organization.
- Information Security Cryptographic Key Management Standard: This standard provides detailed information on both technology and processes for the use of

encryption on Verisign information security systems.
- Secure Apache Standard: Verisign has a multitude of Apache web servers, which
are used in both production and development environments on the Verisign intranet
and on the Internet. They provide a centralized, dynamic, and extensible interface
to various other systems that deliver information to the end user. Because of
their exposure and the confidential nature of the data that these systems host,
adequate security measures must be in place. The Secure Apache Standard
establishes the information security requirements for all systems that run Apache
web servers throughout the Verisign organization.
- Secure Sendmail Standard: Verisign uses sendmail servers in both the production
and development environments on the Verisign intranet and on the Internet.
Sendmail allows users to communicate with one another via email. The Secure
Sendmail Standard establishes the information security requirements for all
systems that run sendmail servers throughout the Verisign organization.
- Secure Logging Standard: This standard establishes the information security
logging requirements for all systems and applications throughout the Verisign
organization. Where specific standards documents have been created for operating
systems or applications, the logging standards have been detailed. This document
covers all technologies.
- Patch Management Standard: This standard establishes the information security
patch and upgrade management requirements for all systems and applications
throughout Verisign.

General
- Secure Password Standard: Because passwords are the most popular and, in many
cases, the sole mechanism for authenticating a user to a system, great care must
be taken to help ensure that passwords are "strong" and secure. The Secure
Password Standard details requirements for the use and implementation of
passwords.
- Secure Anti-Virus Standard: Verisign must be protected continuously from
computer viruses and other forms of malicious code. These threats can cause
significant damage to the overall operation and security of the Verisign network.
The Secure Anti-Virus Standard describes the requirements for minimizing the
occurrence and impact of these incidents.

Security processes and solutions for the .PROTECTION gTLD are based on the
standards defined above, each of which is derived from Verisign's experience and
industry best practice. These standards comprise the framework for the overall
security solution and applicable processes implemented across all products under
Verisign's management. The security solution and applicable processes include, but
are not limited to:
- System and network access control (e.g., monitoring, logging, and backup)
- Independent assessment and periodic independent assessment reports
- Denial of service (DoS) and distributed denial of service (DDoS) attack
mitigation
- Computer and network incident response policies, plans, and processes
- Minimization of risk of unauthorized access to systems or tampering with
registry data
- Intrusion detection mechanisms, threat analysis, defenses, and updates
- Auditing of network access
- Physical security

Further details of these processes and solutions are provided in Part B of this
response.

30A.1.1 Security Policy and Procedures for the Proposed Registry

Specific security policy related details, requested as the bulleted items of
Question 30 – Part A, are provided here.

Independent Assessment and Periodic Independent Assessment Reports.
To help ensure effective security controls are in place, Symantec Corporation,
through its selected back-end registry services provider, Verisign, conducts a
yearly American Institute of Certified Public Accountants (AICPA) and Canadian
Institute of Chartered Accountants (CICA) SAS 70 audit on all of its data centers,
hosted systems, and applications. During these SAS 70 audits, security controls at
the operational, technical, and human level are rigorously tested. These audits
are conducted by a certified and accredited third party and help ensure that
Verisign's in-place environments meet the security criteria specified in
Verisign's customer contractual agreements and are in accordance with commercially
accepted security controls and practices. Verisign also performs numerous audits
throughout the year to verify its security processes and activities. These audits
cover many different environments and technologies and validate Verisign's
capability to protect its registry and DNS resolution environments. Figure 30A-1
lists a subset of the audits that Verisign conducts. For each audit program or
certification listed in Figure 30A-1, Verisign has included, as attachments to the
Part B component of this response, copies of the assessment reports conducted by
the listed third-party auditor. From Verisign's experience operating registries,
it has determined that together these audit programs and certifications provide a
reliable means to ensure effective security controls are in place and that these
controls are sufficient to meet ICANN security requirements and therefore are
commensurate with the guidelines defined by ISO 27001.

(See: Figure 30A-1: Verisign Independent Assessment Activities)

Augmented Security Levels or Capabilities: See Section 5 of this response.

Commitments Made to Registrants Concerning Security Levels: See Section 4 of this
response.


30A.2 Security capabilities are consistent with the overall business approach and
planned size of the registry

Symantec Corporation does not foresee the need for any enhanced security
mechanisms beyond those currently provided by Verisign based upon the following
factors; existing Symantec Corporation IT security protocols; the restrictive
nature of the .PROTECTION registrant universe; validation procedures that Symantec
Corporation will be undertaking prior to allocating names in the gTLD; security
features imposed at the registrar level; and, the limited number of registrars
(likely a single registrar) that will be connecting to the registry.

Verisign, Symantec Corporation's selected back-end registry services provider, is
an experienced back-end registry provider that has developed and uses proprietary
system scaling models to guide the growth of its TLD supporting infrastructure.
These models direct Verisign's infrastructure scaling to include, but not be
limited to, server capacity, data storage volume, and network throughput that are
aligned to projected demand and usage patterns. Verisign periodically updates
these models to account for the adoption of more capable and cost-effective
technologies.

Verisign's scaling models are proven predictors of needed capacity and related
cost. As such, they provide the means to link the projected infrastructure needs
of the .PROTECTION gTLD with necessary implementation and sustainment cost. Using
the projected usage volume for the most likely scenario (defined in Question 46,
Template 1 – Financial Projections: Most Likely) as an input to its scaling
models, Verisign derived the necessary infrastructure required to implement and
sustain this gTLD. Verisign's pricing for the back-end registry services it
provides to Symantec Corporation fully accounts for cost related to this
infrastructure, which is provided as "Total Critical Registry Function Cash

Outflows" (Template 1, Line IIb.G) within the Question 46 financial projections response.


30A.3 Technical plan adequately resourced in the planned costs detailed in the financial section

30A.3.1 Resource Planning

It is anticipated that Symantec Corporation's existing IT personnel will provide security support services, as necessary, to operate the .PROTECTION registry. In addition, Symantec Corporation will engage the services of subject matter experts to provide consulting services on any DNS-specific matters that may be outside the skill set of its internal IT staff.

30A.3.2 Resource Planning Specific to Back-End Registry Activities

Verisign, Symantec Corporation's selected back-end registry services provider, is an experienced back-end registry provider that has developed a set of proprietary resourcing models to project the number and type of personnel resources necessary to operate a gTLD. Verisign routinely adjusts these staffing models to account for new tools and process innovations. These models enable Verisign to continually right-size its staff to accommodate projected demand and meet service level agreements as well as Internet security and stability requirements. Using the projected usage volume for the most likely scenario (defined in Question 46, Template 1 – Financial Projections: Most Likely) as an input to its staffing models, Verisign derived the necessary personnel levels required for this gTLD's initial implementation and ongoing maintenance. Verisign's pricing for the back-end registry services it provides to Symantec Corporation fully accounts for cost related to this infrastructure, which is provided as "Total Critical Registry Function Cash Outflows" (Template 1, Line IIb.G) within the Question 46 financial projections response.

Verisign employs more than 1,040 individuals of which more than 775 comprise its technical work force. (Current statistics are publicly available in Verisign's quarterly filings.) Drawing from this pool of on-hand and fully committed technical resources, Verisign has maintained DNS operational accuracy and stability 100 percent of the time for more than 13 years for .COM, proving Verisign's ability to align personnel resource growth to the scale increases of Verisign's TLD service offerings.

Verisign projects it will use the following personnel role, which is described in Section 5 of the response to Question 31, Technical Overview of Proposed Registry, to support its security policy:
Information Security Engineers: 11

To implement and manage the .PROTECTION gTLD as described in this application, Verisign, Symantec Corporation's selected back-end registry services provider, scales, as needed, the size of each technical area now supporting its portfolio of TLDs. Consistent with its resource modeling, Verisign periodically reviews the level of work to be performed and adjusts staff levels for each technical area.

When usage projections indicate a need for additional staff, Verisign's internal staffing group uses an in-place staffing process to identify qualified candidates. These candidates are then interviewed by the lead of the relevant technical area. By scaling one common team across all its TLDs instead of creating a new entity to manage only this proposed gTLD, Verisign realizes significant economies of scale and ensures its TLD best practices are followed consistently. This consistent application of best practices helps ensure the security and stability of both the Internet and this proposed gTLD, as Verisign holds all contributing staff members

accountable to the same procedures that guide its execution of the Internet's largest TLDs (i.e., .COM and .NET). Moreover, by augmenting existing teams, Verisign affords new employees the opportunity to be mentored by existing senior staff. This mentoring minimizes startup learning curves and helps ensure that new staff members properly execute their duties.

30A.4 Security measures are consistent with any commitments made to registrants regarding security levels

Verisign is Symantec Corporation's selected back-end registry services provider. For the .PROTECTION gTLD, no unique security measures or commitments must be made by Verisign or Symantec Corporation to any registrant.

30A.5 Security measures are appropriate for the applied-for gTLD string

No unique security measures are necessary to implement the .PROTECTION gTLD. As defined in Section 1 of this response, Verisign, Symantec Corporation's selected back-end registry services provider, commits to providing back-end registry services in accordance with the following international and relevant security standards:
- American Institute of Certified Public Accountants (AICPA) and Canadian Institute of Chartered Accountants (CICA) SAS 70
- WebTrust/SysTrust for Certification Authorities (CA)

Symantec Corporation does not foresee the need for any enhanced security mechanisms beyond those currently provided by Verisign based upon the following factors; existing Symantec Corporation IT security protocols; the restrictive nature of the .PROTECTION registrant universe; validation procedures that Symantec Corporation will be undertaking prior to allocating names in the gTLD; security features imposed at the registrar level; and, the limited number of registrars (likely a single registrar) that will be connecting to the registry.

© *Internet Corporation For Assigned Names and Numbers.*

EXHIBIT 2



# ICANN

## New gTLD Application Submitted to ICANN by: KBE gTLD Holding Inc

Application Downloaded On: 10 Oct 2014

String: theatre

Application ID: 1-1326-3558

## Applicant Information

1. Full legal name
KBE gTLD Holding Inc

2. Address of the principal place of business
1619 Broadway
9th FLoor New York, New York - 10019 US

3. Phone number
0019174215467

4. Fax number

5. If applicable, website or URL

## Primary Contact

6(a). Name
Miguel Peschiera

6(b). Title
Legal & HR Analyst

6(c). Address

6(d). Phone Number
(917) 421-5494

6(e). Fax Number

6(f). Email Address
miguel.peschiera@broadwayacrossamerica.com

## Secondary Contact

7(a). Name
Sheila Lavu

7(b). Title
Associate General Council

7(c). Address

7(d). Phone Number
(917) 421-5467

7(e). Fax Number

7(f). Email Address
sheila.lavu@broadwayacrossamerica.com

## Proof of Legal Establishment

8(a). Legal form of the Applicant
Corporation

8(b). State the specific national or other jurisdiction that defines the type of entity identified in 8(a).
Delaware

8(c). Attach evidence of the applicant's establishment.
Attachments are not displayed on this form.

9(a). If applying company is publicly traded, provide the exchange and symbol.

9(b). If the applying entity is a subsidiary, provide the parent company.

9(c). If the applying entity is a joint venture, list all joint venture partners.

## Applicant Background

11(a). Name(s) and position(s) of all directors

| Name | Position |
|------|----------|
| John Gore | President and Chief Financial Officer |

11(b). Name(s) and position(s) of all officers and partners

| Name | Position |
|------|----------|
| Elliot H. Brown | Secretary |
| Ilene Meiseles | Assistant Treasurer |
| John Gore | President and Chief Financial Officer |
| Paul Dietz | Vice President |

11(c). Name(s) and position(s) of all shareholders holding at least 15% of shares

11(d). For an applying entity that does not have directors, officers, partners, or shareholders: Name(s) and position(s) of all individuals having legal or executive responsibility

## Applied-for gTLD string

13. Provide the applied-for gTLD string. If an IDN, provide the U-label.
theatre

14A. If applying for an IDN, provide the A-label (beginning with "xn--").

14B. If an IDN, provide the meaning, or restatement of the string in English, that is, a description of the literal meaning of the string in the opinion of the applicant.

14C1. If an IDN, provide the language of the label (in English).

14C2. If an IDN, provide the language of the label (as referenced by ISO-639-1).

14D1. If an IDN, provide the script of the label (in English).

14D2. If an IDN, provide the script of the label (as referenced by ISO 15924).

14E. If an IDN, list all code points contained in the U-label according to Unicode form.

15A. If an IDN, upload IDN tables for the proposed registry.  An IDN table must include:
1. the applied-for gTLD string relevant to the tables,
2. the script or language designator (as defined in BCP 47),
3. table version number,
4. effective date (DD Month YYYY), and
5. contact name, email address, and phone number.
   Submission of IDN tables in a standards-based format is encouraged.

15B. Describe the process used for development of the IDN tables submitted, including consultations and sources used.

15C. List any variants to the applied-for gTLD string according to the relevant IDN tables.

16. Describe the applicant's efforts to ensure that there are no known operational or rendering problems concerning the applied-for gTLD string. If such issues are known, describe steps that will be taken to mitigate these issues in software and other applications.

Applicant's gTLD application is a non-IDN application. Applicant is unaware of any known operational or rendering problems related to the applied for gTLD.

17. OPTIONAL.
Provide a representation of the label according to the International Phonetic Alphabet (http://www.langsci.ucl.ac.uk/ipa/).

18A. Describe the mission/purpose of your proposed gTLD.

The mission of .theatre is to provide diverse internet users an enhanced online experience while enriching society with artistic and cultural diversity through high quality content, information and authentic connected experiences centered on live theatre, musicals, opera, ballet and other performing arts, Broadway, and other related concepts, topics and activities. .theatre will be a top level domain operated by KBE GTLD Holding Inc., a wholly-owned subsidiary of Key Brand Entertainment (KBE), and intends to provide internet users with the confidence that all of the programming, information, social media, shopping and/or lifestyle opportunities found on the .theatre top level domain is authentic, genuine, safe, trusted, and secure.

18B. How do you expect that your proposed gTLD will benefit registrants, Internet users, and others?

The goal of .theatre is to provide a namespace for high quality, authentic information and online experiences for individuals interested in live theatre, musicals, opera, ballet and other performing arts, Broadway, and other related concepts, topics and activities. The reputation of KBE, through its operation of broadway.com, is well recognized for high quality access to tickets, content, information and programming related to live theatre around the globe. The level of service to its customers is highly regarded as the single most trusted source for Broadway and live theatre entertainment.

Internet users will benefit because .theatre will provide an enhanced online experience through its ability to allow registrants to build more personalized experiences for internet users seeking artistic and cultural diversity. .theatre will provide Applicant greater control over the domain as a registry operator, enabling the domain to be operated with the same exceptional values KBE has shown to users through the operation of broadway.com. Additionally, new communities can be formed to connect internet users with others interested in theatre and other performing arts, Broadway and entertainment.

.theatre intends to carefully safeguard the user experience to provide users confidence that they have found a trusted site, and can be certain that users will find the high quality content,

information and experiences associated with a TLD they know and trust. New users will quickly come to recognize that .theatre stands for authentic, high quality, trusted sources for information about live theatre and other performing arts, entertainment, experiences, products and services.

18C. What operating rules will you adopt to eliminate or minimize social costs (e.g., time or financial resource costs, as well as various types of consumer vulnerabilities)? What other steps will you take to minimize negative consequences/costs imposed upon consumers?

All second level domains names used within .theatre registry will have to adhere to string guidelines limiting the TLD to verified theater-related registrants, for the benefit of the TLD.

Applicant intends to function in such a way that all domain name registrations in the TLD shall be registered to registrants who meet registration criteria. Applicant will not sell, distribute or transfer control of domain name registrations to any party that does not meet the registration criteria.

After analyzing the operation of the TLD after the initial rollout, applicant may choose to loosen its registration policies and run the TLD as an "unrestricted" TLD. In that event Applicant will partner with a corporate registrar with expertise in running a registry to support such efforts. Applicant intends to partner with its current corporate registrar or one of similar technical capability and expertise and allocate the appropriate funds and human resources to ensure that both itself, as the registry operator, and its selected registrar are at all times in compliance with ICANN guidelines.

19. Is the application for a community-based TLD?

No

20A. Provide the name and full description of the community that the applicant is committing to serve. In the event that this application is included in a community priority evaluation, it will be scored based on the community identified in response to this question. The name of the community does not have to be formally adopted for the application to be designated as community-based.

20B. Explain the applicant's relationship to the community identified in 20(a).

20C. Provide a description of the community-based purpose of the applied-for gTLD.

20D. Explain the relationship between the applied- for gTLD string and the community identified in 20(a).

20E. Provide a complete description of the applicant's intended registration policies in support of the community-based purpose of the applied-for gTLD. Policies and enforcement mechanisms are expected to constitute a coherent set.

20F. Attach any written endorsements for the application from established institutions representative of the community identified in 20(a). An applicant may submit written endorsements by multiple institutions, if relevant to the community.

21A. Is the application for a geographic name?

No

22. Describe proposed measures for protection of geographic names at the second and other levels in the applied-for gTLD. This should include any applicable rules and procedures for reservation and/or release of such names.

```
        Applicant will comply with all requirements listed in the
Registry Agreement in regards to reserved names - specifically 2.6
and Specification 5, which contains a list of geographic names that
```

must be reserved by the registry operator.

Applicant will comply with any future ICANN policy governing the reservation and/or release of such names.

Applicant is keenly aware of the sensitivity of national governments in connection with protecting country and territory identifiers in the Domain Name System (DNS).

22.1 Initial Reservation of Country and Territory Names

Applicant is committed to initially reserving the country and territory names contained in the internationally recognized lists described in Article 5 of Specification 5 of the Registry Agreement. Specifically, Applicant will reserve:

The short form (in English) of all country and territory names contained on the ISO 3166-1 list, as updated from time to time, including the European Union, which is exceptionally reserved on the ISO 3166-1 list, and its scope extended in August 1999 to any application needing to represent the name European Union, see http://www.iso.org/iso/support/country_codes/iso_3166_code_lists/iso-3166- 1_decoding_table.htm#EU;

The United Nations Group of Experts on Geographical Names Technical Reference Manual for the Standardization of Geographical Names, Part III: Names of Countries of the World; and

The list of United Nations member states in six official United Nations languages prepared by the Working Group on Country Names of the United Nations Conference on the Standardization of Geographical Names.

22.2 The Legal Protection of Geographical Identifiers

One of the more authoritative resources on the current state of the law in connection with the protection of geographical identifiers was authored by the World Intellectual Property Organization (WIPO) in its 2001 report, Second WIPO Internet Domain Name Process, The Recognition of Rights and the Use of Names in the Internet Domain Name System. Chapter Six of this report was devoted exclusively to the protection of geographical identifiers.

In analyzing the well-established framework against the misuse of geographical identifiers at the international, regional, and national levels, WIPO identified the following two elements for the protection of geographical identifiers: (i) a prohibition of false descriptions of the geographical source of goods; and (ii) a more extensive set of rules prohibiting the misuse of one class of geographical source indicators, known as geographical indications, see Second WIPO Internet Domain Name Process Report, paragraphs 206 and 210. Neither of these elements is present in Applicants's proposed use of geographical identifiers.

Notwithstanding WIPO's recommendation that the protection of geographical identifiers is "a difficult area on which views are not only divided, but also ardently held," see paragraph 237, national governments within the ICANN Governmental Advisory Committee (GAC) and other international fora have continued to advocate for increased safeguards to protect against the misuse of geographical identifiers within the DNS.

Applicant seeks to minimize any potential business practices that might mislead consumers. At the same time, however applicant believes that it is important to be able to use geographical identifiers in fair and a non-misleading manner, if such use can benefit Internet users as proposed in Applicant's business model.

As a minimum, Applicant will adopt any ICANN policy in relation to the protection of country and geographic names and acronyms.

---

23. Provide name and full description of all the Registry Services to be provided. Descriptions should include both technical and business components of each proposed service, and address any potential security or stability concerns.
The following registry services are customary services offered by a registry operator:

A. Receipt of data from registrars concerning registration of domain names and name servers.
B. Dissemination of TLD zone files.
C. Dissemination of contact or other information concerning domain name registrations (e.g., port-43 WHOIS, Web- based Whois, RESTful Whois service).
D. Internationalized Domain Names, where offered.

E. DNS Security Extensions (DNSSEC). The applicant must describe whether any of these registry services are intended to be offered in a manner unique to the TLD.

Additional proposed registry services that are unique to the registry must also be described.

Applicant has chosen CentralNic as the registry infrastructure provider for the TLD. Any information regarding technical and operational capability of the proposed the TLD registry (answers to questions 23 - 44) therefore refers to CentralNic's registry infrastructure systems. Applicant and CentralNic hereby explicitly confirm that all registry services stated below are engineered and will be provided in a manner compliant with the new gTLD Registry Agreement, ICANN consensus policies (such as Inter-Registrar Transfer Policy and AGP Limits Policy) and applicable technical standards. Except for the registry services described above, no other services will be provided by the Registry that relate to (i) receipt of data from registrars concerning registrations of domain names and name servers; (ii) provision to registrars of status information relating to the zone servers for the TLD;(iii) dissemination of TLD zone files; (iv) operation of the Registry zone servers; or (v) dissemination of contact and other information concerning domain name server registrations in the TLD as required by the Registry Agreement.
There are no other products or services, except those described above that the Registry Operator will provide (i) because of the establishment of a Consensus Policy, or (ii) by reason of Applicant being designated as the Registry Operator.
Any changes to the registry services that may be required at a later time in the course of the Applicant operating the registry will be addressed using rules and procedures established by ICANN such as the Registry Services Evaluation Policy.
Applicant proposes to operate the following registry services, utilising CentralNic's registry system:

23.1. Receipt of Data From Registrars
CentralNic will operate a Shared Registry System (SRS) for the TLD. The SRS consists of a database of registered domain names, host objects and contact objects, accessed via an Extensible Provisioning Protocol (EPP) interface, and a web based Registrar Console. Registrars will uses these interfaces to provide registration data to the registry.
The SRS will be hosted at CentralNic's primary operations centre in London, UK. The primary operations centre comprises a resilient, fault-tolerant network infrastructure with multiple high quality redundant links to backbone Internet carriers. The primary operations centre is hosted in Level 3's flagship European data centre and boasts significant physical security capabilities, including 24x7 patrols, CCTV and card-based access controls.
CentralNic's existing SRS system currently supports more than 250,000 domain names managed by over one 1,500 registrars. CentralNic has effective and efficient 24x7 customer support capabilities to support these domain names and registrars, and this capability will be expanded to meet the requirements of the TLD and provide additional capacity during periods of elevated activity (such as during Sunrise

periods).

The SRS and EPP systems are described more fully in §24 and §25. The Registrar Console is described in §31.

EPP is an extensible protocol by definition. Certain extensions have been put in place to comply with the new gTLD registry agreement, ICANN Consensus Policies and technical standards:

1. Registry Grace Period Mapping - compliant with RFC 3915
2. DNSSEC Security Extensions - compliant with RFC 5910
3. Launch Phase Extension - will be only active during the Sunrise phase, before the SRS opens for the general public. The extension is compliant with the current Internet Draft https://github.com/wil/EPP-Launch-Phase-Extension-Specification/blob/master/draft-tan-epp-launchphase.txt

More information on EPP extensions is provided in §25.

The SRS will implement and support all ICANN Consensus Policies and Temporary Policies, including:

• Uniform Domain Name Dispute Resolution Policy
• Inter-Registrar Transfer Policy
• Whois Marketing Restriction Policy
• Restored Names Accuracy Policy
• Expired Domain Deletion Policy
• AGP Limits Policy


23.2. Provision to Registrars of Status Information Relating to the Zone Servers

CentralNic will operate a communications channel to notify registrars of all operational issues and activity relating to the DNS servers which are authoritative for the TLD. This includes notifications relating to:

1. Planned and unplanned maintenance;
2. Denial-of-service attacks;
3. unplanned network outages;
4. delays in publication of DNS zone updates;
5. security incidents such as attempted or successful breaches of access controls;
6. significant changes in DNS server behaviour or features;
7. DNSSEC key rollovers.

Notifications will be sent via email (to preregistered contact addresses), with additional notifications made via an off-site maintenance site and via social media channels.


23.3. Dissemination of TLD Zone Files

CentralNic will make TLD zone files available via the Centralized Zone Data Access Provider according to specification 4, section 2 of the Registry Agreement.

Applicant will enter into an agreement with any Internet user that will allow such user to access an Internet host server or servers designated by Applicant and download zone file data. The agreement will be standardized, facilitated and administered by a Centralized Zone Data Access Provider (the "CZDA Provider"). Applicant will provide access to zone file data using the file format described in Section 2.1.4 of Specification 4 of the New gTLD Registry Agreement. Applicant, through the facilitation of the CZDA Provider, will request each user to provide it with information sufficient to correctly

identify and locate the user. Such user information will include, without limitation, company name, contact name, address, telephone number, facsimile number, email address, and the Internet host machine name and IP address.

Applicant will provide the Zone File FTP (or other Registry supported) service for an ICANN-specified and managed URL for the user to access the Registry's zone data archives. Applicant will grant the user a non-exclusive, non-transferable, limited right to access Applicant's Zone File FTP server, and to transfer a copy of the top-level domain zone files, and any associated cryptographic checksum files no more than once per 24 hour period using FTP, or other data transport and access protocols that may be prescribed by ICANN.

Applicant will provide zone files using a sub-format of the standard Master File format as originally defined in RFC 1035, Section 5, including all the records present in the actual zone used in the public DNS.

Applicant, through CZDA Provider, will provide each user with access to the zone file for a period of not less than three (3) months. Applicant will allow users to renew their Grant of Access.

Applicant will provide, and CZDA Provider will facilitate, access to the zone file to user at no cost.

23.4. Operation of the Registry Zone Servers

The TLD zone will be served from CentralNic's authoritative DNS system. This system has operated at 100% service availability since 1996 and has been developed into a secure and stable platform for domain resolution. Partnering with Community DNS, CentralNic's DNS system includes nameservers in more than forty cities, on five continents. The DNS system fully complies with all relevant RFCs and all ICANN specifications, and has been engineered to ensure resilience and stability in the face of denial-of-service attacks, with substantial overhead and geographical dispersion.

The DNS system is described further in §35.

23.5. Dissemination of Contact and Other Information Concerning Domain Name Server Registrations

CentralNic will operate a Whois service for the TLD. The Whois service will provide information about domain names, contact objects, and name server objects stored in the Shared Registry System via a port-43 service compliant with RFC 3912. The Whois service will permit interested parties to obtain information about the Registered Name Holder, Administrative, Technical and Billing contacts for domain names. The Whois service will return records in a standardised format which complies with ICANN specifications.

CentralNic will provide access to the Whois service at no cost to the general public.

CentralNic's Whois service supports a number of features, including rate limiting to prevent abuse, privacy protections for natural persons, and a secure Searchable Whois Service. The Whois service is more fully described in §26.

Should ICANN specify alternative formats and protocols for the dissemination of Domain Name Registration Data, CentralNic will implement such alternative specifications as soon as reasonably practicable.

23.6. DNSSEC
The TLD zone will be signed by DNSSEC. CentralNic uses the award-winning signer technology from Xelerance Corporation. Zone files will be signed using NSEC3 with opt-out, following a DNSSEC Practice Statement detailed in §43.
CentralNic's DNSSEC implementation complies with RFCs 4033, 4034, 4035, 4509 and follows the best practices described in RFC 4641. Hashed Authenticated Denial of Existence (NSEC3) will be implemented, which complies with RFC 5155. The SRS will accept public-key material from child domain names in a secure manner according to industry best practices (specifically the secDNS EPP extension, described in RFC 5910). CentralNic will also publish in its website the DNSSEC Practice Statements (DPS) describing critical security controls and procedures for key material storage, access and usage for its own keys and secure acceptance of registrants' public-key material. CentralNic will publish its DPS following the format described in the "DPS-framework" Internet Draft within 180 days after that draft becomes an RFC.

23.7. Rights Protection Mechanisms
Applicant will provide all mandatory Rights Protection Mechanisms that are specified by ICANN in the Registry Agreement, the Rights protection Requirements, and the Trademark Clearinghouse, namely Trademark Claims Service, Sunrise service, Notice of Registration Periods, Claims Period, and any and all other ICANN requirements. All the required RPM-related policies and procedures such as UDRP, URS, PDDRP and RRDRP will be adopted and used in the TLD. More information is available in §29.
In addition to such RPMs, Applicant may develop and implement additional RPMs that discourage or prevent registration of domain names that violate or abuse another party's legal rights. Applicant will include all ICANN mandated and independently developed RPMs in the registry-registrar agreement entered into by ICANN-accredited registrars authorised to register names in the TLD. Applicant shall implement these mechanisms in accordance with requirements established by ICANN each of the mandatory RPMs set forth in the Trademark Clearinghouse.
The "LaunchPhase" EPP extension (described above) will be used to implement an SRS interface during the Sunrise period for the TLD. Depending on the final specification for the Trademark Claims Service (details of which have not yet been published), an additional EPP extension may be required in order to implement this service. If this is necessary, the extension will be designed to minimise its effect on the operation of the SRS and the requirements on registrars, and will only be in place for a limited period while the Trademark Claims Service is in effect for the TLD.

23.8. Registrar Support and Account Management
CentralNic will leverage its 16 years of experience of supporting over 1,500 registrars to provide high-quality 24x7 support and account management for the TLD registrars. CentralNic's experienced technical and customer support personnel will assist the TLD registrars during the on-boarding and OT&E process, and provide responsive personal support via email, phone and a web based support ticketing system.

23.9. Reporting to ICANN
Applicant and CentralNic will compile and transmit a monthly report to
ICANN relating to the TLD. This report will comply with Specification
3 of the Registry Agreement.

23.10. Personnel Resources of CentralNic
The technical, operations and support functions of the registry will
performed in-house by CentralNic's personnel. These personnel perform
these functions on a full-time basis.

23.10.1. Technical Operations
Technical Operations refers to the deployment, maintenance, monitoring
and security of the registry system, including the SRS and the other
critical registry functions. Technical Operations staff design, build,
deploy and maintain the technical infrastructure that supports the
registry system, including power distribution, network design, access
control, monitoring and logging services, and server and database
administration. Internal helpdesk and incident reporting is also
performed by the Technical Operations team. The Technical Operations
team performs 24x7 monitoring and support for the registry system and
mans the Network Operations Centre (NOC) from which all technical
activities are co-ordinated.
CentralNic intends to maintain a Technical Operations team consisting
of the following positions. These persons will be responsible for
managing, developing and monitoring the registry system for the TLD on
a 24x7 basis:
• Senior Operations Engineer(s)
• Operations Engineer(s)
• Security Engineer

23.10.2. Technical Development
The Technical Development team develops and maintains the software
which implements the critical registry functions, including the EPP,
Whois, Zone file generation, data escrow, reporting, backoffice and
web-based management systems (intranet and extranet), and open-source
registrar toolkit software. All critical registry software has been
developed and maintained in-house by this team.
CentralNic intends to maintain a Technical Development team consisting
of the following positions. These persons will be responsible for
maintaining and developing the registry software which will support
the TLD:
• Senior Technical Developer x 2
• Technical Developer x 3

23.10.3. Technical Support
Technical Support refers to 1st, 2nd and 3rd line support for
registrars and end-users. Areas covered include technical support for
systems and services, billing and account management. Support
personnel also deal with compliance and legal issues such as UDRP and
URS proceedings, abuse reports and enquiries from law enforcement.
1st line support issues are normally dealt with by these personnel.
2nd and 3rd line support issues (relating to functional or operational
issues with the registry system) are escalated to Technical Operations

or Technical Development as necessary.
The Technical Support team will consist of the following positions:
• Operations Manager
• Support Manager
• Support Agent(s)
Our overseas account managers also perform basic support functions, escalating to the support agents in London where necessary.

### 23.10.4. Key Personnel

#### 23.10.4.1. Gavin Brown – Chief Technology Officer
Gavin has worked at CentralNic since 2001, becoming CTO in 2005. He has overall responsibility for all aspects of the SRS, Whois, DNS and DNSSEC systems. He is a respected figure in the domain industry and has been published in several professional technical journals, and co-authored a book on the Perl programming language. He also participates in a number of technical, public policy and advocacy groups and several open source projects. Gavin has a BSc (hons) in Physics from the University of Kent.

#### 23.10.4.2. Jenny White – Operations Manager
Jenny has been with CentralNic for nine years. Throughout this time she has expertly managed customer relations with external partners, prepared new domain launch processes and documentation, managed daily support and maintenance for over 1,500 Registrars, carried out extensive troubleshooting within the registrar environment to ensure optimum usability for registrars across communication platforms, handled domain disputes (from mediation to WIPO filing), and liaised with WIPO to implement changes to the Dispute Resolution Procedure when necessary.

#### 23.10.4.3. Adam Armstrong – Senior Operations Engineer
Adam has recently joined CentralNic as Senior Operations Engineer. In this role he is responsible for the operation and development of the system and network infrastructure for the registry system. Adam has previously worked at a number of large UK ISPs including Jersey Telecom and Packet Exchange. He is also the lead developer of Observium, a network management system used by ICANN (amongst others). Adam has brought his strong knowledge of network design, management and security to bear at CentralNic and will oversee the operation of the SRS for the TLD.

#### 23.10.4.4. Milos Negovanovic – Senior Technical Developer
Milos has worked at CentralNic since 2009. He has a background in building rich web applications and protocol servers. His main areas of responsibility are the Registrar Console, EPP and backoffice functions.

#### 23.10.4.5. Mary O'Flaherty – Senior Technical Developer
Mary has worked at CentralNic since 2008. She plays an integral role in the ongoing design, development and maintenance of the registry as a whole and has specific experience with the EPP system, Registrar Console and Staff Console. Mary has a 1st class Honors degree in Computer Science from University College Cork and has previously worked for Intel and QAD Ireland.

23.10.5. Job Descriptions
CentralNic will recruit a number of new employees to perform technical
duties in relation to the TLD and other gTLDs. The following job
descriptions will be used to define these roles and select candidates
with suitable skills and experience.

23.10.5.1. Operations Engineer
Operations Engineers assist in the maintenance and development of the
network and server infrastructure of the registry system. Operations
Engineers have a good knowledge of the TCP/IP protocol stack and
related technologies, and are familiar with best practice in the areas
of network design and management and system administration. They
should be competent system administrators with a good knowledge of
Unix system administration, and some knowledge of shell scripting,
software development and databases. Operations Engineers have 1-2
year's relevant commercial experience. Operations Engineers report to
and work with the Senior Operations Engineer, who provides advice and
mentoring. Operations Engineers participate in manning the NOC on a
24x7 basis and participate in the on-call shift rota.

23.10.5.2. Security Engineer
Security Engineers enhance and assure the security of the registry
system. Day-to-day responsibilities are: responding to security
incidents, performing analysis and remediating vulnerabilities,
conducting tests of access controls, refining system configuration to
improve security, training other team members, reviewing source code,
maintaining security policies and procedures, and gathering
intelligence relating to threats to the registry. Security Engineers
have 1-2 year's relevant commercial experience. This role reports to
and works with the Senior Operations Engineer and CTO. Security
Engineers participate in manning the NOC on a 24x7 basis and
participate in the on-call shift rota.

23.10.5.3. Technical Developer
Technical Developers are maintain the software which supports the
registry. Day-to-day responsibilities are developing new systems in
response to requests from management and customers, correcting bugs in
existing software, and improving its performance. Technical Developers
have a good knowledge of general programming practices including use
of revision control and code review systems. Developers have a good
awareness of security issues, such as those described in advisories
published by the oWASP Project. Developers have at least one years'
commercial experience in developing applications in programming
languages such as PHP, Perl, and Python, although knowledge of domain
technologies such as EPP and DNS is not critical. Technical Developers
work as part of a team, with advice and mentoring from the Senior
Technical Developers, to whom they report.

23.10.6. Resource Matrix
To provide a means to accurately and objectively predict human
resource requirements for the operation of the registry system,
CentralNic has developed a Resourcing Matrix, which assigns a
proportion of each employee's available time to each aspect of

registry activities. These activities include technical work such as operations and development, as well as technical support, registrar account management, rights protection, abuse prevention, and financial activity such as payroll, cash collection, etc. This matrix then permits the calculation of the total HR resource assigned to each area. A copy of the Resourcing Matrix is included as Appendix 23.2. It is important to note that the available resources cover the operation of CentralNic's entire registry operations: this includes CentralNic's own domain registry portfolio (uk.com, us.com, etc), the .LA ccTLD, as well as the gTLDs for which CentralNic will provides registry services. The actual proportion of human technical resources required specifically for the TLD is determined by the relative size of the TLD to the rest of CentralNic's operations. This calculation is based on the projected number of domains after three years of operation: the optimistic scenario is used to ensure that sufficient personnel is on hand to meet periods of enhanced demand. CentralNic has calculated that, if all its TLD clients are successful in their applications, and all meet their optimistic projections after three years, its registry system will be required to support up to 4.5 million domain names. Since the optimistic projection for the number of domains registered in the TLD after three years is a very small fraction of CentralNic's total number of domains registered the TLD will therefore require only a small fraction of CentralNic's total available HR resources in order operate fully and correctly. In the event that registration volumes exceed this figure, CentralNic will proactively increase the size of the Technical Operations, Technical Development and support teams to ensure that the needs of the TLD are fully met. Revenues from the additional registration volumes will fund the salaries of these new hires. Nevertheless, CentralNic is confident that the staffing outlined above is sufficient to meet the needs of the TLD for at least the first 18 months of operation.

24. Shared Registration System (SRS) Performance:
describe

- the plan for operation of a robust and reliable SRS. SRS is a critical registry function for enabling multiple registrars to provide domain name registration services in the TLD. SRS must include
  the EPP interface to the registry, as well as any other interfaces intended to be provided, if they are critical to the functioning of the registry. Please refer to
  the requirements in Specification 6 (section 1.2) and Specification 10 (SLA Matrix) attached to the Registry Agreement; and
  • resourcing plans for the initial implementation of, and ongoing maintenance for, this aspect of the criteria (number and description of personnel roles allocated to this area).
  A complete answer should include, but is not limited to:
- A high-level SRS system description;
- Representative network diagram(s);
- Number of servers;
- Description of interconnectivity with other registry systems;
- Frequency of synchronization between servers; and

• Synchronization scheme (e.g., hot standby, cold standby).

Except where specified this answer refers to the operations of the Applicant's outsource Registry Service Provider, CentralNic.

24.1. Registry Type
CentralNic operates a "thick" registry in which the registry maintains copies of all information associated with registered domains. Registrars maintain their own copies of registration information, thus registry-registrar synchronization is required to ensure that both registry and registrar have consistent views of the technical and contact information associated with registered domains. The Extensible Provisioning Protocol (EPP) adopted supports the thick registry model. See §25 for further details.

24.2. Architecture
Figure 24.1 provides a diagram of the overall configuration of the SRS. This diagram should be viewed in the context of the overall architecture of the registry system described in §32.
The SRS is hosted at CentralNic's primary operations centre in London. It is is connected to the public Internet via two upstream connections, one of which is provided by Qube. Figure 32.1 provides a diagram of the outbound network connectivity. Interconnection with upstream transit providers is via two BGP routers which connect to the firewalls which implement access controls over registry services.
Within the firewall boundary, connectivity is provided to servers by means of resilient gigabit ethernet switches implementing Spanning Tree Protocol.
The registry system implements two interfaces to the SRS: the standard EPP system (described in §25) and the Registrar Console (described in §31). These systems interact with the primary registry database (described in §33). The database is the central repository of all registry data. Other registry services also interact with this database.
An internal "Staff Console" is used by CentralNic personnel to perform management of the registry system.

24.3. EPP System Architecture
A description of the characteristics of the EPP system is provided in §25. This response describes the infrastructure which supports the EPP system.
A network diagram for the EPP system is provided in Figure 24.2. The EPP system is hosted at the primary operations centre in London. During failover conditions, the EPP system operates from the Isle of Man Disaster Recovery site (see §34).
CentralNic's EPP system has a three-layer logical and physical architecture, consisting of load balancers, a cluster of

front-end protocol servers, and a pool of application servers. Each layer can be scaled horizontally in order to meet demand.

Registars establish TLS-secured TCP connections to the load balancers on TCP port 700. Load is balanced using DNS round-robin load balancing.

The load balancers pass sessions to the EPP protocol servers. Load is distributed using a weighted-least-connections algorithm. The protocol servers run the Apache web server with the mod_epp and mod_proxy_balancer modules. These servers process session commands ("hello", "login" and "logout") and function as reverse proxies for query and transform commands, converting them into plain HTTP requests which are then distributed to the application servers. EPP commands are distributed using a weighted-least-connections algorithm.

Application servers receives EPP commands as plain HTTP requests, which are handled using application business logic. Application servers process commands and prepare responses which are sent back to the protocol servers, which return responses to clients over EPP sessions.

Each component of the system is resilient: multiple inbound connections, redundant power, high availability firewalls, load balancers and application server clusters enable seamless operation in the event of component failure. This architecture also allows for arbitrary horizontal scaling: commodity hardware is used throughout the system and can be rapidly added to the system, without disruption, to meet an unexpected growth in demand.

The EPP system will comprise of the following systems:
• 4x load balancers (1U rack mount servers with quad-core Intel processors, 16GB RAM, 40GB solid-state disk drives, running the CentOS operating system using the Linux Virtual Server [see http://www.linuxvirtualserver.org/])
• 8x EPP protocol servers (1U rack mount servers with dual-core Intel processors, 16GB RAM, running the CentOS operating system using Apache and mod_epp)
• 20x application servers (1U rack mount servers with dual-core Intel processors, 4GB of RAM, running the CentOS operating system using Apache and PHP)

24.3.1. mod_epp

mod_epp is an Apache server module which adds support for the EPP transport protocol to Apache. This permits implementation of an EPP server using the various features of Apache, including CGI scripts and other dynamic request handlers, reverse proxies, and even static files. mod_epp was originally developed by Nic.at, the Austrian ccTLD registry. Since its release, a large number of ccTLD and other registries have deployed it and continue to support its development and maintenance. Further information can be found at http://sourceforge.net/projects/aepps. CentralNic uses mod_epp to manage EPP sessions with registrar clients, and to convert EPP commands into HTTP requests which can then be handled by backend application servers.

24.3.2. mod_proxy_balancer
mod_proxy_balancer is a core Apache module. Combined with the mod_proxy module, it implements a load-balancing reverse proxy, and includes a number of load balancing algorithms and automated failover between members of a cluster. CentralNic uses mod_proxy_balancer to distribute EPP commands to backend. application servers.

24.4. Performance
CentralNic performs continuous remote monitoring of its EPP system, and this monitoring includes measuring the performance of various parts of the system. As of writing, the average round-trip times (RTTs) for various functions of the EPP system were as follows:
  • connect time: 87ms
  • login time: 75ms
  • hello time: 21ms
  • check time: 123ms
  • logout time: 20ms
These figures include an approximate latency of 2.4ms due to the distant between the monitoring site and the EPP system. They were recorded during normal weekday operations during the busiest time of the day (around 1300hrs UTC) and compare very favourably to the requirement of 4,000ms for session commands and 2,000ms for query commands defined in the new gTLD Service Level Agreement. RTTs for overseas registrars will be higher than this due to the greater distances involved, but will remain well within requirements.

24.5. Scaling
Horizontal scaling is preferred over vertical scaling. Horizontal scaling refers to the introduction of additional nodes into a cluster, while vertical scaling involves using more powerful equipment (more CPU cores, RAM etc) in a single system. Horizontal scaling also encourages effective mechanisms to ensure high-availability, and eliminate single points of failure in the system.
Vertical scaling leverages Moore's Law: when units are depreciated and replaced, the new equipment is likely to be significantly more powerful. If the average lifespan of a server in the system is three years, then its replacement is likely to be around four times as powerful as the old server.
For further information about Capacity Management and Scaling, please see §32.

24.6. Registrar Console
The Registrar Console is a web-based registrar account management tool. It provides a secure and easy-to-use graphical interface to the SRS. It is hosted on a virtual platform at the primary operations centre in London. As with the rest of the registry system, during a failover condition it is operated from

the Isle of Man. The virtual platform is described in Figure 24.3.
        The features of the Registrar Console are described in §31.
        The virtual platform is a utility platform which supports
systems and services which do not operate at significant levels of
load, and which therefore do not require multiple servers or the
additional performance that running on "bare metal" would provide.
The platform functions as a private cloud, with redundant storage
and failover between hosts.
        The Registrar Console currently sustains an average of 6
page requests per minute during normal operations, with peak
volumes of around 8 requests per minute. Volumes during weekends
are significantly lower (fewer than 1 requests per minute).
Additional load resulting from this and other new gTLDs is expected
to result in a trivial increase in Registrar Console request
volumes, and CentralNic does not expect additional hardware
resources to be required to support it.

        24.7. Quality Assurance
        CentralNic employs the following quality assurance (QA)
methods:
        1. 24x7x365 monitoring provides reports of incidents to NOC
        2. Quarterly review of capacity, performance and reliability
        3. Monthly reviews of uptime, latency and bandwidth
consumption
        4. Hardware depreciation schedules
        5. Unit testing framework
        6. Frequent reviews by QA working group
        7. Schema validation and similar technologies to monitor
compliance on a real-time, ongoing basis
        8. Revision control software with online annotation and
change logs
        9. Bug Tracking system to which all employees have access
        10. Code Review Policy in place to enforce peer review of
all changes to core code prior to deployment
        11. Software incorporates built-in error reporting
mechanisms to detect flaws and report to Operations team
        12. Four stage deployment strategy: development
environment, staging for internal testing, OT&E deployment for
registrar testing, then finally production deployment
        13. Evidence-based project scheduling
        14. Specification development and revision
        15. Weekly milestones for developers
        16. Gantt charts and critical path analysis for project
planning
        Registry system updates are performed on an ongoing basis,
with any user-facing updates (ie changes to the behaviour of the
EPP interface) being scheduled at specific times. Disruptive
maintenance is scheduled for periods during which activity is
lowest.

        24.8. Billing

CentralNic operates a complex billing system for domain name registry services to ensure registry billing and collection services are feature rich, accurate, secure, and accessible to all registrars. The goal of the system is to maintain the integrity of data and create reports which are accurate, accessible, secured, and scalable. The foundation of the process is debit accounts established for each registrar. CentralNic will withdraw all domain fees from the registrar's account on a per-transaction basis. CentralNic will provide fee-incurring services (e.g., domain registrations, registrar transfers, domain renewals) to a registrar for as long as that registrar's account shows a positive balance.

Once ICANN notifies Applicant that a registrar has been issued accreditation, CentralNic will begin the registrar on-boarding process, including setting up the registrar's financial account within the SRS.

24.9. Registrar Support

CentralNic provides a multi-tier support system on a 24x7 basis with the following support levels:

• 1st Level: initial support level responsible for basic customer issues. The first job of 1st Level personnel is to gather the customer's information and to determine the customer's issue by analyzing the symptoms and figuring out the underlying problem.

• 2nd Level: more in-depth technical support level than 1st Level support containing experienced and more knowledgeable personnel on a particular product or service. Technicians at this level are responsible for assisting 1st Level personnel solve basic technical problems and for investigating elevated issues by confirming the validity of the problem and seeking for known solutions related to these more complex issues.

• 3rd Level: the highest level of support in a three-tiered technical support model responsible for handling the most difficult or advanced problems. Level 3 personnel are experts in their fields and are responsible for not only assisting both 1st and 2nd level personnel, but with the research and development of solutions to new or unknown issues.

CentralNic provides a support ticketing system for tracking routine support issues. This is a web based system (available via the Registrar Console) allowing registrars to report new issues, follow up on previously raised tickets, and read responses from CentralNic support personnel.

When a new trouble ticket is submitted, it is assigned a unique ID and priority. The following priority levels are used: ▧

1. Normal: general enquiry, usage question, or feature enhancement request. Handled by 1st level support.

2. Elevated: issue with a non-critical feature for which a work-around may or may not exist. Handled by 1st level support.

3. Severe: serious issue with a primary feature necessary for daily operations for which no work-around has been discovered and which completely prevents the feature from being used. Handled by 2nd level support.

4. Critical: A major production system is down or severely impacted. These issues are catastrophic outages that affect the overall Registry System operations. Handled by 3rd level support.

Depending on priority, different personnel will be alerted to the existence of the ticket. For example, a Priority 1 ticket will cause a notification to be emailed to the registrar customer support team, but a Priority 4 ticket will result in a broadcast message sent to the pagers of senior operations staff including the CTO. The system permits escalation of issues that are not resolved within target resolution times.

24.10. Enforcement of Eligibility Requirements

The SRS supports enforcement of eligibility requirements, as required by specific TLD policies.

Figure 24.4 describes the process by which registration requests are validated. Prior to registration, the registrant's eligibility is validated by a Validation Agent. The registrant then instructs their registrar to register the domain. The SRS returns an "Object Pending" result code (1001) to the registrar.

The request is sent to the Validation Agent by the registry. The Validation Agent either approves or rejects the request, having reconciled the registration information with that recorded during the eligibility validation. If the request has been approved, the domain is fully registered. If it is rejected, the domain is immediately removed from the database. A message is sent to the registrar via the EPP message queue in either case. The registrar then notifies the registrant of the result.

24.11. Interconnectivity With Other Registry Systems

The registry system is based on multiple resilient stateless modules. The SRS, Whois, DNS and other systems do not directly interact with each other. Interactions are mediated by the database which is the single authoritative source of data for the registry as a whole. Individuals modules perform "CRUD" (create, read, update, delete) actions upon the database. These actions then affect the behaviour of other registry systems: for example, when a registrar adds the "clientHold" status to a domain object, this is recorded in the database. When a query is received for this domain via the Whois service, the presence of this status code in the database results in the "Status: CLIENT HOLD" appearing in the whois record. It will also be noted by the zone generation system, resulting in the temporary removal of the delegation of the domain name from the DNS.

24.12. Resilience

The SRS has a stateless architecture designed to be fully resilient in order to provide an uninterrupted service in the face of failure or one or more parts of the system. This is achieved by use of redundant hardware and network connections, and by use of continuous "heartbeat" monitoring allowing dynamic and high-speed failover from active to standby components, or between nodes in an

active-active cluster. These technologies also permit rapid scaling
of the system to meet short-term increases in demand during "surge"
periods, such as during the initial launch of a new TLD.

### 24.12.1. Synchronisation Between Servers and Sites
CentralNic's system is implemented as multiple stateless
systems which interact via a central registry database. As a
result, there are only a few situations where synchronisation of
data between servers is necessary:
1. replication of data between active and standby servers
(see §33). CentralNic implements redundancy in its database system
by means of an active-standby database cluster. The database system
used by CentralNic supports native real-time replication of data
allowing operation of a reliable hot standby server. Automated
heartbeat monitoring and failover is implemented to ensure
continued access to the database following a failure of the primary
database system.
2. replication is used to synchronise the primary
operations centre with the Disaster Recovery site hosted in the
Isle of Man (see §34). Database updates are replicated to the DR
site in real-time via a secured VPN, providing a "hot" backup site
which can be used to provide registry services in the event of a
failure at the primary site.

### 24.13. Operational Testing and Evaluation (OT&E)
An Operational Testing and Evaluation (OT&E) environment is
provided for registrars to develop and test their systems. The OT&E
system replicates the SRS in a clean-room environment. Access to
the OT&E system is unrestricted and unlimited: registrars can
freely create multiple OT&E accounts via the Registrar Console.

### 24.14. Resourcing
As can be seen in the Resourcing Matrix found in Appendix
23.2, CentralNic will maintain a team of full-time developers and
engineers which will contribute to the development and maintenance
of this aspect of the registry system. These developers and
engineers will not work on specific subsystems full-time, but a
certain percentage of their time will be dedicated to each area.
The total HR resource dedicated to this area is equivalent to more
than one full-time post.
CentralNic operates a shared registry environment where
multiple registry zones (such as CentralNic's domains, the .LA
ccTLD, this TLD and other gTLDs) share a common infrastructure and
resources. Since the TLD will be operated in an identical manner to
these other registries, and on the same infrastructure, then the
TLD will benefit from an economy of scale with regards to access to
CentralNic's resources.
CentralNic's resourcing model assumes that the "dedicated"
resourcing required for the TLD (ie, that required to deal with
issues related specifically to the TLD and not to general issues
with the system as a whole) will be equal to the proportion of the

overall registry system that the TLD will use. CentralNic has
calculated that, if all its TLD clients are successful in their
applications, and all meet their optimistic projections after three
years, its registry system will be required to support up to 4.5
million domain names. Therefore the TLD will require [0.22]% of the
total resources available for this area of the registry system.

In the event that registration volumes exceed this figure,
CentralNic will proactively increase the size of the Technical
Operations, Technical Development and support teams to ensure that
the needs of the TLD are fully met. Revenues from the additional
registration volumes will fund the salaries of these new hires.
Nevertheless, CentralNic is confident that the staffing outlined
above is sufficient to meet the needs of the TLD for at least the
first 18 months of operation.

---

25. Extensible Provisioning Protocol (EPP): provide a detailed description of the interface
with registrars, including how the applicant will comply with EPP in RFCs 3735 (if
applicable), and 5730-5734.
If intending to provide proprietary EPP extensions, provide documentation consistent with
RFC 3735, including the EPP templates and schemas that will be used.
Describe resourcing plans (number and description of personnel roles allocated to this area).
A complete answer is expected to be no more than 5 pages. If there are proprietary EPP
extensions, a complete answer is also expected to be no more than 5 pages per EPP
extension.

Except where specified this answer refers to the operations of the
Applicant's outsource Registry Service Provider, CentralNic.

The Extensible Provisioning Protocol (EPP) is an application layer client-
server protocol for the provisioning and management of objects stored in
a shared central repository. EPP defines generic object management
operations and an extensible framework that maps protocol operations to
objects. EPP has become established as the common protocol by which
domain registrars can manage domains, nameservers and contact details
held by domain registries. It is widely deployed in the gTLD and ccTLD
registry space.
CentralNic has operated its EPP system since 2005, and it currently
operates at significant load in terms of registrars, sessions and
transaction volumes. CentralNic's EPP system is fully compliant with the
following RFC specifications:
• 5730 - Base Protocol
• 5731 - domains
• 5732 - Host Objects
• 5733 - Contact Objects
• 5734 - TCP Transport
• 3735 - Extension Guidelines
• 3915 - RGP Extension
• 5910 - DNSSEC Extension

25.1. Description of Interface
EPP is a stateful XML protocol layered over TCP (see RFC 3734). Protected

using lower-layer security protocols, clients exchange identification, authentication, and option information, and engage in a series of client-initiated command-response exchanges. All EPP commands are atomic (there is no partial success or partial failure) and designed so that they can be made idempotent (executing a command more than once has the same net effect on system state as successfully executing the command once).
EPP provides four basic service elements: service discovery, commands, responses, and an extension framework that supports definition of managed objects and the relationship of protocol requests and responses to those objects.
EPP servers respond to client-initiated communication (which can be either a lower-layer connection request or an EPP service discovery message) by returning a greeting to a client. The server then responds to each EPP command with a coordinated response that describes the results of processing the command.
EPP commands fall into three categories: session management, queries, and transform commands. Session management commands are used to establish and end persistent sessions with an EPP server. Query commands perform read-only object information retrieval operations. Transform commands perform read-write object management operations.
Commands are processed by a server in the order they are received from a client. The protocol includes features that allow for offline review of transform commands before the requested action is completed. In such situations, the response clearly notes that the command has been received but that the requested action is pending. The corresponding object then reflects processing of the pending action. The server will also notify the client when offline processing of the action has been completed. Object mappings describe standard formats for notices that describe completion of offline processing.
EPP uses XML namespaces to provide an extensible object management framework and to identify schemas required for XML instance parsing and validation. These namespaces and schema definitions are used to identify both the base protocol schema and the schemas for managed objects.

25.1.1. Objects supported
Registrars may create and manage the following object types in the CentralNic EPP system:
• domains (RFC 5731)
• host objects (RFC 5732)
• contact objects (RFC 5733)

25.1.2. Commands supported
CentralNic supports the following EPP commands:
• "hello" – retrieve the "greeting" from the server
• "login" and "logout" – session management
• "poll" – message queue management
• "check" – availability check
• "info" – object information
• "create" – create object
• "update" – update object
• "renew" – renew object
• "delete" – delete object
• "transfer" – manage object transfer

25.2. EPP state diagram
Figure 25.1 describes the state machine for the EPP system. Clients

establish a connection with the server, which sends a greeting. Clients
then authenticate, and once a login session is established, submits
commands and receive responses until the server closes the connection,
the client sends a logout command, or a timeout is reached.

25.3. EPP Object Policies
The following policies apply to objects provisioned via the EPP system:

25.3.1. domains
1. domains must comply with the syntax described in RFC 1035 §2.3.1.
Additionally, the first label of the name must be between 3 and 63
characters in length.
2. domains must have a registrant attribute which is associated with a
contact object in the database.
3. domains must have an administrative contact attribute which is
associated with a contact object in the database.
4. domains must have a technical contact which attribute is associated
with a contact object in the database.
5. domains may have an billing contact attribute which is associated with
a contact object in the database.
6. domains may have between 0 (zero) and 13 DNS servers. A domain with no
name servers will not resolve and no records will be published in the DNS
7. the host object model for domains is used rather than the host
attribute model.
8. domains may have a number of status codes. The presence of certain
status codes indicates the domain's position in the lifecycle, described
further in §27.
9. where policy requires, the server may respond to a "domain:create"
command with an "Object Pending" (1001) response. When this occurs, the
domain is placed onto the pendingCreate status while an out-of-band
validation process takes place.
10. when registered, the expiry date of a domain may be set up to ten
years from the initial date of registration. Registrars can specify
registration periods in one-year increments from one to ten.
11. when renewed, the expiry date of a domain may be set up to ten years
from the current expiry date. Registrars can specify renewal periods in
one-year increments from one to ten. domains which auto-renew are renewed
for one year at a time.
12. domains must have an authInfo code which is used to authenticate
inter-registrar transfer requests. This authInfo code may contain up to
48 bytes of UTF-8 character data.
13. domains may have one or more DS records associated with them. DS
records are managed via the secDNS EPP extension, as specified in RFC
5910.
14. only the sponsoring registrar of the domain may submit "update",
"renew" or "delete" commands for the domain.

25.3.2. Host objects
1. host names must comply with RFC 1035. The maximum length of the host
name may not exceed 255 characters.
2. in-bailiwick hosts must have an IPv4 address. They may optionally have
an IPv6 address.
3. multiple IP addresses are not currently permitted.
4. sponsorship of hosts is determined as follows: if an object is in-
bailiwick (ie child of a domain in the database, and therefore also child
to a TLD in the system), then the sponsor is the sponsor of the parent

domain. If the object is out-of-bailiwick, the sponsor is the registrar which created the contact.
5. if a registrar submits a change to the name of a host object, if the new host name is subordinate to an in-bailiwick domain, then that registrar must be the sponsor of the new parent domain.
6. registrars are not permitted to create hosts that are subordinate to a non-existent in-bailiwick domain, or to change the name of a host object so that it us subordinate to a non-existent in-bailiwick domain.
7. a host cannot be deleted if one or more domains are delegated to it (the registry deletes hosts to remove orphan glue, see §28).
8. inter-registrar transfers are not permitted.
9. only the sponsoring registrar of the host may submit "update" or "delete" commands for the object.

25.3.3. Contact objects
1. contact IDs may only contain characters from the set [A-Z, 0-9, . (period), - (hyphen) and - (underscore)] and are case-insensitive.
2. phone numbers and email addresses must be valid as described in RFC 5733 §2.5 and §2.6.
3. contact information is accepted and stored in "internationalized" format only: that is, contact objects only have a single "contact:postalInfo" element and the type attribute is always "int".
4. the "contact:org", "contact:sp", "contact:pc", "contact:phone" and "contact:fax" elements are optional.
5. contacts must have an authInfo code which is used in inter-registrar transfers. This code may contain up to 48 bytes of UTF-8 character data.
6. a contact cannot be deleted if one or more domains are associated with it.
7. only the sponsoring registrar of the contact may submit "update" or "delete" commands for the object.

25.4. EPP Extensions
CentralNic supports the following EPP extensions. CentralNic's implementations fully comply with the required specifications.

25.4.1. Registry Grace Period Mapping
Various grace periods and hold periods are supported by the Registry Grace Period mapping, as defined in RFC 3915. This is described further in §27.

25.4.2. DNSSEC Security Extensions Mapping
Registrars may submit Delegation Signer (DS) record information for domains under their sponsorship. This permits the establishment of a secure chain-of-trust for DNSSEC validation.
CentralNic supports the specification defined in RFC 5910. This supports two interfaces: the DS Data Interface and Key Data Interface. CentralNic supports the former interface (DS Data), where registrars submit the keytag, algorithm, digest type and digest for DS records as XML elements, rather than as key data. Key data is stored if provided as a child element of the "secDNS:dsData" element. The maxSigLife element is optional in the specification and is not currently supported.

25.4.3. Launch Phase Extension
CentralNic has assisted development of a standard EPP extension for registry "launch phases" (ie Sunrise and Landrush periods), during which the steady-state mode of "first-come, first-served" operation does not

apply. This extension permits registrars to submit requests for domains
with claimed rights such as a registered trademark. The extension is
currently described in an Internet-Draft (see
http://tools.ietf.org/html/draft-tan-epp-launchphase-00). It is hoped
that this draft will eventually be published as an RFC which can be
implemented by other registries and registrars.
CentralNic's system implements this extension and will support the most
recent version of the draft during the initial launch of the TLD. Once
the TLD enters General Availability, this extension will no longer be
available for use by registrars. Example frames describing the use of
this extension are included in Appendix 25.2. As of writing, the current
draft does not include a full schema definition, but a schema from a
previous version has been included in Appendix 25.3. When the Draft is
updated to include a schema, it will be based on this version.

25.5. Registrar Credentials and Access Control
Registrars are issued with a username (their registrar ID) and a
password. This password cannot be used to access any other service and
only this password can be used to access the EPP system. Registrar
officers with the "Management" access level can change their EPP password
via the Registrar Console.
RFC 5730 requires "mutual, strong client-server authentication".
CentralNic requires that all registrars connect using an SSL certificate.
This certificate may be obtained from a recognised certificate authority,
or it may be a self-signed certificate registered with CentralNic via the
Registrar Console. Registrar officers with the "Management" access level
can upload SSL certificates for their account.

25.6. Session Limits and Transaction Volumes
There are no limits on the number of active sessions a registrar can
maintain with the server. Similarly, there are no limits on the volume of
transactions a registrar may send. However the system is fully capable of
imposing connection limits and this measure may be used in future to
ensure equal access amongst registrars.

25.7. Transaction Logging and Reporting
All "transform" commands are logged. Transform commands are: "create",
"renew", "update", "delete" and "transfer". The system logs the time and
date when the command was received, the registrar which submitted it, the
request and response frames, the result code and message. All commands,
whether successful or not, are logged.
The transaction log is stored in the primary registry database.
Registrars have access to the log for their account via the Registrar
Console. The log viewer permits filtering by command, object type, object
ID (domain, host name, contact ID), result code and timestamp.
Query commands ("check", "info", "poll op="req") and session commands
("login", "logout" and "hello") are not logged due to the large volume of
such queries (particularly "check" queries). The EPP system uses counters
for these commands to facilitate generation of monthly reports.

25.8. EPP Message Queue
The EPP protocol provides a message queue to provide registrars with
notifications for out-of-band events. CentralNic currently supports the
following EPP message notifications:
• approved inbound transfer
• rejected inbound transfer

• new outbound transfer
• cancelled outbound transfer
• approved or rejected domain registration request (where TLD policy
requires out-of-band approval of "domain:create" requests)

25.9. Registrar Support, Software Toolkit
CentralNic has supported EPP for many years. CentralNic has released a
number of open source client libraries for several popular programming
languages. These are used by registrars and registries around the world.
CentralNic maintains the following open source EPP libraries:
• Net::EPP, a general purpose EPP library for Perl. See
http://code.google.com/p/perl-net-epp/
• Preppi, a graphical EPP client written in Perl. See
https://www.centralnic.com/company/labs/preppi
• Net_EPP, a PHP client class for EPP. See
https://github.com/centralnic/php-epp
• Simpleepp, a Python client class for EPP. See
https://bitbucket.org/milosn/simpleepp
• tx-epp-proxy, a EPP reverse proxy for shared-nothing client
architectures written in Python. See https://bitbucket.org/milosn/tx-epp-
proxy
These libraries are available for anyone to use, at no cost. CentralNic
develops these libraries, and accepts submissions and bug reports from
users around the world.

25.10. Quality Assurance, RFC Compliance
To ensure that its EPP system fully complies with the relevant
specifications documents, CentralNic has implemented the following:

25.10.1. Schema Validation
The EPP system automatically validates all response frames against the
XSD schema definitions provided in the RFCs. Should a non-validating
response be sent to a registrar, an alert is raised with the NOC to be
investigated and corrected. By default, this feature is disabled in the
production environment but it is enabled in all other environments (as
described below).

25.10.2. Multi-stage Deployment and Testing
EPP system code is developed, tested and deployed in a multi-stage
environment:
1. Developers maintain their own development environment in which new
code is written and changes are prepared. Development environments are
configured with the highest level of debugging and strictness to provide
early detection of faults.
2. All changes to the EPP system are subjected to peer review: other
developers in the team must review, test and sign off the changes before
being committed (or, if developed on a branch, being merged into the
stable branch).
3. Changes to EPP system code are then deployed in the OT&E environment.
Registrars continually test this system as part of their own QA
processes, and this additional phase provides an additional level of
quality assurance.

25.10.3. Registrar Feedback
Registrars are provided with an easy way to report issues with the EPP
system, and many perform schema validation on the responses they receive.

When issues are detected by registrars, they are encouraged to submit bug
reports so that developers can rectify the issues.

25.11. EPP System Resourcing
As can be seen in the Resourcing Matrix found in Appendix 23.2,
CentralNic will maintain a team of full-time developers and engineers
which will contribute to the development and maintenance of this aspect
of the registry system. These developers and engineers will not work on
specific subsystems full-time, but a certain percentage of their time
will be dedicated to each area. The total HR resource dedicated to this
area is equivalent to more than one full-time person.
CentralNic operates a shared registry environment where multiple registry
zones (such as CentralNic's domains, the .LA ccTLD, this TLD and other
gTLDs) share a common infrastructure and resources. Since the TLD will be
operated in an identical manner to these other registries, and on the
same infrastructure, then the TLD will benefit from an economy of scale
with regards to access to CentralNic's resources.
CentralNic's resourcing model assumes that the "dedicated" resourcing
required for the TLD (ie, that required to deal with issues related
specifically to the TLD and not to general issues with the system as a
whole) will be equal to the proportion of the overall registry system
that the TLD will use. CentralNic has calculated that, if all its TLD
clients are successful in their applications, and all meet their
optimistic projections after three years, its registry system will be
required to support up to 4.5 million domain names. Therefore the TLD
will require [0.22]% of the total resources available for this area of
the registry system.
In the event that registration volumes exceed this figure, CentralNic
will proactively increase the size of the Technical Operations, Technical
Development and support teams to ensure that the needs of the TLD are
fully met. Revenues from the additional registration volumes will fund
the salaries of these new hires. Nevertheless, CentralNic is confident
that the staffing outlined above is sufficient to meet the needs of the
TLD for at least the first 18 months of operation.

26. Whois: describe

- how the applicant will comply with Whois specifications for data objects, bulk access,
  and lookups as defined in Specifications 4 and 10 to the Registry Agreement;
- how the Applicant's Whois service will comply with RFC 3912; and
- resourcing plans for the initial implementation of, and ongoing maintenance for, this
  aspect of the criteria (number and description of personnel roles allocated to this area).

A complete answer should include, but is not limited to:

- A high-level Whois system description;
- Relevant network diagram(s);
- IT and infrastructure resources (e.g., servers, switches, routers and other
  components);
- Description of interconnectivity with other registry systems; and

Frequency of synchronization between servers.
To be eligible for a score of 2, answers must also include:

- Provision for Searchable Whois capabilities; and
- A description of potential forms of abuse of this feature, how these risks will be mitigated, and the basis for these descriptions

A complete answer is expected to be no more than 5 pages.

Except where specified this answer refers to the operations of the Applicant's outsource Registry Service Provider, CentralNic.

Whois is one of the oldest Internet protocols still in use. It allows interested persons to retrieve information relating to Internet resources (domain names and IP addresses). Whois services are operated by the registries of these resources, namely TLD registries and RIRs. Whois is described by RFC 3912, which serves as a description of existing systems rather than requiring specific behaviours from clients and servers. The protocol is a query-response protocol, in which both the query and the response are opaque to the protocol, and their meanings are known only the server and to the human user who submits a query. Whois has a number of limitations, but remains ubiquitous as a means for obtaining information about name and number resources.

26.1. Compliance
The Whois service for the TLD will comply with RFC3912 and Specifications 4 and 10 of the Registry Agreement. The service will be provided to the general public at no cost. If ICANN specify alternative formats and protocols (such as WEIRDS) then CentralNic will implement these as soon as reasonably practicable.
CentralNic will monitor its Whois system to confirm compliance. Monitoring stations will check the behaviour and response of the Whois service to ensure the correctness of Whois records. CentralNic will maintain a public Whois contact to which bug reports and other questions about the Whois service can be directed. The Whois service will additionally comply with all requisite data protection laws (with regards to the collection and retention of personal data), including all relevant European Union privacy directives.

26.2. Domain Name
By default, any query is assumed to be a domain name unless a keyword is prepended to the query. If the domain exists, then registration is returned, including the following fields:
- Domain ROID
- Domain Name
- Domain U-label (if IDN)
- Creation Date
- Last Updated
- Expiration Date
- EPP status codes
- Registrant Contact Information
- Administrative Contact Information
- Technical Contact Information
- Billing Contact Information (if any)
- Sponsoring Registrar ID
- Sponsoring Registrar Contact Information
- DNS servers (if any)
- DNSSEC records (if any)